Kenneth A. Goldberg, Esq. (KG 0295)
**GOLDBERG & FLIEGEL LLP**
60 East 42nd Street, Suite 3421
New York, New York 10165
(212) 983-1077
Attorneys For Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| BEATRIZ VEERMAN AND KHADIJETOU ("KADIA") BA, | : | 1:08-CV-05042-WHP |
| | : | |
| Plaintiffs, | : | **PLAINTIFFS' STATEMENT OF DISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1** |
| - against - | : | |
| | : | |
| DEEP BLUE GROUP LLC, OPIA, FREDERICK LESORT, AND ANTOINE BLECH (a/k/a Antoine Bleck), | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Plaintiffs submit the following statement of disputed facts ("Pl. Stmnt.") in opposition to Defendants' motion for summary judgment ("Def. Br."). Defendants failed to submit a statement of facts, in violation of Local Civil Rule 56.1. Plaintiffs maintain that Defendants' motion should be denied because of Defendants' violation of Local Civil Rule 56.1.

      Citations to the Complaint and Answer are to "Compl." and "Ans." and copies of same are attached as Exhibits 1 and 2 to the Certification of Plaintiff's counsel ("Goldberg Cert.").

      Citations to deposition testimony is as follows: (1) Beatriz Veerman - "BV Dep."; (2) Kadia Ba - "KB Dep."; (3) Frederick Lesort - "FL Dep."; and (4) Antoine Blech - "AB Dep."). Copies of the deposition transcripts and cited deposition exhibits are attached as Exhibits 3 to 7 of the Goldberg Cert.

      Copies of affidavits and other documents cited herein are attached as Exhibits 8 to 13 of the Goldberg Cert.

# POINT ONE

## THE PARTIES

1.	Defendant Opia is a restaurant/lounge in New York City. (Compl. ¶ 5; Pl. Dep. Exh. 4; AB Dep. 9).  Defendant Deep Blue Group LLC operates Opia.  (AB Dep. 9-11; Compl. ¶ 6; Compl. ¶ 4; Pl. Dep. Exh. 5).  Defendants Frederick Lesort ("Mr. Lesort") and Antoine Blech ("Mr. Blech") are Managing Partners in Deep Blue Group and owners of Defendants. (Compl. ¶ 7-9; Ans. ¶ 7-9; FL Dep. 7-8; AB Dep. 9-11; KB Dep. 22-23; BV Dep. 18, 21-22, 137-8).  Mr. Blech is married.  (AB Dep. 7-8).  This Statement refers to various current and former employees of Defendants.  During depositions, certain persons were identified by first or last name only and some names were mis-spelled.  Based on Defendants' records (Pl. Dep. Exh. 1; Pl. Dep. Exh. 16), this document provides complete names where possible.

2.	Plaintiffs Beatriz Veerman ("Ms. Veerman") and Ms. Ba ("Ms. Ba") are former employees of Defendants.  (BV Dep. 15; KB Dep. 13, 23, 32; Pl. Dep. Exhs. 25, 26).  Plaintiffs maintain the allegations of the Complaint are true and accurate.  (KB Dep. 208-9).

3.	During Plaintiffs' employment, Defendants Blech and Lesort directly participated in management of the business  (BV Dep. 318-319).  Blech and Lesort spent many hours a week at Opia and were and are the highest level authority figures at Opia.  (AB Dep. 14-17, 105; KB Dep. 39-40, 202-3; BV Dep. 22, 33, 46, 137-8).

4.	During Plaintiffs' employment, Maria Jimena Pereyra ("Ms. Pereyra") was General Manager, reporting directly to Defendants Lesort and Blech.  Ms. Pereyra supervised other managers. (AB Dep. 18-9, 25-6, 105-6, 161-2).  These included, among others, Mihai Luciano Tasu ("Mr. Tasu"), Sean Zier ("Mr. Zier"), Kirill Kisselev ("Mr. Kisselev"), and Dan Costanzo ("Mr. Costanzo) (Pl. Dep. Exh. 7 at page 122; AB Dep. 39-42; BV Dep. 319).

5.	During Plaintiffs' employment, Defendants Blech and Lesort had and have authority to hire and fire employees.  According to Defendants, Ms. Pererya had authority to fire with approval of Defendants Lesort or Blech.  (AB Dep. 21-23; FL Dep. 39-40, 43).

**POINT TWO**

**BEATRIZ VEERMAN**

**A.  Employment**

6.  Ms. Veerman is a Black, born in Brazil.  (Compl. ¶ 17; BV Dep. 6, 72-73).

7.  Ms. Veerman was employed by Defendants as a waitress/server from March 2005 through approximately May 14, 2007, when she was discharged.  (Compl. ¶ 2, 16; BV Dep. 15, 17, 22-25, 115, 150; AB Dep. 44; Pl. Dep. Exh. 25).  On May 14, 2007, Defendants fired Ms. Veerman (BV Dep. 22-25, 115, 150, 232, 339; Pl. Dep. Exh. 25).

8.  At all times, Ms. Veerman was fully qualified for her position.  According to Defendant Blech, he was fully satisfied with job performance of Plaintiffs, Plaintiffs are honest, and he would rehire them.  Compl. ¶ 17; AB Dep. 50, 96, 179-80.  Mr. Lesort admitted that Ms. Veerman was a good waitress.  (FL Dep. 80).

**B.  Sexual Harassment**

9.  During Ms. Veerman's employment, she was repeatedly sexually harassed by Mr. Lesort.  The conduct included, among other items, unlawful touching, unlawful sexual advances, unlawful statements, and harassing and discriminatory statements.  The sexual harassment began in late 2005 to early 2006 and continued throughout 2007.  (BV Dep. 34-37, 39, 76-77, 334-5; Pl. Dep. Exh. 25; Compl. ¶ 18-20).  Plaintiffs' claims are also supported by affidavits of former employees, including Julie Smith, Danielle Duboise and Adesua Okkosun.  (Goldberg Cert., Exhs. 8, 9, 10).  Examples of the sexual harassment are set forth below.

10.  According to Ms. Veerman, Defendants Lesort and Blech "would hit on girls."  (BV Dep. 323).  Mr. Lesort testified that he dated waitresses.  (FL Dep. 13-15, 33-35).

11.  During Ms. Veerman's employment, Mr. Lesort sexually harassed Ms. Veerman with sexual statements and touching on at least 100 occasions.  (BV Dep. 140-141).

12.  During Ms. Veerman's employment, Mr. Lesort asked Ms. Veerman out for dates 100-150 times.  This began in or about late 2005 to early 2006.  (BV Dep. 34-37, 39, 164, 167;

see also BV Dep. 142, 148). He repeatedly asked Ms. Veerman out both in person at the restaurant, on the telephone and through text messaging. He repeatedly asked Ms. Veerman to have a relationship with him. Mr. Lesort would say "let's go for drinks, let's go out, what are you doing after work, Can I come pick you up, Let's go for drinks at my other restaurant." Ms. Veerman repeatedly declined but Mr. Lesort continued to ask her out even when he knew that she had no interest in him. (BV Dep. 34-41, 147, 164, 167, 177-8, 334-5).

   13. Mr. Lesort admits that he was attracted to Ms. Veerman (FL Dep. 16-7) and admits that he asked Ms. Veerman out on multiple occasions. (FL Dep. 18-20, 21-22, 28).

   14. Mr. Lesort repeatedly approached Ms. Veerman at the Opia restaurant and put his hand on her shoulders. This began at least as early as 2006. When he touched her shoulders, he would caress them and squeeze her skin. He did this about 10-15 times and singled her out. (BV Dep. 148-9, 152-4). Mr. Lesort's conduct was unwelcome and Ms. Veerman made that clear to him, but he continued to engage in such conduct. (BV Dep. 154-155).

   15. Mr. Lesort sexually harassed Ms. Veerman as she worked her shifts. He would ask Ms. Veerman to wait on his table. When Ms. Veerman came to his table to take the order, he would ask Ms. Veerman "Are you married? I just want to make sure you are not." and on other occasions he would ask "Do you work out? I can tell by your legs. I've been looking at them." Ms. Veerman told Mr. Lesort he made her uncomfortable. (BV Dep. 34, 76-77, 141-3, 144-6, 171-6). Mr. Lesort also told Ms. Veerman "you look good" (BV Dep. 176-177). Mr. Lesort told Ms. Veerman he was watching her legs when she walked. (BV Dep. 34, 142-3). Ms. Veerman testified that Mr. Lesort made these types of sexual statements at least 20 times. (BV Dep. 34, 141-142).

   16. In or about late 2006, Mr. Lesort invited Ms. Veerman and a guest to join a group of persons at his restaurant Frederick's Lounge to watch the Oscars and have dinner. Ms. Veerman planned to bring a friend to the event but the friend canceled at the last minute. When Ms. Veerman arrived at Frederick's Lounge she was told the dinner was being held in Mr.

Lesort's apartment.  She felt it would be an opportunity to reiterate that she had no interest in him.  Notwithstanding Mr. Lesort's invitation, he had only one other guest, his cousin.  (BV Dep. 38, 47-53, 60, 316; see also BV Dep. 315-7) .  Mr. Lesort admits that Ms. Veerman had dinner in his apartment.  (FL Dep. 20-21, 23-27, 88-89).

   17. That evening, Mr. Lesort told Ms. Veerman "You are so beautiful.  Are all Brazilians like you?  Are you wearing a push-up bra?  Your breasts look very voluptuous.  (BV Dep. 317).  Mr. Lesort also told Ms. Veerman that "he would not usually cook for any woman and he is doing it just for me." (BV Dep. 51-52).  Mr. Lesort told Ms. Veerman he wanted her to have a relationship with him.  He said he had other relationships with waitresses.   Ms. Veerman flatly rejected Mr. Lesort's advances and told him she was not interested in having any relationship with him.  (BV Dep. 53-54, 179-80).  Mr. Lesort walked Ms. Veerman to a cab.  He tried to kiss Ms. Veerman on the mouth and he fondled her breast. She pushed him away.  (BV Dep. 53-58, 152, 170-1, 317).

   18. Defendants allowed their male friends/customers to sexually harass Plaintiffs both verbally and through physical touching, and even demanded that Plaintiffs give their phone numbers to those male friends/customers.  (Compl. ¶ 42; BV Dep. 252-258; KB Dep. 196-7).

   19. In or about May 2006, Defendants held a staff meeting.  They told the cocktail servers to flirt with customers and sit down and drink with them.  (KB Dep. 66; BV Dep. 323-4).

### C. Ms. Veerman's Repeated Complaints

   20.  Ms. Veerman felt she was working in a hostile work environment. (BV Dep. 242, 335-8).  Mr. Lesort's conduct was unwelcome and offensive and Ms. Veerman opposed, objected to and complained about same.  Ms. Veerman rejected Mr. Lesort's advances, complained to Mr. Lesort about his conduct, and made it clear to him that his conduct was unwelcome and offensive.  For example, she told Mr. Lesort "Don't touch me that way", she told Mr. Lesort she had a boyfriend, and she told Mr. Lesort that she was not interested in him.  (Compl. ¶ 23; BV Dep. 34-37, 39, 54-58, 68, 76-77, 154-155).

21. Ms. Veerman also complained to managers Thadee Zachariasen, Mihai Luciano Taso and Nicholas Vinsonneau, about Mr. Lesort's conduct. (Compl. ¶ 23, 24; BV Dep. 41, 59, 61, 156-7, 319-21). She complained to Mr. Zachariasen ("Thadee") about Mr. Lesort's text messages (BV Dep. 41). Ms. Veerman complained to Jimena Pereyra about Mr. Lesort's conduct and that Mr. Lesort kept asking her out (BV Dep. 59, 156-7). Ms. Veerman complained to Mr. Tasu ("Luciano") about various incidents of sexual harassment. (BV Dep. 61).

22. Defendants did not take any remedial action. Mr. Tasu ("Luciano") replied that Mr. Lesort was the owner of the restaurant. (BV Dep. 61-2). Ms. Veerman also complained to Ms. Pereyra about Mr. Blech's conduct towards Ms. Ba. Ms. Pereyra said that Ms. Ba has a job because Mr. Blech has a crush on her. (BV Dep. 201).

23. Ms. Veerman also complained to various co-workers about Mr. Lesort's conduct. Various co-workers witnessed such conduct. (BV Dep. 59-63, 75, 143-4, 156, 165-7).

D. **Termination Of Employment**

24. In or about April 2007, Mr. Lesort asked Ms. Veerman for a date. Mr. Lesort told Ms. Veerman he was going downtown to open a restaurant and asked her to go with him. Ms. Veerman told Mr. Lesort "Frederick, this has been going on for the last year and a half. You've been asking me out for the year, year and a half. You know my boyfriend. He has come in here a few times. Why do you continue to ask me out.....I would appreciate it if you never ask me out again. That's not comfortable for me." (BV Dep. 338-9; Compl. ¶ 22-3).

25. On Sunday, May 13, 2007, Sean Zier (manager) called Ms. Veerman at home at about 4:45 p.m. and said she was scheduled for a shift at 4:30 p.m. that same day. Ms. Veerman told Mr. Zier that she was unaware that she was scheduled to work. She said she was not in Manhattan but would come to work as soon as possible. (BV Dep. 261-262, 309-10).

26. Ms. Veerman she did not regularly work on Sundays and no one advised her that she was scheduled to work on Sunday, May 13, 2007. For this reason, Ms. Veerman was unaware that she had been scheduled to work on May 13, 2007. (BV Dep. 309).

27. After Ms. Veerman spoke with Mr. Zier, she hurried to Opia and arrived for work about one hour late. Mr. Zier then refused to allow her to work (BV Dep. 261-263, 265, 309-10). Ms. Veerman told Mr. Zier she was scheduled to work the morning of May 14, 2007 to cover for another employee. Mr. Zier told Ms. Veerman that someone would call her. (BV Dep. 310).

28. On the morning of May 14, 2007, Ms. Veerman called Opia. (BV Dep. 311-13). Ms. Veerman then reported to work and worked the morning shift. After Ms. Veerman completed the shift, she advised Kirill Kisselev (manager on duty) that she was taking a break and would return to work her regular shift, which began later that day. At that time, Mr. Kisselev told Ms. Veerman not to return to Opia because she was fired. Mr. Kisselev told Ms. Veerman words to the effect of "Frederick told me to fire you" and "Frederick just doesn't want to deal with you anymore" and "You're fired, Bea." (BV Dep. 22-30, 263-66, 313).

29. Ms. Veerman then called Ms. Pereyra to discuss the matter. Ms. Pereyra refused to discuss the matter with Ms. Veerman. (BV Dep. 17, 26-27).

30. Defendants regularly posted a Monday-Sunday work schedule. Ms. Veerman checked the work schedule. Her name was crossed off the schedule and she was not listed for any further shifts. (BV Dep. 103, 287, 314-5, 318; KB Dep. 207-9, 223-4).

31. On the evening of May 14, 2007, Ms. Veerman received a telephone message from Mr. Blech. Mr. Blech was not on the premises of Opia that day. (BV Dep. 30-32, 151, 313-4). On May 15, 2007, Ms. Veerman called Mr. Blech and asked if he had heard anything from Mr. Lesort or Ms. Pereyra. (BV Dep. 117, 151-2, 314). He said no and that he would call her back. Mr. Blech never called Ms. Veerman back. (BV Dep. 117; see also BV Dep. 258-61, 314). Ms. Veerman called Ms. Pereyra at least twice after she was fired. Ms. Pereyra never returned Ms. Veerman's calls. (BV Dep. 117-118, 151). After Defendants fired Ms. Veerman, Defendants did not call Ms. Veerman to return to work, did not put her back on the schedule, and never advised her that she was back on the schedule. (BV Dep. 151, 266). Defendants failed to

produce a work schedule from the week of May 21, 2007 (Pl. Dep. Exh. 14; Pl. Dep. Exh. 15; see also Def. Dep. Exhs. B and C ( Zack Declaration, Exh. E)). Defendants had a policy of issuing any suspensions in writing and Defendants never suspended Ms. Veerman. (BV Dep. 317-8).

32. Ms. Veerman maintains that Defendants unlawfully discharged her employment in retaliation for her protected activities and because of her race, color and national origin. (Pl. Dep. Exh. 25; Compl. ¶ 25).

33. John Liegey, a customer, was aware of incidents of sexual harassment by Messrs. Blech and Lesort. He told Ms. Veerman and Ms. Ba that they should sue Opia. (BV Dep. 324-6). The alleged affidavit of Mr. Liegey contains false statements (BV Dep. 266-278).

## POINT THREE
## KADIA BA

**A.    Employment**

34. Ms. Ba is a Black, born in Africa. (Compl. ¶ 27; AB Dep. 50, 96, 179-80, 48; BV Dep. 72; KB Dep. 7, 164-5, 190-91).

35. Ms. Ba was employed by Defendants as a waitress/server from November 2005 through approximately March 17, 2007, when she was unlawfully discharged. (Compl. ¶ 3, 26; AB Dep. 44, 47; Pl. Dep. Exh. 26; KB Dep. 12-13, 23-25, 32-33).

36. At all times, Ms. Ba was fully qualified for her position. Mr. Blech so admits. (Compl. ¶ 27; AB Dep. 50, 96, 179-80). Mr. Lesort admits that Mr. Blech felt Ms. Ba was a good waitress. (FL Dep. 76-8). Mr. Lesort admits that Ms. Ba was not terminated for performance reasons. (FL Dep. 73-8).

**B.    Sexual Harassment**

37. During Ms. Ba's employment, she was repeatedly sexually harassed by Mr. Blech. The conduct included, among other items, unlawful touching, unlawful sexual advances, unlawful statements, and harassing and discriminatory statements. (Compl. ¶ 28-35; Pl. Dep. Exh. 26; KB Dep. 62, 90, 105-6, 113, 118, 171, 172, 174, 178). Plaintiffs' claims are also

supported by affidavits of former employees, including Julie Smith, Danielle Duboise and Adesua Okkosun. (Goldberg Cert., Exhs. 8, 9, 10).

38. Mr. Blech began making sexual advances to Ms. Ba when she was hired in 2005. (KB Dep. 105-06). Mr. Blech sexually harassed Ms. Ba virtually every shift that he saw her. (KB Dep. 62, 90). Mr. Blech found Plaintiffs attractive. (AB Dep. 72-3).

39. When Ms. Ba first began working, Mr. Blech started caressing her hand with his two hands. Ms. Ba pulled her hand away and walked away. (KB Dep. 106-07).

40. As Ms. Ba testified, throughout Ms. Ba's employment, Mr. Blech repeatedly touched Ms. Ba in a sexual manner virtually everywhere. Mr. Blech touched Ms. Ba's breasts, buttocks, waist, legs, kissing her neck and talking sexy in her ear. (KB Dep. 113, 172-9, 213-4; Compl. ¶ 29). Mr. Blech touched Ms. Ba's breasts about 700 times at Opia. (KB Dep. 174-5).

41. During Ms. Ba's employment, Mr. Blech regularly grabbed Ms. Ba when she walked by him. (KB Dep. 113, 118). Mr. Bleck whispered in Ms. Ba's ear in French that "you are looking very sexy today." (KB Dep. 113). Mr. Blech repeatedly touched Ms. Ba's buttocks and made comments about her buttocks. (KB Dep. 212-3; 178). When Ms. Ba came to Mr. Blech's table to take his order, he would caress her legs. (KB Dep. 178-179).

42. Mr. Blech repeatedly called Ms. Ba at home and made sexual advances to her. (KB Dep. 125-6, 213-4). He repeatedly asked her out. (KB Dep. 218). He told her that "his fantasy was for me to dance like a stripper for him." (KB Dep. 216). Mr. Blech repeatedly referred to Ms. Ba as "la gazelle," "la tigresse," "ma puce" and "ma cherie." (Compl. ¶ 32; KB Dep. 212-3; Pl. Dep. Exh. 25; Pl. Dep. Exh. 26). Mr. Blech would also wait outside Opia after Ms. Ba's shifts were over to make advances to her. (KB Dep. 213). On an occasion when Ms. Ba accepted a ride home, he sexually harassed her in the car. (KB Dep. 218-20, 228-9).

43. At a New Years' Eve Party, Mr. Blech leaned on Ms. Ba. She pushed him away. She was removed from the work schedule for a period of time. (KB Dep. 62, 171, 217; see also AB Dep. 78-9.). At some point Ms. Pereyra told Ms. Ba that Mr. Lesort wanted her off the

schedule. (KB Dep. 89). Mr. Blech held a party for his wife at Opia. (AB Dep. 86-7). Ms. Ba walked by Mr. Blech to go to the bathroom and he grabbed her buttocks. (KB Dep. 113-14, 215). Julio Tapia (Manager) touched Ms. Ba in a sexual manner. (KB Dep. 117-118, 148-9).

44. Mr. Blech told Ms. Ba to give her phone number to a male customer. She gave a fake number. Mr. Blech later gave her real number to the customer. (KB Dep. 124-126,196-7).

45. Ms. Veerman witnessed Mr. Blech sexually harass Ms. Ba at the Opia restaurant. (BV Dep. 80, 193-8, 201-202). Ms. Veerman witnessed Mr. Blech approach Ms. Ba, touch her shoulders, touch her buttocks, touch her hair. This occurred virtually every shift that Ms. Veerman worked with Ms. Ba. (BV Dep. 193, 195-6, 197). Ms. Veerman witnessed about 30 incidents. This includes about 20 times touching Ms. Ba's buttocks and touching Ms. Ba's hair about 5 times. (BV Dep. 195-6). Ms. Veerman witnessed Mr. Blech constantly grabbing Ms. Ba. (BV Dep. 160). Ms. Veerman witnessed Mr. Blech put his hands on Ms. Ba. (BV Dep. 163). Ms. Veerman witnessed Mr. Blech stare at Ms. Ba's buttocks. (BV Dep. 202). She heard Mr. Blech make comments about Ms. Ba's buttocks. (BV Dep. 163). Ms. Veerman witnessed Mr. Blech waiting outside Opia to pursue Ms. Ba after her shifts ended. (BV Dep. 162, 185-6).

C.     **Ms. Ba's Complaints**

46. Mr. Blech's conduct was unwelcome and offensive and Ms. Ba opposed, objected to and complained about same. Ms. Ba complained to Mr. Blech about his conduct and rejected his sexual advances. Ms. Ba never had any voluntary sexual interaction with Mr. Blech and never performed any sexual act on him. (Compl. ¶ 36; KB Dep. 103-04, 114-15, 135, 172-3, 215-6). As part of Ms. Ba's efforts to deter Mr. Blech's conduct, she told him she had a boyfriend. (AB Dep. 75; KB Dep. 103, 215-6).

47. Ms. Ba complained to managers Mr. Zachariasen, Mr. Tasu and Ludovick Bricks ("Ludo") (KB Dep. 14-15, 104-05; Pl. Dep. Exh. 1; Pl. Dep. Exh. 16). Ms. Ba repeatedly complained to Mr. Tasu about Mr. Blech's sexual harassment and Mr. Lesort's racism. (KB Dep. 14-15, 17)

48. Mr. Blech sexually harassed Ms. Ba in the presence of Mr. Lesort and various managers including Mr. Tasu, Mr. Zachariasen, and also engaged in such conduct in front of Ms. Ba's co-workers. None of the managers took any remedial action. (KB Dep. 119).

49. Ms. Pereyra witnessed Mr. Blech sexually harassing Ms. Ba. Ms. Veerman complained to Ms. Pereyra about Mr. Blech's conduct. Ms. Pereyra did not take any remedial action. She said Ms. Ba has a job because Mr. Blech liked her. (KB Dep. 176; BV Dep. 80, 85, 201-04; Compl. ¶ 38).

50. Ms. Ba complained to Ms. Veerman that Mr. Blech was making comments about her buttocks in french and how it went up and down when she walked. (KB Dep. 158, 179-80; BV Dep. 163, 187-190). Ms. Ba told Ms. Veerman that Mr. Blech touched her "in a way I don't like." (BV Dep. 83) . Ms. Ba told Ms. Veerman she had no relationship with Mr. Blech and that he was "not her type." (BV Dep. 161). Ms. Ba told Ms. Veerman that she finally accepted a ride home from Mr. Blech and during the ride he made inappropriate comments to her. (BV Dep. 186). She told Ms. Veerman that after that episode, she was leaving through the back door of Opia to avoid Mr. Blech. (BV Dep. 183-186). Ms. Ba complained to Ms. Veerman about Mr. Blech's sexual harassment, including the fact that he waited for her after her shift ended. (BV Dep. 82-84; see also BV Dep. 161-3, 199). Ms. Veerman witnessed Ms. Ba leave Opia through a back door to avoid Mr. Blech after her shifts. (BV Dep. 82-84).

51. Ms. Ba complained to other employees about Mr. Blech. (KB Dep. 179-80; Compl. ¶ 37).

**D.    Termination Of Employment**

52. During Plaintiffs' employment, Defendants told waitresses/servers that they were required to personally pay for unpaid customer bills. (AB Dep. 28-30; FL Dep. 59-60).

53. Ms. Pereyra stated in writing that waitresses/servers must pay for an unpaid customer bill, stating: "all our employees are aware that if a client leave the premises and doesn't sign the credit card slip its their responsibility if they claim charges." (Pl. Dep. Exh. 18).

54. On January 13, 2007, Ms. Ba told Ms. Pereyra that a party of customers that Ms. Ba had served had left Opia without paying their bill. Ms. Pereyra told Ms. Ba "don't worry about it." Ms. Ba did nothing wrong. She gave the party their bill. The party gave Ms. Ba a credit card to pay the bill and Ms. Ba gave them a credit card slip to sign. The customers did not dispute the bill, but simply exited Opia without signing the credit card slip. The bill was approximately $569. (Compl. ¶ 40; KB Dep. 57; Goldberg Cert., Exh. 13).

55. On or about March 17, 2007, Ms. Pereyra confronted Ms. Ba and demanded that Ms. Ba personally pay that entire bill of $569. (KB Dep. 23-25; see also KB Dep. 53-64). Ms. Pereyra told Ms. Ba that she had to pay the full amount or "you don't have to come back" i.e., that Ms. Ba was fired. (KB Dep. 25; see also KB Dep. 225-6; Compl. ¶ 39). Ms. Ba opposed, objected to and complained about Defendants' wrongful demand that she personally pay a customer bill. Ms. Ba refused to personally pay the customers' bill of $569. (KB Dep. 210, 225-6; see also KB Dep. 53-64). Ms. Pereyra told Ms. Ba not to come back to work if she did not pay the customers' bill. (KB Dep. 211). Defendants, by their unlawful conduct, unlawfully discharged Ms. Ba's employment. No one from Opia ever offered Ms. Ba another shift to work. (KB Dep. 23, 210-12; Compl. ¶ 41).

56. Defendants did not require white waitresses/servers to pay the full amount on unpaid customer bills. Defendants required Jelena Baranov (referred to in the deposition transcript as "Helena") and Meredith McLaughlin to pay only 50% of unpaid customer bills on their tables. (KB Dep. 58, 66-69; Pl. Dep. Exh. 1 at Bates Number OPIA 00036).

57. In or about April 2007, Ms. Ba went to a restaurant where Mr. Blech was dining with his friends so that she could discuss getting her job back. Mr. Blech did not offer Ms. Ba her job back. (KB Dep. 64-65, 127-8, 203-6; AB Dep. 59-60, 72). Mr. Blech had the power to rehire Ms. Ba. He did not rehire Ms. Ba. (AB Dep. 97-101).

## POINT FOUR

## OTHER INCIDENTS

58. During Ms. Veerman's employment, Ms. Pereyra struck Ms. Veerman on the head. (Compl. ¶ 44; Pl. Dep. Exh. 25; Pl. Dep. Exh. 26). During Ms. Ba's employment, Daniel Costanzo, the bar manager, threw a glass at her and threatened to "fuck her" up. (KB Dep. 91-101, 206; Compl. ¶ 44). Ms. Ba complained to Mr. Blech. (KB Dep. 92-94). Defendants did not terminate Mr. Costanzo for this incident. According to Defendants, Mr. Costanzo was let go several months later for a variety of reasons. (FL Dep. 87-88; KB Dep. 94-97, 170).

59. Mr. Lesort dated employee Dana Perry. (FL Dep. 13; BV Dep. 320). In 2006, Ms. Veerman saw Mr. Lesort kiss Ms. Perry, touch her legs, touch her neck, touch her hair. This made Ms. Veerman feel uncomfortable. (BV Dep. 178-81, 238-240). Ms. Perry said she had sex with Mr. Lesort. (BV Dep. 178, 326-7; see also BV Dep. 181).

60. In 2006, Ms. Veerman witnessed Mr. Lesort approach waitress Natalia Belgrade and touch her in a sexual manner. (KB Dep. 207; BV Dep. 233-235; Pl. Dep. Exh. 1 at Bates Number OPIA 00028).

61. Ms. Veerman witnessed Mr. Blech sexually harass a bartender named Isabella in November and December of 2006 and witnessed several incidents. Mr. Blech went behind the bar and hugged Isabella from behind, kissed her neck, touched her hands. Isabella pushed him away but he came back and did it again. (BV 242-247, 322; see also KB Dep. 192).

62. Ms. Ba witnessed Julio Tapia touching Meaghan Fitzgerald (referred to as "Meagan"), and saw her cry. (KB Dep. 120; Pl. Dep. Exh. 1 at Bates Number OPIA 00026).

# POINT FIVE

## DENIAL OF EQUAL SHIFTS TO PLAINTIFFS

**A.    Introduction**

63.    Plaintiffs maintain that Defendants also discriminated against them based on their race, color and national origin by, among other items, denying Plaintiffs desirable work schedules, and giving better schedules to waitresses outside Plaintiffs' protected classes. Plaintiffs maintain that Defendants even told Plaintiffs that they were "too dark". Plaintiffs complained to Defendants about these matters. (Compl. ¶ 43). In Plaintiffs' document requests, Plaintiffs requested that Defendants produce all work schedules covering Plaintiffs' employment. (Goldberg Cert., Exh. 11 at Document Request and Response Nos. 1-4). Defendants failed to produce any schedules for 2005.   Defendants produced incomplete schedules for 2006. (Pl. Dep. Exh. 14; see Defendants' Brief at page 6).

64.    According to Ms. Veerman, the most desirable shifts for a cocktail server, and opportunity to earn good tips, were Wednesdays and Thursdays, during the time frame 5:00-9:00 p.m. (BV Dep. 228). The evening shifts were better than the morning shifts. (BV Dep. 112). Management prepared work schedules and Defendants Lesort and Blech were aware of the work schedules and had ultimate authority over them. (BV Dep. 91-92, 112-3). Mr. Lesort was aware of employee work schedules. (FL Dep. 38). He testified that Wednesday, Thursday and Friday were more desirable for waitresses. (FL Dep. 9-11).

**B.    Ms. Veerman**

65.    When Ms. Veerman was hired, she advised Opia she could work four days a week. (BV Dep. 89). She worked as many shifts as possible. (BV Dep. 117).

66.    During the period of 2005 to about mid 2006, Defendants denied Ms. Veerman an equal share of good work shifts. (BV Dep. 225-6, 232, 288, 307-08). Defendants gave better shifts to white cocktail servers, including among others Dana Perry, Meloee Buchud (referred to as "Meloise"), Meredith McLaughlin, Molly Recher, Natalia Pereira, Heveli Heinasile and/or

Jelena Baranov. (BV Dep. 94, 288, 300-01, 329-30; Pl. Dep. Exh. 1 at Bates Number OPIA 00030, 00036). Defendants gave newly hired white cocktail servers better shifts than Plaintiffs. (BV Dep. 103, 290-1, 320). The incomplete 2006 schedules produced by Defendants support Plaintiffs' claims that they were denied an equal share of good shifts in the first part of 2006. At least one of the schedules produced by Defendants (Monday January 6 to Sunday January 12) does not match the calendars for 2005-2007. (Pl. Dep. Exh. 14 and Bates Number OPIA00492).

67. In or about 2005, Ms. Veerman complained about the denial of equal shifts and complained to Ms. Pereyra that servers hired after her were being assigned better shifts. Ms. Pereyra said the decision was made by the owners, i.e., Messrs. Lesort and Blech and management. (BV Dep. 289-291, 330).

68. Ms. Veerman wanted to work better shifts. A waitress, Dana Perry, asked Ms. Veerman to work Ms. Perry's Thursday shift. Ms. Veerman agreed but then Mr. Zachariasen (manager) refused to allow Ms. Veerman to work that shift. (BV Dep. 95, 97). Ms. Veerman and Ms. Ba complained to Mr. Zachariasen and asked him why they were denied such shifts. He told Plaintiffs they are "too dark" to work those shifts. (BV Dep. 98-9, 207-08, 216-7, 286-89, 330-1; KB Dep. 197-8). He said Mr. Lesort said they are "too dark." (BV Dep. 207, 286). On only two occasions, Ms. Pereyra granted requests by Ms. Veerman to change her schedule (BV Dep. 104).

69. Ms. Veerman complained to Mr. Blech that she was denied Wednesday and Thursday night shifts, which were the best shifts. (BV Dep. 93, 228-9). Ms. Veerman complained to Mr. Lesort about Mr. Zachariasen's comment. Mr. Lesort told Ms. Veerman that Mr. Zachariasen did not have the same taste in women that he had. (BV Dep. 93-6, 169-170, 230).

70. According to Ms. Veerman, about one and one half years after she was hired, she received better shifts. (BV Dep. 103, 205). Ms. Veerman maintains that Mr. Lesort improved her work schedule hoping that she would then go out with him. (BV Dep. 231, 292-3).

**C.      Ms. Ba**

71.     Defendants hired Ms. Ba as a waitress/server.  However, Defendants initially assigned her to the coat room and/or hostess work.  Defendants did not make such assignments to other newly hired waitresses/servers that were not of Ms. Ba's race, color or national origin. (AB Dep. 47-8, 88-90; KB Dep. 51-2, 69-73, 84, 86, 102).  In fact, Ms. Ba trained a newly hired white cocktail server for one week.  Defendants then gave the white cocktail server the shifts that Ms. Ba was supposed to have and assigned Ms. Ba to the coat check room.  (KB Dep. 70, 146; BV Dep. 295, 297).   Ms. Ba complained to Asdin (manager) about being replaced on the schedule by a white woman that Ms. Ba had just trained a week before (KB Dep. 71, 153).

72.     During Ms. Ba's employment, and specifically in 2005 through about the first half of 2006, she was assigned undesirable shifts.  Defendant assigned better shifts to the white waitresses.   (KB Dep. 27, 147, 151-3, 160-161, 224).

73.     Ms. Ba complained to Mr. Blech about her work schedule. (AB Dep. 87-90,  92-3).

74.     At a staff meeting in or about mid 2006, Ms. Ba complained about her work schedule.  (KB Dep. 27; see also KB Dep. 224).

75.     Mr. Lesort learned that Ms. Ba complained about her schedule.  He said "well who is Kadia to even complain?  You should tell her that she should feel lucky that she is actually walking on my floors." (KB Dep. 26-27, 29, 38, 43, 171).  Mr. Lesort told Ms. Ba that if it were up to him, she would not even be near the Opia.  (KB Dep.38).  Mr. Lesort referred to Ms. Ba as "African."  (KB Dep. 64-65, 137, 166, 191).  Mr. Lesort refused to allow her to wait on his table and often ignored her.  (BV Dep. 102; KB Dep. 83, 166).  Ms. Ba believes that one of the reasons she was terminated was her race and color.  (KB Dep. 210).

76.     At some point, Defendants completely removed Ms. Ba from the schedule after she had complained about her shifts.  She complained to Mr. Blech and was put back on the schedule.  (AB Dep. 90-91; KB Dep. 26-33, 38, 62, 89-90, 171).

77. Datsa (a new manager) told Ms. Ba that there are new white girls that were hired and they had the good schedules. (KB Dep. 28). Ms. Ba was hired at or about the same time as Jelena Baranov (referred to as "Helena" in the transcript) (white female cocktail server, Pl. Dep. Exh. 1 at Bates Number OPIA 00036). Defendants gave Ms. Baranov a better schedule than Ms. Ba. (KB Dep. 87). Defendants allowed white cocktail servers to take off for Christmas, New Years' Eve, Thanksgiving and other holidays, and gave them better schedules. (KB Dep. 161).

78. Ms. Ba wanted to pick up her father at the airport and get a schedule accommodation for that. Ms. Pereyra effectively punished Ms. Ba, taking away her Wednesday and Friday shifts and giving her Monday and Saturday shifts. (KB Dep. 24, 152, 161).

79. In or about the Summer of 2006, there was a fluctuation in Ms. Ba's work schedule because the restaurant was understaffed and this was the season of the Soccer World Cup and Opia was busy then. (BV Dep. 110, 217, 219, 292-3; KB Dep. 34-35, 152).

80. Defendants denied Ms. Ba a uniform. (KB Dep. 77).

81. The only other Black waitress during Plaintiffs' employment was Shontai Hollingsworth. She was discriminated against and was and regularly assigned to work the back. She only worked on the front lounge when Opia was short staffed. (BV Dep. 72-73, 98-99, 103, 296, 301-2; KB Dep. 44, 164, 194). Ms. Hollingsworth told Ms. Ba that Mr. Lesort is prejudiced and a racist. (BV Dep. 72-73, 100-101).

### POINT SIX

### MISAPPROPRIATION OF PLAINTIFFS' TIPS

82. Plaintiffs' income at Opia was primarily from tips. This is clear from payroll records. (Pl. Dep. Exhs. 1, 16; KB Dep. 153-4, 159; BV Dep. 109).

83. Defendants had written policies requiring waitresses to complete tip reports. (Pl. Dep. Exh. 3; Pl. Dep. Exh. 7; FL Dep. 63-6; BV Dep. 331-4). Reports were prepared. (Pl. Dep. Exh. 7; Fl Dep. 65; BV Dep. 331-4).

84. Defendants took 5% of Plaintiffs' tips and gave them to managers. (Compl. ¶ 45, ¶ 106; KB Dep. 153-6; BV Dep 124-8, 130-33, 135, 135). This is shown by a tips report. (Pl. Dep. Exh. 3; BV Dep. 331-4).

85. Ms. Veerman complained to management about Defendants taking away 5% of her tip monies. (BV Dep. 135-6). Plaintiffs' claims are supported by affidavits of former employees, including Julie Smith and Danielle Duboise. (Goldberg Cert., Exhs. 8, 9).

## POINT SEVEN

## DEFENDANTS' EXHIBITS TO THEIR MOTION

86. Plaintiffs filed timely charges of discrimination, harassment and retaliation with the United States Equal Employment Opportunity Commission ("EEOC"). The EEOC issued Plaintiffs Notice of Right To Sue letters. (Compl. ¶ 12; Pl. Dep. Exh. 25; Pl. Dep. Exh. 26). Plaintiffs timely filed this lawsuit. (Compl. ¶ 13; Goldberg Cert., Exh. 1).

87. The parties conducted various discovery. During discovery, Plaintiffs requested any and all "investigation" materials. Defendants refused to produce any such documents, alleging that any such documents were being withheld on grounds of "privilege." (Goldberg Cert., Exh. 11 at Document Request and Response Nos. 6, 13 and 21).

88. Notwithstanding the above, Defendants attached to their motion papers about eight pages of alleged "investigation" materials from June 2008 and July 2008 that were never produced during discovery and were apparently withheld during discovery on grounds of alleged "privilege." Defendants' counsel refers to these documents, dated June 16, 2008, Jun 19, 2008 and July 10, 2008, as "reports from our private investigator" and "Alessio letters", and Defendants rely on those documents in their motion (Def. Br. 2, 5 and Zack Declaration Exh. B).

Dated: New York, New York
      December 18, 2009

                                                 GOLDBERG & FLIEGEL LLP
By:   /s/ Kenneth A. Goldberg
        Kenneth A. Goldberg (KG 0295)
        60 East 42nd Street, Suite 3421
        New York, New York 10165
        (212) 983-1077
        Attorneys for Plaintiffs