# EXHIBIT A

,06BYVER1,

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ----------------------------x

3  BEATRIZ VEERMAN and
   KHADIJETOU BA,
4
                Plaintiffs,
5
          v.                        08 Cv. 5042 (LB)
6
   DEEP BLUE GROUP, LLC.,
7  et al.,

8
                Defendants.
9
   ----------------------------x
10
                                    June 11, 2010
11                                  9:30 p.m.

12  Before:

13        HON. LARRY BURNS,

14                                       District Judge

15
                        APPEARANCES
16
    GOLDBERG & FLIEGEL, LLP
17  Attorneys for Plaintiffs
        60 East 42nd Street
18      New York, New York
    KENNETH A. GOLDBERG, ESQ.,
19  JONATHAN MARGOLIS, ESQ.,
        Of counsel
20
21  LEONARD ZACK & ASSOCIATES,
    Attorneys  for Defendants
22      405 Park Avenue
        New York, New York
23  LINDA FRIDEGOTTO, ESQ.,
    MARTIN CRAUS, ESQ.,
24      Of counsel
25

,06BYVER1,

1          THE COURT:  This is the matter of Veerman, et al,
2   versus Deep Blue Group, LLC, et al.

3          May I have appearances of the counsel for the record,
4   please.

5          MR. GOLDBERG:  Kenneth Goldberg representing the
6   plaintiffs.

7          THE COURT:  Good morning.

8          MS. FRIDEGOTTO:  Good morning, your Honor.  Linda
9   Fridegotto alley representing defendants.

10          THE COURT:  Good morning.

11          The jury is not present.  We have not selected a jury
12   yet.

13          The court has read and considered certain pretrial
14   motions filed on behalf of the parties.  I have discussed court
15   procedures with the parties informally and prepared to hear
16   brief argument on the motions in limine and rule on those
17   before we summoned a jury and select a jury.

18          Ms. Goldberg, I am happy to hear from you.

19          MR. GOLDBERG:  Thank you, your Honor.

20          On the plaintiffs' motion in limine, which was to
21   preclude the testimony of defendant witness John Liegey.

22          Mr. Liegey is a customer of Opia or was a customer.
23   He is not an employee or manager of the defendant.  He, as a
24   customer, we say he's not at Opia often enough to be a relevant
25   fact witness.

, 06BYVER1,

1      The defendants, I believe, will say he dated one or

2   more of the plaintiffs.  My clients say that is not true.  Even

3   if that was true, that would be some consensual relationship

4   that really wouldn't be part of the sexual harassment case

5   against Opia and co-owners.

6      Under Rule 412 of the Federal Rules of Evidence and a

7   case in the Second Circuit called Wolak, 217 F.3d 157, we

8   believe that any sexual behavior by my clients outside of work,

9   such as if they went on a date with somebody, would be under

10   that case law irrelevant and inadmissible.

11      I do not see the relevance of defendants calling

12   Mr. Liegey to testify.  He might say I did not see any

13   wrongdoing at the workplace, they did not complain to me,

14   Mr. Liegey is not in the management chain and if he came to

15   Opia on a given day and didn't see something happening, that is

16   not relevant to prove there was unlawful conduct against my

17   clients.

18      We stand on our paper.  I wanted to supplement it with

19   the cite and Wolak case.

20      THE COURT:  Thank you.

21      Ms. Fridegotto.

22      MS. FRIDEGOTTO:  An inherent part of plaintiffs'

23   claims against the defendants is the issue that they were

24   required by management to give their phone numbers to customers

25   and that this was a practice that was basically imposed upon

1  them and that they were inherently forced to do this against

2  their will.

3       We believe that someone like Mr. Liegey, who both

4  plaintiffs in their previous testimony at depositions had

5  indicated was THERE very, very, very frequently and had been

6  there many, many times and to whom they had agreed had possible

7  consensual conduct with, such as frequenting him outside the

8  restaurant or going out and meeting him for drinks with friends

9  on other occasions, that kind of information, in our opinion,

10  is very relevant, because it goes to show that, you know, that

11  there was contact with the customers that was consensual and

12  that it was done regularly.

13       I mean, one of the plaintiffs met her fiancee at Opia.

14  He was a customer, too.  It is inherent in everyday life that

15  we get to meet people, sometimes at work, sometimes not at

16  work, and we think that Mr. Liegey's testimony would basically

17  just indicate that he had interactions with the plaintiffs at

18  their place of employment, that these interactions were not

19  unwelcomed, that they actually became friendly and that he was

20  never in any way, shape or form forced by the managers --

21  sorry -- that there was -- the managers were not in any way, I

22  guess, involved in the creation, I guess, of this consensual

23  relationship or of this friendship.

24       THE COURT:  As I understand it, you want to offer

25  Mr. Liegey to testify to the following:

,06BYVER1,

1          That he dated Ms. Veerman, is that right?

2          MS. FRIDEGOTTO:  No, your Honor.

3          THE COURT:  Okay.

4          MS. FRIDEGOTTO:  That was what he had -- that is what

5     had been proffered in an affidavit that Mr. Liegey had given at

6     the EEOC stage.

7          There was a lot of information with regards to his

8     interactions with Veerman at Opia, his interactions with Ba at

9     Opia.  That is the issue whether or not they would have

10    complained to him about the presence -- I'm sorry, your Honor,

11    these are my clients.

12         Your Honor, I want to introduce to you Antoine Blech

13    and Mr. Frederick Lesort.

14         THE COURT:  Good morning, gentlemen.

15         I have the impression that Mr. Liegey's testimony, I

16    understand he's not available, right, it's going to be offered

17    by?

18         MS. FRIDEGOTTO:  He actually most probably will be

19    available.

20         THE COURT:  All right.

21         MS. FRIDEGOTTO:  There had been some initial doubt at

22    the very beginning, your Honor, because of his schedule because

23    of his travel, previous travel commitments and because we

24    didn't realize what day we actually would be starting the

25    trial.

,06BYVER1,

1        THE COURT: I was led to believe that Mr. Liegey's

2   proffered testimony would be that he had dated Ms. Veerman and

3   according to him, at least, that they had been intimate, that

4   Ms. Ba had wanted to date him and tried to date him, that

5   neither plaintiff complained to them about the defendants and

6   he personally had not witnessed any unlawful conduct and that

7   he had a conversation at some point with Ms. Veerman in which

8   she said she wanted to sue Opia.

9        I thought those were the things that he was --

10       MS. FRIDEGOTTO: Those are some of the statements that

11  were made within the context of that affidavit, but those were

12  picked and chosen by plaintiff in his motion in limine to try

13  and, I guess, inflame the whole issue of -- John Liegey was a

14  customer at Opia and he was a very regular customer and he has

15  known both defendants for a very long time. He has frequented

16  this place since it opened and he had almost very frequent

17  contact also by the plaintiffs' own admission at the

18  restaurant. He had a relationship with one of them, according

19  to the statement that he made.

20       THE COURT: Mr. Goldberg, is this the plaintiffs'

21  intention to offer as part of the evidence of the hostile work

22  environment claim that they were forced to date customers

23  against their will or go out with customers against their will?

24       MR. GOLDBERG: It is their testimony that the owners

25  directed them to give their phone numbers to certain customers.

,06BYVER1,

1 Mr. Liegey is not one of those customers. There were a couple
2 of customers they were told give your number to that person.
3 Mr. Liegey is not included in that category.

4 THE COURT: Your point is that the plaintiffs on their
5 own gave their numbers to some customers? That is part of the
6 gist of what Mr. Liegey was saying?

7 MS. FRIDEGOTTO: Yes, your Honor. The fact that
8 plaintiffs could have chosen and were free to give their
9 numbers to whomever they wished.

10 THE COURT: And defendants deny the allegation that
11 they told plaintiffs they had to give their numbers to certain
12 customers?

13 MS. FRIDEGOTTO: Absolutely.

14 THE COURT: Okay.

15 Anything more?

16 (Pause)

17 The court is prepared to rule on the motion in limine.

18 I have a written order that forms the rulings. I will
19 just read it in the record and provide copies and file it told.

20 MR. GOLDBERG: I did have one comment on the
21 defendant's motion.

22 With respect to the issue of Mr. Blech's marital
23 status, your Honor, in going through the plaintiffs' Rule 56.1
24 summary judgment statement I saw that one of the incidents of
25 sexual harassment occurred when Mr. Blech hosted a birthday

1    party for his wife at Opia and introduced his wife and children

2    in my client.  And so, against, in talking about the incidents

3    of harassment, one of the incidents was at the wife's birthday

4    party.  Add that to the issue of the marital status is just one

5    of the facts in this case.

6         THE COURT:  I understand that Mr. Blech was married at

7    the time of these incidents and is no longer married and

8    separated?

9         MS. FRIDEGOTTO:  He is very much married, your Honor.

10        THE COURT:  Again, I don't know where I got that.

11        Let me make sure I understand what the dispute is

12   here.  That the defendants don't want this marital status to

13   come in?

14        MS. FRIDEGOTTO:  We don't believe it is relevant, your

15   Honor.

16        THE COURT:  Well, okay.  All right.

17        The court rules as follows.

18        In preparation for trial the parties filed motions in

19   limine seeking to admit and exclude certain evidence.

20        Defendants have asked the court to exclude testimony

21   concerning dating and allegedly sexual contact at Opia, the

22   restaurant where the plaintiffs' worked, and the sight of many

23   of the incidents that are at issue in this case.

24        The plaintiffs, in particular, seek to exclude

25   testimony from a long-time customer of Opia, Mr. John Liegey.

1    Plaintiffs have brought their claims under several

2  different theories, but the deputed evidence primarily concern

3  claims that arise from alleged sexual harassment in violation

4  of Title VII, and the briefing shows that the plaintiffs are

5  primarily pursuing a hostile work environment theory.

6    For their part the defendants seek to exclude evidence

7  that includes dating and sexual conduct in a variety of

8  circumstances that involves different staff members.

9    At this point, having read the papers, the specifics

10  of much of the testimony are unclear. I have some of the

11  specifics in mind, but by no means do I have a full

12  understanding of what the specifics would be.

13    Some of the conduct it appears may have been welcomed

14  by staff members while other conduct certainly was not.

15  Plaintiffs say that they witnessed some of the conduct

16  personally, they heard about other conduct. The defendants

17  argue that the evidence is irrelevant or unduly prejudicial.

18    The court assesses a hostile work environment based on

19  the totality of circumstances. Instances of harassment that

20  are not directed at the plaintiff may be relevant to show the

21  overall work environment and if the plaintiff is emotionally

22  traumatized as a result of the workplace being permeated by

23  sexual discrimination then she can recovery. It is the ruling

24  in Leibovitz versus New York Transit Authority, 252 F.3d 179 at

25  185.

1      However, harassment directed at others can contribute

2 to the establishment of a hostile work environment irrespective

3 whether the harassment is directed at the plaintiffs.

4      A title VII claim can't be based solely on incidents

5 that plaintiff has heard about, Leibovitz holds to that effect,

6 but evidence of other incidents can be relevant to show the

7 type of environment that plaintiffs were subjected to.

8      If the plaintiffs can show that they were affected by

9 the defendant's behavior in the restaurant during the relevant

10 period of time, then the evidence of that behavior would be

11 relevant. Evidence is not admissible to show, however, simply

12 that the defendants behaved similarly on other occasions.

13 That would be impermissible under Federal Rule of Evidence

14 404(b), nor is the evidence of behavior that had no effect

15 on the plaintiffs relevant.

16      Defendants have argued that evidence of their sexual

17 contact with staff is only relevant if the plaintiffs can show

18 it was nonconsensual or unwelcomed to other members of the

19 staff.

20      Plaintiffs have proffered some evidence that some of

21 the incidents respecting other staff members were unwelcomed.

22 However, the applicable test is not whether the other staff

23 members consented to or welcomed the defendants' advances, but

24 whether the defendant's behavior or the behavior they

25 encouraged was objectively offensive or created a hostile work

1    environment for the plaintiffs.

2              A persistent and sexually-charged atmosphere even if

3    some of the instance were welcomed can provide support for a

4    the hostile work environment claim.

5              Here part of the plaintiffs' proffered testimony

6    consists of incidents other employees reported to them.    The

7    defendants have objected to this evidence as hearsay and with

8    minimal exception the court agrees with the hearsay objection.

9              Proffered testimony does appear to me to be hearsay

10   not within any recognized exception, and is, thus,

11   inadmissible if offered to prove that the incidents actually

12   occurred.  However, because the plaintiffs have to show they

13   were affected by the environment in which they worked, reports

14   of sexual incidents might be admissible to show the effects

15   that those incidents had on the plaintiffs.  These reports,

16   however, are only relevant if the actual incidents occurred.`

17   Plaintiffs, therefore, have to offer admissible non-hearsay

18   evidence to show that the incidents in question actually

19   happened.  To the extent they are able to do so, then

20   plaintiffs may testify that they were told about the incidents.

21   The testimony cannot be used, however, to provide new

22   information or fill in details.  To this limited extent the

23   plaintiffs' testimony about what other staff members told them

24   is excluded.

25              Defendants have offered Mr. Liegey, a long-time

1    regular customer of the Opia bar and the plaintiffs seek to

2    exclude his testimony.

3         I have confirmed today that perhaps Mr. Liegey will

4    not testify to all the things that it appeared he was proffered

5    to testify in the papers.

6         Again, surprising, what the papers suggested

7    Mr. Liegey was being offered as a witness to testify that he

8    dated Ms. Veerman and that they had an intimate relationship,

9    testified that Ms. Ba had wanted to date him and had tried to

10   date him, that the plaintiffs didn't complain to him about the

11   defendants, that he didn't witness the unlawful conduct and a

12   at some point Ms. Veerman said she wanted to sue the restaurant

13   to get money.

14        Mr. Liegey's affidavit, which I've read, touched on a

15   few other issues, but these are the part of the testimony.

16        The court agrees with the plaintiffs that the evidence

17   proffered respecting Mr. Liegey is for the most part not

18   relevant and, therefore, must be excluded.

19        Plaintiffs' consensual conduct in other contexts is

20   not relevant to show that she was not subject to a hostile work

21   environment.

22        Whether Ms. Veerman welcomed the dating or intimate

23   relationship with Mr. Liegey really had no bearing whether they

24   are willing to date or have sexual contact with any men that

25   the defendants might send their way or whether the defendants'

1    conduct in other respects created a hostile work environment.

2            In this respect, Ms. Fridegotto, I will permit you to

3    inquire of the plaintiffs whether they, generally speaking,

4    dated other men on their own inasmuch as that was part of their

5    claim they were forced to do that, you may certainly inquire

6    were there instances you met people at the bar and on your own

7    without impetus from the defendants went out with them and gave

8    the phone numbers.  I think that is a fair reply to the

9    allegations so I will permit that.

10           In other respects that Mr. Liegey's testimony was

11   offered, he was a long-time customer at the bar.  It is clear

12   to the court based on the affidavit that he was present at the

13   restaurant several days a week.  He saw the plaintiffs

14   frequently, he saw other staff there frequently, was familiar

15   with them.  But I agree with Mr. Goldberg that his not having

16   observed the alleged behavior is not probative of whether it

17   happened.  There is no showing that the defendants were likely

18   to harass the plaintiffs or otherwise misbehaved in front of

19   Mr. Liegey or that plaintiffs would have probably complained to

20   him if they were mistreated.

21           In fact, to the contrary, Mr. Liegey's affidavit says

22   at one time Mr. Veerman mentioned having trouble with the

23   defendants and considered suing them and Mr. Liegey discouraged

24   her from that.  This implies to the court that Ms. Veerman

25   realized that Mr. Liegey may not have welcomed her complaints

,06BYVER1,

1    about the defendants.  So I don't make a lot out of that.

2    Ms. Veerman's remarks, alleged remarks to Mr. Liegey

3    about needing money and her plans to sue the defendants I

4    regard as unremarkable.  While the affidavit couched in terms

5    as sort of hints at mendacity and extortion, there is nothing

6    in what Ms. Veerman reportedly said that unambiguously supports

7    these inferences.  Almost everybody wants or needs money and

8    the fact that Ms. Veerman did at some point doesn't strike me

9    as relevant.  So I do exclude that testimony.

10   Likewise, there is no need for testimony to establish

11   that Ms. Veerman planned to sue people that she thought injured

12   her and looking for monetary damages because a lawsuit itself

13   makes that utterly plain at this point.

14   Ms. Veerman's statement Mr. Liegey repeats that the

15   lawsuit would cause the defendants bad publicity I find to be

16   likewise irrelevant.

17   Accordingly, the court finds under 402 that all of

18   that proffered testimony of Mr. Liegey is not relevant and will

19   be excluded.

20   In sum, the defendants' motion in limine is granted in

21   part.  Plaintiffs may only offer evidence of what other staff

22   told them if they offer evidence sufficient to support a

23   finding that the incidents that they were told about actually

24   occurred.  The court will give appropriate limiting

25   instructions if such evidence is offered.  The testimony of the

,06BYVER1,

1    incidents must be established through other evidence, not by

2    what plaintiffs were told.  In all other respects, defendants'

3    motion in limine is denied.

4         Plaintiffs' motion in limine to exclude the testimony

5    of Mr. Liegey is granted.

6         Okay.

7         As I said, I intend to file this as a written order

8    and I enter the order without prejudice.  Obviously, if

9    something different or unexpected comes out during the course

10   of the trial, either counsel can ask me to reconsider aspects

11   of the motion in limine, but you should be guided by that in

12   asking your questions in the first instance.

13        Any questions?

14        MS. FRIDEGOTTO:  Not at this time, your Honor.

15        THE COURT:  All right.

16        Are we ready?

17        I can bring the jury.  We will briefly recess while

18   Mr. Lopez brings in our prospective jurors.

19        (Recess)

20        (Jury panel of prospective jurors was seated)

21        THE CLERK:   In the matter of Beatriz Veerman against

22   Deep Blue Group, LLC, Opia, Frederick Lesort and Antoine Blech

23   for trial by jury.

24        Are the plaintiffs ready to proceed?

25        MR. GOLDBERG:  Yes.

,06BYVER1,

1          THE CLERK:  Are the defendants ready to proceed?

2          MS. FRIDEGOTTO:  Yes.

3          THE CLERK:  The Honorable Larry Burns presiding.

4          THE COURT:  Ladies and gentlemen, good morning.

5          Welcome to the United States District Court for the

6   Southern District of New York.

7          We have summoned you here today in connection with a

8   civil case.  I'm going to tell you a little bit about the case,

9   also tell you a little bit about our logistics here.

10          It is expected that this case is going to last about

11   four or five days.  The parties have agreed to present their

12   cases respectively within ten hours per side.  That is ten

13   hours of testimony and argument and opening statements and all

14   so that is everything.

15          We will take reasonable breaks, of course, that's why

16   I can't be entirely precise and give you exactly the time that

17   the case will be submitted to those of you who are selected to

18   hear it, but I think, my best estimate, is about four or five

19   days on this.  It will obviously go over until next week.

20          Here is what this case is about:

21          The plaintiffs in the case are Beatriz Veerman and

22   Khadijetou Ba, these two young ladies to my left at counsel

23   table.  They were servers at a restaurant called Opia, O-P-I-A.

24   That is in midtown, Manhattan, I'm told.

25          Opia is owned in part and managed by Mr. Frederick

, 06BYVER1,

```
1    Lesort and Mr. Antoine Blech -- these are the two gentleman to
2    my right at the other counsel table -- through a company that
3    is called Deep Blue Group.
4         Ms. Veerman and Ms. Ba have brought these claims
5    against Opia, the restaurant, Deep Blue Group, the ownership
6    group, and Mr. Lesort and Mr. Blech relating to their former
7    employment at that restaurant, at Opia.
8         First, Ms. Veerman and Ms. Ba alleged they were
9    sexually harassed while they were employed at the restaurant
10   and that they were required to work in a sexually hostile work
11   environment.  They allege that Mr. Lesort, Mr. Blech
12   participated in the harassment through verbal and fiscal sexual
13   harassment.
14        The defendants for their part deny these allegations.
15        Second, Ms. Veerman and Ms. Ba allege that Opia and
16   the Deep Blue Group, that is the ownership group, and
17   Mr. Lesort and Mr. Blech discriminated against them on the base
18   of race, color and national origin by giving them less
19   desirable work shifts.  They also allege they were also
20   harassed and discriminated against and discharged from
21   employment based on their race and their color and national
22   origin.
23        Again, the defendants deny these allegations.
24        Third, Ms. Veerman and Ms. Ba allege that Opia and the
25   Deep Blue Group and Mr. Lesort, Mr. Blech unlawfully retaliated
```

,06BYVER1,

1   against them and terminated their employment after they

2   complained about the discrimination that they were

3   experiencing, and that Ba also claims that she was retaliated

4   against and discharged from employment after she opposed their

5   demand to pay an unpaid customer bill in violation of New York

6   State labor law.

7           Again, with respect to the allegations I just read

8   you, the defendants deny each and every one of those

9   allegations.

10          Finally, Ms. Veerman and Ms. Ba Opia, Deep Blue Group,

11  Mr. Lesort and Mr. Blech took away five percent of their tips

12  during the time that they were working at the restaurant.  This

13  is also alleged to be a violation of New York State labor law.

14          And, again, with respect to these final allegations,

15  the defendants deny them.

16          We have summoned you here and we are having a trial

17  because obviously the parties disagree on what the evidence is

18  going to show and the statement I just read you sort of sums up

19  the disagreement.

20          We want to pick eight of you who have no

21  preconceptions at this point about what the outcome here should

22  be to hear the case and decide it, let the chips fall where

23  they will, let the evidence take you where it will.  Toward

24  that end we are going to ask you some questions, get to know a

25  little bit about you.

,06BYVER1,

1      There are no right answers to these questions, there
2  are only honest ones.
3          I met with counsel beforehand and anticipated that
4  maybe some prospective jurors will say, no, I had an incident
5  that is just too close to that is being alleged, I don't think
6  I can fairly judge a case like that.
7          If you are in that category, then freely admit it.  We
8  have lots of cases going out and I would send you back to the
9  jury administrator and have you sent on another case.
10          As a matter of fact, I recognize two of our
11  prospective juror today who have been here before on other
12  cases so I know there are cases going out every day.
13          Let me tell you the way the process works.  I don't
14  know what you are used told.
15          How many have been through jury selection before,
16  either here or in the state court?
17          (Hands)
18          A lot of you.
19          Sometimes the process can be very tedious and long.  I
20  vowed to myself many years ago that I would not participate in
21  those long processes again.  It usually takes about an hour 15
22  minutes, an hour and 30 minutes to assemble a jury.
23          I have put together a questionnaire.  All of you
24  should have a copy of that on your chairs.  It is just general
25  questions.

,06BYVER1,

1    It is not my intent and it certainly is not the intent

2  of the parties to embarrass anybody.  I suppose potentially

3  there are a couple of questions on there that might be

4  embarrassing and you may not want to answer in front of

5  everybody else.  If that is the case let me know and I will ask

6  you answer in front of me and the lawyers at the bench.

7    But, again, I'm looking for broad strokes.  If you

8  think there is anything that might cause you to tilt one way or

9  the other without hearing any evidence in this case, then that

10  is something we should know about and then the lawyers ought to

11  be able to assess.

12    There are two types of challenges to prospective

13  jurors on a case, one is called a challenge for cause.

14    If one of you says, for example, you know, I just went

15  through an employment situation like that myself this last

16  year, I'm an employer, I am an employee the same thing happened

17  and I just don't think I can be fair in a case like this, I

18  would excuse you for cause.  As the name implies, there is

19  reason to excuse you from this case, you can't be fair.

20    The more familiar type of challenge is what is called

21  a peremptory challenge.  The lawyers on both sides have three

22  of these and they can exclude up to six of you, three each

23  side, for any reason.  They may not like the fact that you got

24  a green sweatshirt on today.  They don't have to give me any

25  reason for those challenges, it's completely up to them.

,06BYVER1,

1    I have told jurors in the past and I will say this to

2    those of you assembled today as prospective jurors it really

3    says more about the lawyers than it does about you if you get

4    challenged on a peremptory basis.

5    I have been at this for a long time.  I started when I

6    was a young man, 24 years old, trying cases.  You know what my

7    rule of thumb was back then?  No one younger than I on the

8    jury.  That has changed over time, but no one younger than I.

9    What informed my thinking, well, older people made more

10   decisions, they made harder decisions, they got a greater stake

11   in the community.

12   That was what I was thinking when I was out picking a

13   jury.  Did I excuse younger people who probably were just fine

14   and voted with me in my favor?  Of course I did.  Did it say

15   more about me than the people being excused?  Of course it did.

16   So bear that in mind as we go through this process.

17   It's not personnel, it does really say more about what the

18   lawyers are thinking than about any attribute of any

19   prospective juror.

20   So that's what this case is about.

21   I promise you this, and two prospective jurors who

22   were here last time will probably say, well, I guess he means

23   what he says, we will make efficient use of your time.

24   We had a case that we started last week that was

25   supposed to last five days, started it Monday, and it was over

,06BYVER1,

1    by 2:00 o'clock yesterday.

2         I understand I'm not so far removed from being a

3    regular human being that I don't understand that all of you

4    have important things to do and that this is sort of crimping

5    your schedule.  There are probably other places that you rather

6    be.  I understand that.

7         This is important matter, though, to these parties.

8    They waited to have it resolved.  They want eight conscientious

9    people to listen to the evidence and to give them a decision

10   over this dispute.  In our country, we afford that.  Our legal

11   system affords that.  Any one of us would want to have the same

12   privilege if he were in either the plaintiffs' or defendants'

13   position.

14        We appreciate your being here.  We will make efficient

15   use of your time.  There are not going to be long periods

16   sitting around and talk to the lawyers.  I met with them and

17   told them my protocol, which is to make hey when the sun

18   shines.  When the jury is here we are going to be in session,

19   we are going to hear testimony.  I will take up legal issues at

20   breaks.

21        I can't give you a precise time when this case will

22   end, but I do commit to you that we are mindful of the

23   sacrifice that you are making by being here.

24   BY THE COURT:

25   Q.  All right.  With those things said, Elizabeth Kelley,

1  please stand and answer the questions on the sheet.

2  A.  I live in Mamaroneck New York, which is in Westchester

3  County, and I've lived there for 40 years.

4          We own our home.

5          Actually, I've lived in Mamaroneck for 37 years and

6  New Rochell for three years before that.

7          We own our home.

8          I graduated high school, I didn't go on after that.

9          I am an executive assistant working for the CEO and

10  CFO of Eight O'clock Coffee Company, which also Teatley Tea --

11  Q.  What kind of company?

12  A.  Eight O'clock Coffee, and we also own Teatley Tea.

13  Q.  Hold on a second.  I want to follow along.

14  A.  Yes, I am married and my husband is a sergeant in the

15  Mamaroneck police department.

16          Yes, I have a child.  He is 22 years old.  He has just

17  graduated from college and he is an emergency medical

18  technician at the moment working in the city.

19          I have not served as a juror before.

20          Cross-connection certainly would be my husband.

21  Q.  Does he testify from time to time as a police officer?

22  Does he come to court and testify?

23  A.  He has only been involved in relation to another question

24  in one particular case which was against police officers

25  internally in the police department, not involving him but as a

,06BYVER1,

1   sergeant of the department he was called in.  That's the only

2   time.

3   Q.  Was there a time earlier in his career when he was a patrol

4   officer and had to come to court and testify?

5   A.  No.

6   Q.  Okay.

7   A.  I love to garden, I love to hike and I am a member of our

8   local citizens emergency response team as well as pet

9   sheltering in emergencies.

10      There is no reason why I can't serve fairly and

11  impartially.

12  Q.  You heard the allegations that have been made in this case,

13  the allegations are denied and, as I said, there is going to be

14  a confrontation of evidence that we want you to resolve.  Are

15  you up to the task here?

16  A.  Absolutely.

17  Q.  Nothing about this case that is troublesome to you at the

18  outset here such as you have a lack of confidence about ability

19  to render a fair and impartial decision?

20  A.  Not at all.

21  Q.  Thank you very much.

22  BY THE COURT:

23  Q.  Mr. Jones, good morning.

24  A.  Good morning.

25      I live in Mount Vernon, New York.  I lived there for

,06BYVER1,

1   about 30 years.  I rent my home.

2           I've gone through a year of college.

3           I'm staff administrator.  I'm currently unemployed

4   right now.

5           I'm single.  I have no children.

6           I've served as a juror before in a criminal case many

7   years ago.

8   Q.  Did the jury reach a decision in that case?

9   A.  Yes, they did.

10          .  I have a friend who is studying to be a lawyer.

11  Q.  Is it a man or woman?

12  A.  A man.

13  Q.  Do you talk to him often about his studies?

14  A.  Not really.

15  Q.  Ever have a conversation about any of the areas of the law

16  that are implicated in this case?

17  A.  Not that I can recall.

18  Q.  Okay.

19  A.  Have you had any friends in lawsuits?

20          I believe my niece is going through something right

21  now.  She had a problem with her eyes and her doctor so they

22  are going through something.  I don't know how far that is

23  going.

24          My free time I'm into music and bowling.  And I don't

25  see any reason why I can't continue this.

,06BYVER1,

1   Q.   Thank you, Mr. Jones.  I appreciate your answers.

2   BY THE COURT:

3   Q.   Mr. Lewyn, good morning again.

4   A.   Good morning again, Judge.

5   Q.   You are one of the guys that can verify what I said about

6   making efficient use of time.  I bet you didn't think that case

7   would be over.

8   A.   Actually, you said three or four days.

9   Q.   Mr. Lewyn is a lawyer who is a prospective juror in the

10  other case.

11          Anyway, tell us about yourself.

12  A.   I'm a senior litigation attorney with C&A, I have done

13  insurance defense work since 1980, live in Manhattan, married,

14  two children.

15          I think as I told you before, I might have -- I have

16  done insurance defense work since 1980, so I like to think I'm

17  fair as I told you before, but --

18  Q.   Do you know these counsel at all?

19  A.   I don't know who they are.  They weren't introduced to us.

20  Q.   Let me take a minute and do that.  I apologize.

21          Mr. Goldberg, if you would like to stand and

22  reintroduce yourself to me and Mr. Margolis and introduce your

23  clients and tell the prospective jurors about yourself.

24          (Continue on next page)

25

1          MR. GOLDBERG:  Good morning.

2          My name is Kenneth Goldberg.  I am an attorney.  This

3     is Jonathan Margolis, an attorney at my office.  These are my

4     clients Beatriz Veerman and Khadijetou Ba.

5          My office focuses on representing individuals in

6     employment discrimination cases.  So that's typically what my

7     case load is, employees that a terminated and harassed.

8          Ms. Fridegotto, would you like to introduce yourself

9     to the jurors, your co-counsel and clients.

10          MS. FRIDEGOTTO:  My name is Linda Fridegotto and I am

11     with the firm Havkins Rosenfeld Ritzert & Varriale.  Seated

12     right here is Matthew Krauss.  My two clients are Mr. Lesort

13     and Mr. Blech.  My main area of expertise is litigation and

14     that's it.  Thank you.

15          THE COURT:  Do any of the perspective juror know Mr.

16     Goldberg or Ms. Fridegotto or any of the other folks that are

17     here today, the plaintiffs or the defendants?  No one so

18     indicates.

19          Mr. Lewyn, I don't want to short circuit this but if

20     you feel based on what I've read that this is a case that might

21     challenge your ability to be fair and impartial --

22          THE JUROR:  There's a concern, judge.

23          THE COURT:  Okay.  I don't want to put words in your

24     mouth.  I know on the other case that you had the same concern.

25     On the other hand you know you are here and in your capacity as

1    a private citizen I know as a lawyer you believe in the rule of

2    law and all the principles that I talk about with perspective

3    jurors.  Could you put aside what you do for a living and put

4    on your citizen hat and listen to the case and fairly judge it?

5        THE JUROR:  I guess my one concern is that I'd be

6    giving the defendant maybe a little fraction of a head start

7    since I've done this for a number of different carriers since

8    1998.

9        THE COURT:  And you have had a lot of opportunity to

10   think about jury service and what kinds of cases you might be

11   called to serve on might be better to tell the jury

12   administrator to only send you out on criminal cases.  If you

13   want me to have Mr. Lopez do that that will avoid this drill.

14       THE JUROR:  I did intern years ago for the DA's

15   office.

16       THE COURT:  What have they told but your term of

17   service?  How long do you have to keep coming back before you

18   are finally excused if you don't get picked?

19       THE JUROR:  I started on Monday.  They indicate you

20   have an obligation up to two weeks.  They did pass us for the

21   last couple days and then we were asked to return here so I

22   have no idea how long this is going to last.

23       THE COURT:  Mr. Goldberg, Ms. Fridegotto, in light of

24   Mr.  Lewyn's statements, I propose that we excuse him from this

25   case.  He has doubts about his ability to be fair.  Any

1    objections to excusing Mr. Lewyn when for cause?

2            MR. GOLDBERG:  No.

3            MS. FRIDEGOTTO:  No.

4            THE COURT:  We'll excuse you again.

5            Mr. Lopez, what I was going to ask you is rather than

6    have Mr. Lewyn brought up on cases where he labors in the same

7    vineyard, can you tell the jury administrator maybe he ought to

8    be called just if they have a criminal case, not that he wants

9    to, but call him on those and if he is to be called at all to

10   finish his commitment just on criminal cases.

11           COURTROOM DEPUTY:  Yes, your Honor.

12           THE COURT:  Mr. nice meeting you.  Thank you again.

13           Mr. Zebatto, good morning.  Tell us about yourself.

14           THE JUROR:  I live in Manhattan.  I own my apartment.

15   I have a two year degree from college.

16           I own a ladies apparent manufacturing company on

17   Seventh Avenue been doing that for 20 some odd years.  I am

18   single.

19           I've never served as a juror.

20           I have friends that are lawyers but it wouldn't affect

21   this.

22           Let's see.  Free time just with friends on the weekend

23   dinners and stuff like that.

24           And I feel I could make a fair judgment in this case

25           THE COURT:  Okay.  You've heard the allegations.  The

1   allegations are denied but nothing shocking, just at face value

2   to you or causing to you tilt just when you heard me read them

3   one way are the other?

4        THE JUROR:  Not at all.

5        THE COURT:  Okay.  Thank you, Mr. Zebatto.

6        Mr. Docherty, good morning.

7        THE JUROR:  Good morning.

8        I live in White Plains New York.  I've lived there for

9   about 27 or 28 years.  We own our own home.

10       I did graduate from law school.

11       I work for the Westchester County District Attorneys

12  and I have been there for about 27 or 28 years.

13       THE COURT:  Are you a criminal prosecutor there?

14       THE JUROR:  I am indeed.  My wife is a human resources

15  executive.

16       I do have two children.  They are both in college.

17       I have never served a juror before.

18       I have many friends who are attorneys or police

19  officers.

20       THE COURT:  Judges I suppose too?

21       THE JUROR:  Yes, and judges.  I have been named as a

22  party in civil suits.

23       Until recently I was active in youth soccer.  More

24  recently I play a little golf work around the house.

25       I don't think there's any reason that I couldn't serve

1   fairly or impartially.

2           THE COURT:  Okay.  I spoke with Mr. Lewyn about the

3   different capacity in which you've served as a juror.  You

4   fully appreciate that.

5           THE JUROR:  I do.

6           THE COURT:  You've been in the position of counsel

7   picking juries in undoubtedly?

8           THE JUROR:  I have.

9           THE COURT:  Thank you, Mr. Docherty, appreciate your

10  answers.

11          Oscar Navarrete.

12          THE JUROR:  Good morning.

13          First time.  I don't speak English almost, so I'll

14  try.  I live in the Bronx.  I rent.

15          I never go to school in this country.

16          I work in hotel.  I cook on the -- La Meridian in

17. Manhattan.

18          I married.  I got two kids.

19          I never serve in jury.  That was my first time.

20  That's it.

21          THE COURT:  So you don't know anybody in the criminal

22  justice system?

23          THE JUROR:  No.

24          THE COURT:  You've never been involved in a lawsuit as

25  a witness or defendant or a plaintiff?

1        THE JUROR:  No.

2        THE COURT:  What about this case?  Can you give a fair

3    judgment to this case if you are selected?

4        THE JUROR:  I don't understand too many things cause

5    my English not so good for serving on the jury.

6        THE COURT:  Okay.  I am able to understand what you

7    are saying.  Have you been able to follow was has been said

8    here or is some of it, have you been unable to comprehend some

9    of what's been said?

10       THE JUROR:  No, I can't serve it.

11       THE COURT:  Okay.  You think that you don't speak

12   English or understand English well enough?

13       THE JUROR:  I understand a little bit and I can talk a

14   little bit but not so much.

15       THE COURT:  You think you'll have difficulty following

16   the testimony and the proceedings?

17       THE JUROR:  Yes.

18       THE COURT:  Counsel, I propose that we excuse Mr?

19   Navarrete, if there is not an any objection.

20       MR. GOLDBERG:  No objection.

21       MS. FRIDEGOTTO:  No objection.

22       THE COURT:  All right.  We're going to excuse you.

23       Jose, this another case where maybe the jury

24   administrator ought to talk to Mr. Navarrete if he feels

25   uncomfortable with his comprehension of English, then maybe we

1     shouldn't keep him here.

2                 COURTROOM DEPUTY:  Okay.

3                 THE COURT:  Mr. Navarrete, I am going to excuse you.

4     If you go back to the jury room the clerk here is going to let

5     the jury administrator know, they'll talk to you a little bit

6     about whether you should be called out on other cases.  If you

7     are not completely conversive with English then it is going to

8     be a problem in any case, so thank you.

9                 THE JUROR:  Okay.  Thanks.

10                THE COURT:  Mr. Montalio.

11                THE JUROR:  I live in the south Bronx all my life.  My

12    family owned their own home.  I graduated four years in

13    college.

14                THE COURT:  What was your degree in?

15                THE JUROR:  Cooking.

16                THE COURT:  Okay.

17                THE JUROR:  I have no kids.  Single.  Never served on

18    a jury.  Don't know nobody in the justice system.  I play

19    baseball and I would serve jury.

20                THE COURT:  Okay.  What do you do for a living at the

21    present time?

22                THE JUROR:  I am unemployed.

23                THE COURT:  Your last job what were you doing?

24                THE JUROR:  I was in school.  I just graduated.

25                THE COURT:  All right.  When you last had a job when

1  ever that was --

2          THE JUROR:  I was an intern at a restaurant.

3          THE COURT:  Have you ever been a party to a lawsuit of

4  any kind or been a witness or a plaintiff or a defendant in a

5  case?

6          THE JUROR:  No.

7          THE COURT:  Okay.  How about contacts with the justice

8  system, lawyers or judges or anything?  You heard me read what

9  the allegations are, what is at issue in this case.  Plaintiffs

10  have made allegations.  The defendants denied those.  Can you

11  fairly judge a case that involves these issues?

12          THE JUROR:  Yes.

13          THE COURT:  Thank you.  Appreciate your answers.

14          Ms. Breakenridge.

15          THE JUROR:  I've lived in New Rochelle all my life.

16          THE COURT:  Keep your voice up.

17          THE JUROR:  I live in New Rochelle all my life.  I

18  graduated from high school and I've done some college.  Haven't

19  graduated yet.

20          Do for a living?  Currently I am working for Cerebral

21  Palsy in Westchester.

22          THE COURT:  What is the nature of your work for in

23  relation to cerebral palsy?

24          THE JUROR:  I work with the mentally disabled, like I

25  help them, where they live I help them out with dressing and

1   showering and stuff like that.

2           I am single.  I have no children.

3           I have never served on a jury before.  Yeah, I do have

4   a couple of, I do know a couple of people in the justice

5   system, know a couple of lawyers and judges.

6           THE COURT:  You think your friendship or affiliation

7   with lawyers or judges would affect how you judge this case if

8   you were picked?

9           THE JUROR:  No.

10          THE COURT:  Okay.

11          THE JUROR:  What do I do in my free time?  I like to

12  sing.  I love going to church, Internet and hang out with my

13  friends and that's about it.

14          THE COURT:  They seem like pretty formal things for

15  somebody your age to be doing.  You know you've heard that I

16  read off the allegations that the plaintiffs have made and I

17  told you that the defendants deny those allegations and you

18  heard me tell Ms. Kelly earlier that there's going to be a

19  confrontation of evidence here.  There is a going to be a clash

20  of evidence and if you are picked you and other jurors are

21  going to have to listen and sort through it and decide which is

22  the truthful version and base a verdict on the truthful

23  version.  Are you up to that task?

24          THE JUROR:  Yes, I am.

25          THE COURT:  That may involve listening to witnesses

1  and saying, you know, I don't think that's the truth about what

2  and happened or, alternatively, you know that sounds truthful

3  to me.  That sounds like the way things happen in everyday life

4  and I am going to credit that person's account.  You are

5  probably going to have to make judgments like that in this

6  case.  Can you do that?

7            THE JUROR:  Yes, I can.

8            THE COURT:  Okay Any reason can you think of where why

9  you wouldn't be completely fair in judging this particular

10 case?

11           THE JUROR:  No.

12           THE COURT:  All right.  Thank you, Ms. Breakenridge.

13           Ms. Mapp.

14           THE JUROR:  Good morning.  I live in Manhattan and I

15 rent and I went to the 11th grade in school.  I served as a

16 juror before.

17           THE COURT:  How long ago was that?

18           THE JUROR:  About nine years.

19           THE COURT:  Okay.  Criminal or civil case?

20           THE JUROR:  Civil case.  It was a hit and run also was

21 a -- for two days in that same case.

22           THE COURT:  Did the jury reach a decision?

23           THE JUROR:  Yes, we did.

24           THE COURT:  Okay.

25           THE JUROR:  I have three kids.

1          And also work in the store shipping and receiving

2     department.  I have been there 24 years.

3               THE COURT:  What business is it?

4               THE JUROR:  Shipping and receiving in a store,

5     Barney's New York.

6               THE COURT:  Okay.

7               THE JUROR:  That's about it.  And in my free time I

8     like to go to the movies, to the casino.

9               THE COURT:  Do they have casinos around here?

10              THE JUROR:  No.  Atlantic City.

11              THE COURT:  What is your game of choice there?

12              THE JUROR:  Slot machines.

13              THE COURT:  Okay.  You heard, as the others did, the

14    allegations that I read off, the allegations I hasten to add

15    the allegations are denied.  That's why we've assembled in this

16    courtroom to have eight fair people listen to the whole case

17    and decide it.  Are you up to that task?

18              THE JUROR:  Yes, I am.

19              THE COURT:  Anything about the nature of the case that

20    causes you to think I might not be completely fair, I might not

21    be able to assess both side's positions?

22              THE JUROR:  No.

23              THE COURT:  You find yourself tilting, leaning one way

24    or the other in this case at this point?

25              THE JUROR:  No.

06BAAVEE2              Jury Voir Dire

1      THE COURT:  Thank you, Ms. Mapp.  Appreciate your
2  answers.

3      Ms. Gordon.

4      THE JUROR:  I live in Westchester County Briar Cliff
5  Manor, the Rockefeller Preserve.  I've lived there about 20
6  years.  I rent.

7      Went three years in college.

8      I am a soap maker, I guess, for a living.  Not a very
9  successful one but I am working on that.  I work for myself.

10      I have a significant other who does computer repair
11  networking.  I have no children.

12      I've never served a juror.

13      I don't have any close connections to the court.

14      My significant other went through a civil case or was
15  sued any way.  When he was doing construction work the
16  construction site was damage and it was a lot of money lost.

17      THE COURT:  It doesn't sound like that had anything to
18  do with the kinds of claims that are being made here,
19  completely different, right?

20      THE JUROR:  Yeah.

21      THE COURT:  Okay.

22      THE JUROR:  Free time, I guess gardening.  I am
23  interested in herbs and just learning about them.

24      To be honest, there may be a reason why I can't serve
25  fairly but I think I can.  I mean I'll have to say I have been

1    in a similar situation but --

2              THE COURT:  To the plaintiffs?

3              THE JUROR:  Yes.

4              THE COURT:  Okay.  So here is the question and it's

5    not disqualifying that you have had personal experiences that

6    maybe touches on some of the issues at all.  We want people to

7    draw on their experience and common sense and all.  The only

8    problem it would create is if you thought in your mind you'd

9    start drifting back to what happened to you and you would let

10   your own situation control the outcome here.  That is, that you

11   wouldn't fairly listen to the evidence presented here and make

12   an independent judgment.  Do you think --

13             THE JUROR:  I think I could be fair but I thought I

14   should say my own experience.

15             THE COURT:  Okay.  But let me ask it differently.  The

16   experience that you had was it recent or a long time ago?

17             THE JUROR:  It was year ago but it's something that

18   happened and I thought I should be honest and say.

19             THE COURT:  No, and as I said, there's no right

20   answers.  There's just honest answers.  I appreciate you

21   raising this.  The concern I think that the lawyers would have

22   is, well, okay, is it something that the residue of it

23   continues on in your mind and you would --

24             THE JUROR:  No, just something happened.  It happens

25   in life, just deal with it and --

1          THE COURT:  Okay.  You heard Mr. Lewyn, the lawyer,

2     who does defense work all the time saying, you know, I think

3     I'd naturally tilt toward the defendants.  Do you have any

4     similar feeling that maybe because you have been in these shoes

5     that at some point you'd a tilt toward the plaintiffs

6     instinctively.

7          THE JUROR:  No, but consciously I'd say no but I think

8     I should say honestly the experience I have had.

9          THE COURT:  Okay.  Here is what any judge will tell

10    you in handling a jury in any trial.  What we try to find are

11    eight, ten, 12 people who can say, you know, I have had

12    experiences, maybe I have had experiences that touch on the

13    subject matter being tried but, judge, I feel pretty confident

14    that I can exercise the mental discipline to not let my own

15    experiences control the outcome of this case.  I'll listen to

16    the evidence I'll make a judgment on the evidence.  I'll,

17    certainly, be informed by my own experiences.  You heard me say

18    earlier, you know, one of the questions about credibility is

19    that the way things really happen in life?  I've got common

20    sense and experience.  I am going to evaluate it that way.  We

21    want you to use that experience.  It's kind of a fine line

22    where you say, well, it happened to me so it happens this is

23    way all the time.  We wouldn't want you to do that.  We'd want

24    you to listen here, make on objective decision based on the

25    evidence that's presented here.  Do you think you could do

1    that?

2            THE JUROR:  I think I could but I still wanted you to

3    know my experience.

4            THE COURT:  No.  I get it and I appreciate it.  That's

5    just right that you would tell us about that.  But I don't want

6    to put words in your mouth.  What I hear you saying thought is

7    that you've thought this through.  You are pretty confident

8    that you can judge this case on the facts that will be

9    presented here.  Have I got it right?

10           THE JUROR:  Yes.

11           THE COURT:  Thank you very much.

12           Stephanie Feyne.

13           THE JUROR:  Yes.

14           THE COURT:  Good morning.

15           THE JUROR:  Good morning.  Okay.  I live in Manhattan.

16   I have been here nor 22 years.  We own our home.

17           I am back in school getting a masters in linguistic

18   anthropology.

19           THE COURT:  What does that concern?

20           THE JUROR:  Exactly.  It's language in context.  I

21   work as a sign language interpreter so I am interested in how

22   all that comes together.  I've been doing that for 32 years.  I

23   have a part-time job with the Board of Ed.  I also interpret

24   free-lance which includes medical, educational and also some

25   legal.  Most of the interpreting I've done in the legal arena

1   has been state and federal but criminal or family.  I haven't

2   interpreted any civil.

3          THE COURT:  Okay.  So, this would be hearing impaired

4   people and you will sign the, okay, the proceedings?

5          THE JUROR:  Um-hmm.

6          THE COURT:  All right.

7          THE JUROR:  My husband is a musician.  We have no

8   children.

9          And the last time I was a juror was 35 years ago but

10  we did come to a verdict.

11         THE COURT:  You must have been six years old.

12         THE JUROR:  I love you.

13         THE COURT:  Was the case at all similar to what is at

14  issue here?

15         THE JUROR:  No.  It was a paternity suit.

16         THE COURT:  Okay.  You heard me put the question to

17  one of the other perspective jurors about judging credibility.

18  In this case you should be prepared for an inevitable

19  confrontation of facts and sides and if you are selected and

20  seven others will have to sort through this, make sense of it

21  and say, here is what we believe the accurate version to be and

22  here is our verdict based on findings of fact.  Can you do

23  that?

24         THE JUROR:  Yes, sir.

25         THE COURT:  It's not coincidental that the jury box is

1    located very, very close to the witness stand.  One of the

2    instructions I'll give you says, in judging credibility one of

3    the things that you should pay attention to is the manner in

4    which a person testifies, not just what they say but the manner

5    in which they testify.  Often, I know this, you probably know

6    this from human experience that sometimes a no can mean yes.

7    I've raised two sons and I have had them shake their head no to

8    me and I knew that the answer was really yes.  The same

9    phenomena occurs here in court.  And you may know that from

10   your experiences as an interpreter watching somebody, watching

11   the manner looking for non verbal clues is a very big part of

12   judging and getting to proper judgments, correct judgments

13   about credibility.  Are you up to that task if you are selected

14   here?

15            THE JUROR:  Yes, sir.

16            THE COURT:  Okay.  Finally, let me put to you the

17   question that I've put to many others.  You've heard the

18   allegations.  The allegations are denied.  Can you give both

19   parties here a fair trial, a level playing field?

20            THE JUROR:  Yes.

21            THE COURT:  OK.  Thank you very much.  Appreciate your

22   answers.

23            Ms. Reed.

24            THE JUROR:  Yes.

25            THE COURT:  Good morning.

1        THE JUROR:  Good morning.  I live in the Bronx.  My

2   husband and I have lived there for over 20 years.  We rent.  I

3   finished high school.  I am attending art college at home.  I

4   work for the police department as an administrative aid.

5        THE COURT:  How long have you done that, Ms. Reed?

6        THE JUROR:  28 years.

7        THE COURT:  Do your duties ever call on you to come to

8   court or to testify, anything like that?

9        THE JUROR:  No.

10       THE COURT:  Okay.

11       THE JUROR:  I am married.

12       My spouse is retired.  He used to work as a New York

13   City Housing maintenance man.

14       We have two children.

15       No, I have not served as a juror.

16       I don't have any close friends who are judges or

17   relatives lawyers or police officers.

18       My brother was in a lawsuit.  He was hit by a car but

19   it's been settled.

20       THE COURT:  Was that quite a while ago?

21       THE JUROR:  Yes.  It's been a long time.

22       THE COURT:  Doesn't sound like that would influence

23   you in any way in this case.

24       THE JUROR:  It would not.

25       I like to listen to music.  I like to go by cycling.

 1  I like to read.  I like to play sports, handball.

 2          Organization, I attend church regularly.

 3          And there is no reason why I can't make a fair

 4  judgment on this case

 5          THE COURT:  Okay.  You've heard particular questions

 6  I've asked the other perspective jurors before you.  The last

 7  statement that you just made to me, no reason that you can't be

 8  fair in this case, do you make that statement mindful of all

 9  the questions I've put to others?

10          THE JUROR:  Yes.

11          THE COURT:  Okay.  Thank you very much.

12          Neda Khatamee?

13          THE JUROR:  Yes.  I live in Manhattan.  I have been

14  living here for about 14 years.  I own my home.

15          I graduated law school.  Practiced law for about five

16  years.

17          THE COURT:  What was the nature of your practice,

18  Ms. Khatamee?

19          THE JUROR:  Corporate.

20          THE COURT:  Okay.

21          THE JUROR:  What I do now, my present employer is a

22  Major Lindsey & Africa.  We're legal recruiters.  I have been

23  doing that for about five years with them.

24          I am single.  I have no children.

25          I've never served on a jury.

1              Most of my friends are lawyers.

2              THE COURT:  Do you have lawyers that practice in the

3    specialty of our two counsel?

4              THE JUROR:  Yes, friends.  But I also work with

5    lawyers.

6              THE COURT:  Okay.  Do you think you would tilt one way

7    or the other or are you open?

8              THE JUROR:  I am open.

9              THE COURT:  Okay.

10             THE JUROR:  I like playing golf.  I go to the ballet

11   and opera.

12             THE COURT:  Where is the closest golf course here.

13             Ladies and gentlemen, I guess I haven't mentioned this

14   to some of you.  You may pick it up either from the way I speak

15   but I am not from here.  I am a visiting judge from San Diego.

16   Land is at a premium it seems to me.  Where is the closest golf

17   course?

18             THE JUROR:  The winter times I go down to Florida and

19   in the summers I play up in the Berkshires usually.

20             THE COURT:  Okay.

21             THE JUROR:  And I believe I can serve fairly.

22             THE COURT:  Okay.  I put this question to the other

23   lawyers in the group.  You are not here as a lawyer, of course,

24   or a legal recruiter.  You are here as a citizen of the

25   Southern District of New York and they want you to judge this

1  case with your citizen's hat on.  It sounds like you are

2  prepared to do that.

3              THE JUROR:  Yes.

4              THE COURT:  Thank you.  Appreciate your answers.

5              Good morning, Mr. We.

6              THE JUROR:  I live in White Plains almost eight years.

7  I am ophthalmologist eye doctor.  And my wife is office

8  manager.  I have two kids, one boy and one girl.

9              THE COURT:  Are they employed, your children?  Are

10 they young or old enough to be employed?

11             THE JUROR:  My boy is ophthalmologist too.  And I

12 practice in Flushing and I am going to retire end of this year

13 and I am 68 years old.

14             THE COURT:  Okay.  Is your daughter employed also?

15             THE JUROR:  Yes, designer.

16             THE COURT:  Okay.

17             THE JUROR:  My daughter.

18             THE COURT:  Okay.

19             THE JUROR:  I don't know any judge, anyone of these

20 people.

21             THE COURT:  You know a lot of ophthalmologists I bet

22 but no, judges or lawyers.

23             THE JUROR:  Yes.  But my English is limited.

24             THE COURT:  Okay.  Have you been able to follow the

25 proceedings, follow what I've said so far?

06BAAVEE2                    Jury Voir Dire

1    THE JUROR:  My concern is I have two, my brain have a

2   surgery, my brain twice.  And I take many medications and

3   include the Dilantin to control my seizure.

4    THE COURT:  Okay.  Do you think that that would pose a

5   be problem for you sitting four or five days?

6    THE JUROR:  I doubt because I can't control my emotion

7   and I tends to seizure.

8    THE COURT:  Okay.  Do you think there is anything

9   about being part of a trial that would bring that on or cause

10  that to be more frequent than normal?

11    THE JUROR:  I don't know.

12    THE COURT:  Let me ask you this, do you feel under

13  stress just from having to answer the questions or be a part of

14  this process?

15    THE JUROR:  I think so.

16    THE COURT:  All right.  Well, maybe, Mr. Goldberg and

17  Ms. Fridge, it might be that rather than put Mr. Wu through

18  that, if you are in agreement, I propose that we excuse him for

19  cause.  Is there any objection?

20    MR. GOLDBERG:  No objection.

21    MS. FRIDEGOTTO:  No objection, your Honor.

22    THE COURT:  All right.  Mr. Wu, I think rather than

23  test this given what you've told me that we'll excuse you from

24  jury service here.

25    THE JUROR:  Thank you.

1      THE COURT:  You can just leave your questionnaire on

2   the chair, Mr. Wu.  Nice meeting you.

3          Mr. Miller.

4      THE JUROR:  Good morning, your Honor, begging your

5   pardon, I would normal take off the glasses and visor but I do

6   have a medicine medical reason.

7      THE COURT:  Okay.

8      THE JUROR:  I don't know if that will be an issue or

9   not.

10     THE COURT:  Okay.  Not as far as I'm concerned.  You

11  have to tell me whether you think it might be.

12     THE JUROR:  I don't believe so.

13     THE COURT:  Okay.  Are you able to see what is going

14  on here in court?

15     THE JUROR:  Of course.

16     THE COURT:  I know at some point Mr. Goldberg and,

17  perhaps, Ms. Fridegotto, Mr. Goldberg in particular, has shown

18  me a chart with some numbers on it.  I think he is going to

19  have some blow-ups here.  Circumstantial evidence tells me that

20  at some point that the contents of that wrapped package against

21  the wall are going to be opened and displayed to the jury but

22  have you no problem seeing around the courtroom?

23     THE JUROR:  No.

24     THE COURT:  Okay.  Thank you for that explanation but

25  I am happy to hear from you.

1      THE JUROR:  Want to make sure I'd be no disrespect.

2          I've lived in Manhattan for about 30 years.  I'm

3   originally from upstate New York.  I rent.  I live in Greenwich

4   Village.

5          associates degree in schooling.  I've worked for Con

6   Edison as an electronics electrician

7          THE COURT:  What was the name of the business?

8          THE JUROR:  Consolidated Edison.  I work as an

9   electronics technician.  I have been there for about 22 years

10   now.

11          I am single.  I am non custodial parent of a 16 year

12   old boy.

13          I have been through the jury selection process a

14   couple of times but I've never gone the full distance through

15   the commencement of the trial.

16          THE COURT:  You have not been picked to sit on an

17   actual jury then?

18          THE JUROR:  Yeah, through it's entirety.

19          THE COURT:  Okay.

20          THE JUROR:  Nobody I know closely, at least, or that I

21   know works in the justice system.  I ride a motorcycle quite a

22   bit.  I am a musician, guitarist.

23          And I did have a motorcycle accident in 2001 and we

24   finally settled in 2006

25          THE COURT:  Was the case like a hard fought case that

1  the case to get a settlement on that?

2       THE JUROR: Not particularly. The proceedings lasted,

3  approximately, three and a half days before the defending

4  lawyer finally offered an acceptable --

5       THE COURT: Okay. Were you actually in trial on the

6  matter then?

7       THE JUROR: I believe that's what you would call it,

8  yeah.

9       THE COURT: Either a trial or arbitration?

10      THE JUROR: Yeah. There was a jury selected and

11 hearing testimony and all that kind of stuff.

12      THE COURT: Okay.

13      THE JUROR: I don't see any reason that I wouldn't be

14 able to serve fairly in this case.

15      THE COURT: All right. Mr. Miller, thank you. I

16 appreciate your answers.

17      Let's see. Mr. Rowe, now I am maybe mistaken,

18 Mr. Rowe. Were you called up earlier this week too? You look

19 like a fellow that was called up.

20      THE JUROR: Yes, a couple days ago.

21      THE COURT: I never got to you in the questioning.

22 Welcome again.

23      THE JUROR: Thank you, sir.

24      I live in Manhattan around 40 years. Live in rent

25 apartment because I never bought the house. I have a reason

1  for that.  I have a one son.  I raised, my friend told me

2  raised in the city.  Now he is a college kid (inaudible).

3         I am retired.  Before retire I have my own business

4  over 35 years.

5         THE COURT:  What was your business?

6         THE JUROR:  Food enterprise, retail and at the Madison

7  Avenue, 83rd Street.

8         THE COURT:  Did you attend school yourself?

9         THE JUROR:  I run myself everything.  I have three

10 store but after 9/11 I have to close --

11        THE COURT:  Oh.

12        THE JUROR:  -- most of them and I moved to the Third

13 Avenue, wrong place, wrong time, so I closed that too.

14        THE COURT:  All right.  You've been a business man for

15 a long time.  Did you go to school here?

16        THE JUROR:  No.  I study music at Korea.

17        THE COURT:  Okay.  I think we're at question 6.

18        THE JUROR:  Yes.  I have my wife.  She is teaching the

19 kindergarten.

20        THE COURT:  Okay.  You've already mentioned you have a

21 son who is in culinary school, is that what you said or hotel

22 management?

23        THE JUROR:  Yes.

24        THE COURT:  He is in his third year?

25        THE JUROR:  Yeah, a junior.

1        THE COURT:  How about prior jury service, have you

2    ever served as a juror?

3        THE JUROR:  Yeah, I've been serving as a coroner's

4    juror.

5        THE COURT:  How long ago was that?

6        THE JUROR:  I think about four or five year ago.

7        THE COURT:  What about a civil case or a criminal

8    case.  Have you sat on one of those?

9        THE JUROR:  Civil case I never did.

10       THE COURT:  Do you know lawyers or judges or police

11   officers?

12       THE JUROR:  When have you a business you have to know

13   the lawyers.  First thing have you to know the real estate

14   lawyer, litigation lawyer, all kind of lawyer.

15       THE COURT:  Okay.

16       THE JUROR:  And you have to be friends to them.

17       THE COURT:  Have you ever been in a lawsuit?  Have you

18   been a plaintiff or a defendant or a witness in a case?

19       THE JUROR:  No.

20       THE COURT:  Never have, okay.  What do you do to enjoy

21   yourself?  What do you do in your free time?

22       THE JUROR:  I watch HBO Bill Maher.

23       THE COURT:  Okay.

24       THE JUROR:  And Comedy Central John Stewart.

25       THE COURT:  Hobbies, you have hobbies?

1    THE JUROR:  Yeah.  I listen to music.

2    THE COURT:  Okay.  You've heard the questions I've

3    asked about this particular case.  Is there anything that

4    you've heard me say about this case or anything in the

5    allegations, if you get picked can you serve fairly and give a

6    fair judgment?

7    THE JUROR:  Sure.

8    THE COURT:  Thank you.  I appreciate your answers.

9    Mr. Sacco?

10    THE JUROR:  Yes.  Before I forget, your Honor, walk

11    over the Brooklyn Bridge stop on the number four and get off at

12    the Mosholu Parkway.  You are a 20 minute walk away from the

13    Van Cortlandt Public Golf Course which is one of the oldest

14    golf courses in the country.  You can just bring your clubs

15    right on the subway and be right there.

16    THE COURT:  Mr. Sacco, I hesitate to tell you all of

17    you this but I gave it up about 25 years ago.  I was a club

18    thrower.  I went out with my dad and my brother and they said

19    never again.  They are, said you are an embarrassment to us.

20    You are throwing clubs and cursing.  So I gave up.

21    THE JUROR:  It sounded like you might be looking.  You

22    don't have to go all the way to Florida.

23    I live in northern Westchester County in a town called

24    South Salem.  I have been there for at last ten years.  Prior

25    to that I was here in the city.  I am a life long New Yorker.

1    I share ownership of my house with bank.

2           I am a doctor.  Went to medical school here in the

3    city at Mount Sinai.

4           THE COURT:  What is your specialty.

5           THE JUROR:  I specialize in hospice and palliative

6    medicine.  I work with patients mostly at the end of life.  I

7    am at Bronx Lebanon Hospital where I have been for the last 18

8    years.  And I, in fact, do have a concern in that regard that's

9    not, specifically, related to my qualification as a juror but I

10   would like your permission to bring that up to you if possible.

11          THE COURT:  Sure.

12          THE JUROR:  I have been working for the last several

13   months on opening an inpatient hospice unit for our patients at

14   the hospital.  We did actually just opened that unit this week

15   and it's now filled with patients and I am, unfortunately, I am

16   the only physician at the hospital who is boarded in the

17   specialty and I am responsible for their care.

18          You might legitimately ask how is that I allowed that

19   to happened when I was called for jury duty some time in

20   advance.  And the answer to that question is that it's been on

21   and off as to whether or not this unit would open

22          THE COURT:  I am certain.

23          THE JUROR:  The opening was uncertain and my hospital

24   administration typically said we've done as much as we can to

25   delay the opening of this.  When can you get it done?  That was

1  on Tuesday.

2          THE COURT:  Okay.  That is important stuff and here is

3  what I would propose and let me see if counsel will agree.  It

4  is important that we have conscientious and well spoken people

5  like you on the jury.  If we were to postpone your service so

6  that you can get things underway and deal with the pressures of

7  the moment you would have to come back and finish this service,

8  could you do you that?

9          THE JUROR:  May I add, sir, that I take my

10  responsibility as a juror very seriously.

11          THE COURT:  Oh, I am sure.

12          THE JUROR:  I would happily defer my service.

13          THE COURT:  You are here today in the midst of what's

14  he going on tells me that you do take it very seriously.

15          Counsel, have any objection given the peculiar time

16  problems that Dr. Sacco that we release him from the service

17  today and deferred his service to some time once he has got

18  matters organized and in hand?

19          MR. GOLDBERG:  No objection.

20          MS. FRIDEGOTTO:  No objection.

21          THE COURT:  Okay.  Doctor, very nice meeting you.

22  Good luck with that.  Sounds like a very important thing that

23  you are doing.  We'll defer your service.

24          Mr. Lopez, would you give appropriate instructions to

25  Dr. Sacco and the jury administrator?

1          COURTROOM DEPUTY:  Yes, your Honor.

2          THE COURT:  All right.  That brings us to Ms. Daley.

3          Margaret Daley, good morning.

4          THE JUROR:  I live in Westchester, Yonkers.  I rent.

5   I did not go to school in this country.  I work as a certified

6   nurse's aid at a nursing home, Regency Extended Nursing Home.

7          THE COURT:  Mr. Lopez, do we have a mic?

8          COURTROOM DEPUTY:  I think that she can maybe step up

9   to the lectern.  Your voice is dropping off a little bit and

10  the court reporter around I are having some difficulty.  You

11  have a small voice and this a big room.

12         I got the first part.  I know you live in Westchester,

13  Yonkers.  You are a nurse and go on from there if you would.

14         You are presently employed?

15         THE JUROR:  Yes.

16         THE COURT:  Are you married?

17         THE JUROR:  No.  I didn't marry.  I have two children.

18         I did not serve on a jury

19         THE COURT:  Tell me in about your children.  Are they

20  adults?

21         THE JUROR:  Yes.

22         THE COURT:  What do they do for a living?

23         THE JUROR:  One of them is a manager for a store and

24  one of them is a certified nurse's aid.

25         THE COURT:  Okay.  Do you have any connection to the

1    court system?  Do you know lawyers or judges, anything like

2    that?

3              THE JUROR:  Yeah.  My mom have a lawsuit.

4              THE COURT:  Your mom is involved a lawsuit now?

5              THE JUROR:  Yes.

6              THE COURT:  Generally speaking, what is the nature of

7    the lawsuit that she is involved in?

8              THE JUROR:  She fell.

9              THE COURT:  Okay.  So a personal injury case?

10             THE JUROR:  Yes.

11             THE COURT:  She is trying to get damages for her

12   injuries?

13             THE JUROR:  Yeah.

14             THE COURT:  OK.  Were you involved?  Were you a

15   witness to that at all?

16             THE JUROR:  Yeah.

17             THE COURT:  You witnessed it?

18             THE JUROR:  Yeah.

19             THE COURT:  You are going to be called as a witness,

20   do you expect?

21             THE JUROR:  Yeah.

22             THE COURT:  Okay.  How long before the case goes to

23   trial, do you have any idea?

24             THE JUROR:  No, I don't.

25             THE COURT:  Okay.  Do you think, Ms. Daley, that the

06BAAVEE2                    Jury Voir Dire

1  fact that your mother is in a lawsuit and you are going to be a

2  witness do you think that that might interfere with your able

3  to fairly judge this particular case?

4          THE JUROR:  Maybe.

5          THE COURT:  It doesn't sound like a personal injury

6  case is anything like what is alleged here.  The claims here

7  are very, very different.  So it doesn't immediately occur to

8  me that there would be any connection but I just wonder if

9  knowing that you are going to be a witness, if maybe that will

10  come into your mind or do you think that that would influence

11  you at all in deciding this case?  What do you think?

12          THE JUROR:  Sometimes I have to go with the lawyer so

13  I don't know.

14          THE COURT:  Okay.  So I am catching you off guard here

15  I know because you didn't anticipate any of this but let me ask

16  you this, what about the allegations?  You've heard me read the

17  allegations is there anything about that that shocks you or

18  that causes you to think you might favor one side or the other

19  side automatically?

20          THE JUROR:  Yeah.

21          THE COURT:  You do think you might favor one side or

22  the other?

23          THE JUROR:  (Nodding).  (Shrugging).

24          (Pause)

25          THE JUROR:  My hobbies, I like to cook and I like to

1    go shopping malls.

2            THE COURT:  I want to come back to one question.  I am

3    not sure you understood what I was asking.  You heard when I

4    read what this case is about, right?

5            THE JUROR:  Yeah.

6            THE COURT:  But the plaintiffs are essentially

7    claiming they were discriminated against and there's other

8    claims and defendants deny those claims.  Do you think you can

9    judge those claims fairly or do you think that you might favor

10   one side or the other?

11           THE JUROR:  Maybe.

12           THE COURT:  You don't know.

13           THE JUROR:  (Shaking her head).

14           THE COURT:  All right.  Well, I think given

15   Ms. Daley's indecision about whether she can fairly judge the

16   claims I would propose that she be excused for cause unless

17   counsel have an objection.

18           Mr. Goldberg, you can follow-up if you have any

19   additional questions

20           MR. GOLDBERG:  Could I ask her?

21           THE COURT:  Yes, of course.

22           MR. GOLDBERG:  Ms. Daley, do you feel that you could,

23   if you were picked, do you feel you could sit, listen to the

24   evidence and make a decision on the case based on the evidence

25   that is presented in this litigation, this lawsuit?

1          THE JUROR:  (Nodding).

2          THE COURT:  All right.  Ms. Fridegotto, you may

3     inquire also.

4          MS. FRIDEGOTTO:  Thank you.

5          You do not have to tell us what it is that has you

6     thinking that maybe, but do you think that you could -- I don't

7     know how to put this.  Do you think that you could approach the

8     case with a clean slate and then see where the evidence takes

9     you and only make a decision once all the evidence has been

10    presented to you or do you feel that just starting off straight

11    off the bat you tend to already have, I guess, some ideas

12    regarding which way the case is going to go based on anything

13    that you might feel?

14         THE JUROR:  Yeah.  (Nodding).

15         THE COURT:  All right.  Thank you, Ms. Daley.

16         We'll leave Ms. Daley for now.  You may have your seat

17    back.

18         Mr. Loperena, good morning.

19         THE JUROR:  No problem.  I live in the Bronx, New

20    York.  I rent the apartment.

21         I just graduated from Apex Technical School to be an

22    auto technician.

23         THE COURT:  Okay.

24         THE JUROR:  I am unemployed right now because I just

25    graduated.  My present employer was actually Duane Reade which

1  was like two years ago.

2            THE COURT:   What kind of business is Duane Reade?

3            THE JUROR:   That's a drug store.   It's like Walgreen's

4  but it's only in New York.

5            THE COURT:   That's why I had to ask you, I guess.

6            THE JUROR:   I am single.   I don't have any children.

7            I never served as a juror.   I'd love to.

8            I don't have no close connection with any judges,

9  lawyers or anything

10           THE COURT:   Okay.

11           THE JUROR:   My free time I like to work on my '96

12 Honda Accord.

13           No, I don't think -- I judge everything fairly.

14           THE COURT:   You are not tilting one way or the other

15 just on hearing what we've discussed so far?

16           THE JUROR:   Not at all.

17           THE COURT:   Let me follow-up with you.   I don't have

18 special concerns about you so I am speaking to everybody here

19 but I want to make this point.

20           If you are picked to sit on this case you can't talk

21 about it with anybody.

22           THE JUROR:   No, I understand.

23           THE COURT:   And what I will tell the jurors is that

24 you have like a girlfriend or somebody you hang out with?

25           THE JUROR:   No.

1            THE COURT:  Friends?

2            THE JUROR:  Friends, yeah.

3            THE COURT:  Well, if you go back tonight and your

4    friends say, hey, you got picked for this jury.  Tell us about

5    it.  You've got to say, I can't tell you anything.  All I can

6    say is it's a civil case and it's supposed to last three or

7    four days.  At the end once we have reached a verdict I'll give

8    you a blow-by-blow account but not until then.  That's what you

9    got to say.  Are you willing to do that?

10           THE JUROR:  Definitely.

11           THE COURT:  Here is another rule and this seems a

12   little curious.  You can't even talk to the other people that

13   are serving on the jury with you about the case until the case

14   is submitted to you for a decision.

15           You ever watch that program Survivor?

16           THE JUROR:  No.

17           THE COURT:  There's a program, they put all these

18   people on an island.

19           THE JUROR:  No, I heard of it.

20           THE COURT:  I don't watch it either but I understand

21   that what they do is they make little deals with each other and

22   they say, we are going to vote to kick off this guy.  Then we

23   are going to form these things called coalitions.  Jury service

24   is not like Survivor.  Jurors don't form coalitions.  They wait

25   until the end and everybody discusses the evidence.  After

1  everything's been said and done, you've heard from the lawyers,

2  you've heard the instructions, you've head all of the evidence

3  in the case and, importantly, you've heard from your fellow

4  jurors, that's when you make up your mind in any case.  But in

5  this case in particular can you wait until then and keep an

6  open mind until the very end?

7          THE JUROR:  Absolutely.

8          THE COURT:  Now, what I am asking you will be sounding

9  it is contrary to human nature because we form impressions as

10 we process information.  Somebody will take and say something

11 and we'll say that makes me think this.  And this instruction

12 that I am talking about doesn't forbid you from forming

13 impressions.  It just says, exercise the mental discipline to

14 say to yourself, I am not going to decide which way I am voting

15 until I've heard everything and my fellow jurors have given me

16 their perspectives.  Maybe I've missed something.  I am open to

17 listening to what other people have to say.  Only then will I

18 makeup my mind on how I am going to vote.  You want to sit on

19 this case, if you get to sit on this case can you follow that

20 rule?

21         THE JUROR:  Absolutely.

22         THE COURT:  Thank you.  Appreciate your answers.

23         Finally, Mr. Cohen.  Thank you for being patient.

24         THE JUROR:  I live in Manhattan.  I've lived there my

25 entire life, upper west side 40 years.  I rent my apartment.

1        I graduated from high school and from college and from

2   business school. In college I studied sociology. In business

3   school, finance.

4        I'm a real estate dealer. I'm a partner with a

5   developer on a project. My present employer I'm essentially

6   self-employed. I'm in a partnership. That's two years now.

7        I am single, not married. I don't have any children.

8        I have serves as a juror on a civil case. We did

9   reach a verdict three years ago.

10            THE COURT:  What kind of case?

11            THE JUROR:  Malpractice.

12            THE COURT:  Okay.

13            THE JUROR:  My father's an attorney, maritime law

14   practice.

15            THE COURT:  Is he still in practice?

16            THE JUROR:  Yes.

17            THE COURT:  Do you know other lawyers, friends of your

18   father?

19            THE JUROR:  Many.

20            THE COURT:  Any of the lawyers are well acquainted do

21   the kind of work that counsel in this case are doing,

22   employment work?

23            THE JUROR:  No.  Most are corporate law.

24            THE COURT:  Okay.

25            THE JUROR:  My free time exercise, read, socialize

1  with friends and family.

2          THE COURT:  You look like you are pretty trim and

3  buffed out.

4          THE JUROR:  Very kind, sir.

5          THE COURT:  What about this case?  Now you've heard

6  the questions that I've asked all the other perspective jurors.

7  Incidentally, would you have given significantly different

8  answers to the one that has been given by anybody who still

9  remains here as part of the perspective jury?

10          THE JUROR:  No, your Honor.

11          THE COURT:  Can you fairly judge this case?  You know

12  what the allegations are?  You now know the allegations are

13  denied.  Can you sit, listen and make a judgment and tell the

14  parties, here the accurate version, here is the consensus

15  version of the eight of us that are conscientious that you

16  chose to decide this case and here is our verdict based on

17  that; can you do that?

18          THE JUROR:  Yes, your Honor.

19          THE COURT:  Thank you very much, Mr. Cohen.

20          All right.  That concludes the questioning.  Counsel,

21  are there any challenges for cause that you want to make at

22  sidebar?

23          MS. FRIDEGOTTO:  Would it be possible to have five

24  minutes, your Honor?

25          THE COURT:  Yes.  At this point I am just asking if

1  you want to make a challenge for cause.  If there are no

2  challenges for cause then I'll have Mr. Lopez give you the

3  sheets, Ms. Fridge.

4          MS. FRIDEGOTTO:  Yes, there will be challenges.

5          THE COURT:  Okay.  You have a challenge for cause?

6          MS. FRIDEGOTTO:  Please.  Okay.  I'll see both

7  principal counsel at sidebar.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Sidebar)

2        MS. FRIDEGOTTO:  I wanted to challenge number 10.  I

3    am very concerned about the issues regarding the fact that she

4    had had prior experience regarding this type of case.  I would

5    not want to be make her feel uncomfortable and have to disclose

6    what the exact nature of it might be, so that might be related

7    or because she is a woman and therefore I would like to

8    challenge her just because of that.

9        MR. GOLDBERG:  My sense is that she can judge the case

10   and that she is trying very hard to serve and so I think that

11   she has thought about it and because if she didn't say she

12   could feel that she could do the job I would not be inclined to

13   agree to that, I would think she's qualified.

14       MS. FRIDEGOTTO:  One more thing, personally, I just

15   felt that the fact that she kept bringing it up more than once

16   and not just the initial time when your Honor was questioning

17   her that is what would lead me to believe that it would

18   possibly and I don't think it would be intentional doing, I

19   just feel she would be inputting a little bit of her personal

20   experiences and that was the why she kept bringing it up.

21       THE COURT:  Okay.  The Court denies the challenge for

22   cause, inquired extensively of Ms. Gordon.  I tend to think

23   that she is just being very conscientious.  I gave a preamble

24   type instruction of why I explained and where I regarded her

25   answer as an attempt to be very conscientious to say, look,

1  there was something in my background the lawyers ought to know.

2  I asked her several times whether she could distinguish between

3  evidence that she'd hear in a case and what had happened to her

4  and I asked her whether she would allow no require involvement,

5  what she was involved with to control the outcome here.  She

6  clearly said no.  So I don't see a -- for excusing her for

7  cause.

8         Next?

9         MS. FRIDEGOTTO:  This is, the issue is with number 18.

10  I'm not exactly sure that she understands English.

11         THE COURT:  I agree.  I see a big, big language

12  problem with her and I am inclined to excuse her for cause.

13         MR. GOLDBERG:  I think that's what it was, language

14  barrier.

15         THE COURT:  I think there will be a problem

16  comprehending the evidence.  Here is what I'll do.  She is

17  discussed for cause.  Just scratch her off the list.  I am not

18  going to tell her she's excused for cause.  We will let her go

19  with everybody else when we excuse the rest of the jurors but

20  you can assume Ms. Daley is excused for cause.  She was clearly

21  trying but I could tell she just wasn't comprehending what she

22  was being asked.  A couple of times the answers didn't make

23  sense.

24         Anything else?

25         MS. FRIDEGOTTO:  No.

1          THE COURT:  We will give you time.  I am going to pass

2     the list out.  I am not going to ask you to instantaneously

3     exercise challenges.  That's it?

4          MR. GOLDBERG:  Yes.

5          MS. FRIDEGOTTO:  Yes.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

06BAAVEE2                    Jury Voir Dire

1          (In Open Court)

2          THE COURT:  All right.  The Court has entertained

3     challenges for cause from counsel at sidebar.  At this time,

4     Mr. Lopez -- actually counsel have the list.

5          COURTROOM DEPUTY:  I've already provided the list to

6     counsel, your Honor.

7          THE COURT:  This is the time for counsel to exercise

8     their preemptory challenges and you could do so with some

9     dispatch.

10         (Pause)

11         THE COURT:  I've made the point to all of you as part

12    of what our experiences are, I've tried a lot of cases for 18

13    years.  I've tried a lot of cases and I went through a lot of

14    jury selection myself.  I had one case where the jury selection

15    process, this process in which we have been involved for the

16    last hour and a half lasted three weeks.  Can you imagine

17    coming and listening to questions and having repetitive

18    questions asked of successive jurors?  Remember the old Bill

19    Murray movie, Ground Hog Day?  I'd get up every morning.  The

20    alarm clock would go off. I've a vowed to myself if I was ever

21    in a position to affect that part of the process I would do

22    what I could to expedite it.  So the procedure that I've

23    followed I am told is not a common one here.  It is called the

24    Arizona method.  They used this method.  It originated in

25    Arizona.

1       The parties now have three preemptory challenges each.
2  I require them to exercise them simultaneously and without
3  knowing what the other guy is doing.  So it's possible the
4  lawyers to, both lawyers may excuse the same prospective juror.
5  But it's an efficient way of picking a jury that doesn't really
6  compromise the partys' ability to make an assessment and pick
7  people that they want.  And as I say, it usually takes about an
8  hour and a half or an hour and 15 minutes.  Much better than
9  three weeks.

10      In some systems the lawyers are allowed to put
11 questions to the jurors too.  I am from California.  That's
12 sort of the order of the day there and that can go on
13 tediously.  A lot of times you find the lawyers aren't really
14 interested in the answers.  They're trying to make a point
15 beforehand.  They'll get time to advocate once the case is
16 underway.

17      Incidentally, for those of you who haven't served on
18 juries before are unfamiliar with the court process, the
19 lawyers by the rules of the court and the contentions of the
20 Court won't be interacting with you personally once the case is
21 underway.  You'll hear from them here in court but if you see
22 them here during the breaks they won't talk to you.  It's not
23 because they're snotty.  Both lawyers I've met, they're decent
24 approachable people but they are following my order not to
25 speak to prospective jurors because it looks bad if

1   Mr. Goldberg is seen chatting with you. Then it looks like

2   maybe he is trying to curry favor or somebody might think you

3   are talking about the case. So they won't do that. But take

4   my word for it, they're decent approaching people and you'll be

5   able to talk to them after case is all over.

6        I am here for two weeks. As a federal judge you can

7   sit anywhere in the country where there's a federal court.

8   There was a need here and there is a lot of cases here. Some

9   of the judges had a need to have somebody come in and help

10  them. So I took on four cases. And two of them settled once I

11  made rulings and set some time limits. Then I tried one and

12  this is the other. And if we finish I might even take on a

13  fifth case.

14       But impetus for me coming out here is my wife hasn't

15  been to New York and she is joining me tonight. Unfortunately,

16  I've got to work while she is taking the tour and the Circle

17  Line but she wanted to see New York. But this is return for

18  me. I came here when I was in still in law school. My last

19  semester in law school I worked for the U.S. Attorney's Office.

20  That was 32 years ago. I lived up at Columbia University in

21  the dorm and took the subway down every day but I spent the

22  summer in 1978 here. Some things have changed but many things

23  have not.

24       So I tell you these things to pass the time with you

25  while the lawyers make their decisions. What we'll do is,

06BAAVEE2          Jury Voir Dire

1    they're deciding who they want to have on this case. Once they

2    turn in their sheets indicating their preemptory challenges

3    Mr. Lopez will reconcile the list and we will call the names of

4    the first eight jurors, perspective jurors, who have not been

5    stricken and they will be the jury in this case.

6         In federal court whether a criminal or civil case the

7    juries must be unanimous and in civil cases we don't have

8    alternates. All jurors who sit and participate in the trial

9    will deliberate at the end and be part of the process. We to

10   have at least six, so I've impaneled two more than necessary.

11   And as I said, I don't anticipate that this case is going to

12   present a time problem for anyone. I think all of you were

13   probably time screened too. You had an opportunity to say oh,

14   no. I've got a big thing coming up. I can't serve this week.

15   Is that accurate?

16        (Pause)

17        THE COURT: Once the list is ready counsel will have

18   an opportunity to see it before we call the names and make any

19   objections. If there are any to the list I'll hear those.

20        Folks, those of you in the jury box if I could ask

21   that you take a seat in the gallery or just any where else in

22   the courtroom. This will avoid people having to step over each

23   other when we do call the names of those who have been

24   selected.

25        (Pause)

06BAAVEE2                    Jury Voir Dire

1           THE COURT:  All right.  Mr. Lopez, you've reconcile

2    the lists?

3           COURTROOM DEPUTY:  Yes, your Honor.

4           THE COURT:  Counsel, if you'll take a look at the

5    board that the clerk has.

6           (Pause)

7           THE COURT:  Inform me, please, whether your peremptory

8    challenges are accurately reflected.

9           (Pause)

10          MS. FRIDEGOTTO:  No, they're not, your Honor, because

11   one of the people that I've challenged is still listed.

12          THE COURT:  Okay.  All right.

13          (Pause)

14          THE COURT:  Mr. Goldberg, you may approach to make

15   sure that your peremptories are --

16          (Pause)

17          (Continued on next page)

18

19

20

21

22

23

24

25

76

| | |
|---|---|
| 1 | THE COURT: All right, counsel have had an opportunity |
| 2 | to look at the list as reconciled. |
| 3 | Mr. Goldberg, does the reconciled list accurately |
| 4 | reflect the challenges issued by the plaintiffs? |
| 5 | MR. GOLDBERG: Yes, your Honor. |
| 6 | THE COURT: Ms. Fridegotto, does the list accurately |
| 7 | reflect your challenges on behalf of defendants? |
| 8 | MS. FRIDEGOTTO: Yes. |
| 9 | THE COURT: Is there any objection by either party to |
| 10 | the list as reconciled? |
| 11 | MR. GOLDBERG: No, your Honor. |
| 12 | MS. FRIDEGOTTO: No, your Honor. |
| 13 | THE COURT: Call the names. |
| 14 | If your name is called, come back to the jury box. |
| 15 | THE CLERK: Juror number 1, Cato Jones. |
| 16 | Number 2, Robert Docherty. |
| 17 | Juror number 3, Viola Mapp. |
| 18 | Juror number 4, Linda Reed. |
| 19 | Juror number 5, Steven Miller. |
| 20 | Juror number 6, Jai Hwan Rowe. |
| 21 | Juror number 7, Milton Loperena. |
| 22 | Juror number 8, Daniel Cohen. |
| 23 | Those jurors whose names I did not call, I am just |
| 24 | going to ask you to report to the courtroom right across the |
| 25 | hallway and I will be there very shortly. |

1          THE COURT: Hold on one second.

2          I want to address you before you leave.

3          Mr. Goldberg, Ms. Fridegotto, are these the ladies and

4     gentlemen you have chosen to try your case?

5          MR. GOLDBERG: Yes, your Honor.

6          MS. FRIDEGOTTO: Yes, your Honor.

7          THE COURT: Folks, those who were not called I want to

8     thank you. It has been my pleasure to meet you. Thank you for

9     coming today. This is important stuff. As you heard me say,

10    if you were in the position of the plaintiffs or the defendants

11    you would want conscientious people like yourself to be

12    available to serve and to judge this matter and to reach a

13    conclusion.

14         Thank you. My great pleasure to meet all of you.

15         You are excused.

16         (Prospective jurors excused)

17         THE COURT: This is the last time it is going to seem

18    a little like church, but if you will all stand and raise your

19    right hand, we will swear you in as the jurors in this case.

20         (A jury panel was duly sworn.)

21         THE COURT: Ladies and gentlemen, I am going to give

22    you a few preliminary instructions in this case before we take

23    our lunch break, and I assume we will break at about twelve.

24         Let me talk to you about logistics going forward now

25    that you are the jury in this case.

1          We start at 9:00 o'clock and we will go until twelve.

2  We will take a 15 minute break, this is starting Monday of

3  course because we already subsumed the morning today.  In the

4  afternoon we will start at one and we will go until five and we

5  will take a 15 minute break in the afternoon as well.  You will

6  have an hour for lunch.

7          I am informed that if there is a line trying to come

8  into the court house, if you tell the court security officer

9  that you are a sitting juror and that you need to get through

10  the line, they will move you to the front, you won't have to

11  stand in line.  Please do that.  That will insure that the hour

12  we give you is adequate for you to get something to eat and

13  make it back here.

14          We move at the pace of the slowest ship in the convey,

15  so what that means is if one of you is not here we can't start.

16          Please come on time.  Allow a little extra time to get

17  here in the morning and be mindful of the time during the

18  breaks.  As I said, I want to manage your time efficiently, so

19  if you are all here we can start, if you are not we can't.

20          Last week I made the same speech and unfortunately we

21  got somebody who was 20 minutes late and all her fellow jurors

22  were the box, the dapper court reporter was here ready to tap

23  the keys and I was waiting and the juror was very embarrassed

24  to have to come in and make excuses why she was late and kept

25  everybody waiting.

1    I don't do that intentionally, I don't revel in it,

2    but do be mindful we start and end on time and it is a courtesy

3    for fellow jurors to be here on time.

4    I want to give you some preliminary instructions

5    before I send you on your first break. These instructions will

6    be preliminary, kind of broad strokes, about burden of proof

7    and some of the things that you probably should know before you

8    start hearing evidence, which will occur this afternoon.

9    At the end of the case I will give you further

10   instructions, more specific instructions and, in fact, I will

11   give you a packet of instructions about this case that will go

12   back with you when you deliberate the case so you will have

13   them to refer to during your discussions and deliberations.

14   Ladies and gentlemen, you are now the jury in this

15   case and it is my duty to instruct you on the law.

16   You are not to infer from these instructions who are

17   anything that I say or do during the course of the trial that I

18   have any opinion about what the evidence is or what verdict you

19   should reach. The parties have the option of waiving their

20   right to a jury and having me decide the case. They did not

21   opt to do that. They want a consensus decision from people

22   drawn from the community. I don't feel badly about that at

23   all. It is their absolute right and I understand why they

24   would exercise it.

25   I tell you that so that you don't read into anything

80

1 │ that I say and I try not to say or do anything that indicates I

2 │ have an interest in the outcome or that your verdict should be

3 │ one way or the other, but I don't, I don't, so if you think I'm

4 │ leaning one way, you are misapprehending things.  It's up to

5 │ the twelve of you have.  You are going to be the judges of the

6 │ facts in in case.  You are going to say what happened here and

7 │ what the outcome should be.

8 │ It is your duty as jurors to find the facts from all

9 │ the evidence in this case and then to those facts as you kind

10 │ they will you apply the law as I give it to you.

11 │ You have to follow the law as I give it whether you

12 │ agree with it or not.  In deciding this case you must put aside

13 │ subjective factors, like your personal likes or dislikes,

14 │ personal opinions or prejudices or sympathy.  What that means

15 │ is you have to decide the case fairly and based solely on the

16 │ evidence.  The oath that you took just now confirms that

17 │ obligation.

18 │ In following the instructions that I give you now and

19 │ I will give you later you have to follow all of them and not

20 │ single out some and ignore others, they are all equally

21 │ importantly.

22 │ I explained to you already what this case is about.  I

23 │ will not read the claims and defenses again.  Suffice it to say

24 │ that this is an employment discrimination case and the

25 │ plaintiffs have made allegations which the defendants deny and

06BYVER3

1  we have you here to decide this.

2      Civil cases are decided by a standard of prove called
3  preponderance of evidence. What that means is that when a
4  party has the burden of proof on any claim that you must be
5  persuaded by evidence that the claim is more probably true than
6  not. It's often described as just tilting the balance, 51
7  percent wins in a civil case. The quantum of evidence you may
8  find is much higher than that, much lower, all it takes when a
9  party has a burden on an issue or a claim or a defense it is to
10  convince you it is who are likely true than not.

11      You should base your decision in the case on all of
12  the evidence regardless of which party presented it.

13      The evidence that you are to consider in deciding what
14  the facts consist of consists of the following:

15      First, you are going to hear sworn testimony from
16  witnesses. They are going to be called, they will take an oath
17  to tell the truth and certainly is going to be the bulk of the
18  evidence in this case, sworn testimony.

19      I anticipate that already also going to be physical
20  exhibits. There is going to be probably documents, maybe some
21  photographs, I don't know for sure, but there will be things
22  that are marked as evidence. If those things are received in
23  evidence, if you hear me say that will be received in evidence,
24  then you can also consider that. And documentary evidence and
25  that type will go back to you when you deliberate. You will

1  have that to consider.

2           Finally, sometimes certain facts are uncontested.

3  There may be things that are important but neither side contest

4  it, and if that is the case it happens occasionally that the

5  lawyers will agree, they will stipulate that those things are

6  true.  It will avoid the necessity of calling a witness

7  unnecessarily.  So if the lawyers stipulate to any facts, then

8  you should accept those facts that are agreed to as true and as

9  proved.

10          Let me tell you in contrast what is not evidence.

11          First, as I told you, testimony from the stand, things

12 received in evidence and then stipulations are evidence.

13 Here's what's not evidence:

14          Arguments and statements by the lawyers are not

15 evidence.

16          I don't say to deprecate these lawyers, but here's

17 what's true about this.  They weren't at the hotel when these

18 things happen.  They had to reconstruct this case after the

19 fact much as you will and much as I will.  They don't have any

20 historical connection to the case.  You should take the

21 evidence from people who do have a historical connection, who

22 were part of this.  And so bear that in mind when you hear the

23 lawyers talk about the evidence or characterize the evidence.

24 They are not witnesses, they weren't there, they are doing

25 their best to present the case in their understanding of them.

83

1    Likewise objections and questions by lawyers are not

2    evidence. The lawyers have a duty to their clients to object

3    when they believe a question is improper and the under the

4    rules of evidence and you should not be influenced by a lawyer

5    making an objection or by the court's ruling on it.

6    From time to time in the course of the trial I may

7    tell you to disregard certain evidence or I will strike it out.

8    That most often comes up when a witness is asked a question and

9    hears the question differently than what's intended or the way

10    the rest of us hear it and then answers non-responsive.

11    Sometimes it happens the lawyer will say that is a

12    non-responsive answer, Judge, I ask you to strike that. If I

13    do that, you go through the mental discipline of saying I heard

14    it, but I'm not going to consider it, it's not going to play

15    apart in deciding this case, I'm going to keep it out of my

16    mind. So we ask you to do that if I strike any testimony or

17    disregard any testimony. It doesn't come up often, but it may

18    come up in the course of the case and that's what you are to do

19    if it does.

20    Finally, anything you see or hear when the court is

21    not in session is not evidence. You will hear this principle

22    in several of the instructions and hear it is:

23    All of you have to decide the case bear on the same

24    information and that is the evidence that is presented here in

25    court. Nothing outside of that. No external information,

06BYVER3

1   nothing in the newspapers, nothing on the Internet, just what's
2   here.

3        The lawyers are equipped to present every bit of
4   evidence that you need to have to decide this and you have must
5   do it on the basis of what you hear in this case.

6        Remember, jury service is not like Survivor, it's not
7   independent decisions that are being made outside the presence
8   of others.

9        You are going to hear both direct and circumstantial
10  evidence. Some of these allegations have to do what did
11  somebody intend, what was on their mind and obviously the only
12  way we can infer what is on somebody's mind is by
13  circumstantial evidence. We consider what they said and did as
14  indicating what they were thinking Teatley.

15       Direct evidence is direct prove of a fact, such as
16  testimony by a witness about what that witness personally saw
17  or personally heard or personally did.

18       In contrast, circumstantial evidence is indirect
19  evidence. It is proof of one fact from which you can infer
20  another fact.

21       If the issue to be tried before you is whether a jet
22  plane flew over the court house this morning, a party could
23  proffer that by calling in a witness that say yeah, I looked up
24  and I saw the plane and it flew over and if you believe that
25  you can find for that party.

1      Another way of proving it is somebody can come in and

2    say you know, I didn't see a plane, I didn't here a rumble of

3    jet engines, but I saw one of those vapor trails that planes

4    leave and it was just starting to break apart, and you can say,

5    well, okay, the vapor trail must mean a plane had flown over.

6    You can infer that fact.

7      The point is direct and circumstantial evidence are

8    both competent ways of proving facts. Sometimes circumstantial

9    evidence gets a bad rap if you watch TV lawyer programs and say

10   circumstantial evidence. That is not true in real life. Both

11   forms of evidence are competent. Ultimately it's up to you to

12   decide how much weight to give either form of evidence, direct

13   or circumstantial.

14      I alluded to the rules of evidence and I predicted to

15   you that there will be objections in this case. There are

16   rules of evidence that control what can be received in

17   evidence. They are contained in a big book like this. You go

18   to law school to learn those rules of evidence.

19      Now, at least the misconception sometimes a lawyer

20   will object and sometimes the juror will think why are they

21   objecting to that, I really want to know the answer to that,

22   why is that being hidden from me. That's the wrong way to look

23   at it. The rules of evidence have been maintained and have

24   come together over a long period, hundreds of years. The

25   object of the rules of evidence is to make sure you get

1    reliable information on which to base a decision. That way

2    once you reach a verdict in this case, no one can undercut it

3    by saying, oh, of course they reached that decision, look at

4    the kind of information that they had.

5         I will give you an example of one of the rules of

6    evidence that establishes this point that I'm making.

7         We have a rule called hearsay. All of you heard that

8    term before. Hearsay generally prohibits somebody from coming

9    before the court and saying what somebody else said outside of

10    court and the reason behind that rule is the context of a

11    statement is often very important. We want to know what the

12    circumstances are, we want to hear it from the speaking himself

13    or herself.

14         The hearsay rule is designed to make sure that you get

15    the context of a statement when that statement is used in

16    court.

17         Now, there are a lot of exceptions to the hearsay

18    rule, but it proves my point about why these rules exist. They

19    exist to insure that you get reliable information on which to

20    base a decision.

21         So if a lawyer makes an objection in this case,

22    understand that we are doing our best to insure that the

23    evidence that you get will be reliable and can be counted on.

24    You shouldn't make any inference from the fact that a lawyer is

25    making an objection or how I rule on it.

1        If I overrule an objection, that means that the

2    question can be answered or the exhibit can be received. If I

3    sustain an objection, that means I have determined that it is

4    not admissible under the rules of evidence.

5        Again, don't draw any inference from the court's

6    ruling on objections or from lawyers making objections.

7        I mentioned to several of the prospective jurors that

8    in deciding this case you may have to decide which testimony to

9    believe and which testimony not to believe. You, as jurors,

10   may believe everything a witness says or a part of it or none

11   of it at all.

12       Here's a non-exclusive list of factors for you to keep

13   in mind as you listen to testimony in this case. These are

14   common sense things that if we had to write them down or

15   articulate them these are things that would inform them in

16   making judgments in our daily life, but they also apply in

17   court.

18       First, ask yourselves what opportunity and ability did

19   the witness have to see or hear or know the things that he or

20   she is testifying about.

21       Second, ask yourselves what's the state of the

22   witness' memory? Is it good or is it sketchy?

23       Third, it's very important, I alluded to this during

24   the jury selection process, what is the witness' manner while

25   testifying?

1          It's often said that we, jurors in particular, have

2   lie detector instincts. They can look at somebody and have

3   kind of a sixth sense. As you heard me say not coincidental

4   that courtrooms are arranged with the witness stand very close

5   to the jury box. We want up to pay attention.

6          Fourth, ask yourselves does the witness have any

7   interest in the outcome of the case or do I detect any obvious

8   bias or prejudice on the part of this witness. That can also

9   determine whether you believe or disbelieve a witness.

10         Is there other evidence that contradicts the witness'

11  testimony. That should be a consideration.

12         Does the witness' testimony seem reasonable to you in

13  light of all the evidence.

14         You have been selected because the lawyers have made a

15  judgment here that you are intelligence, experienced,

16  conscientious people. We want you to apply those facilities

17  here. Apply your experience, apply your common sense.

18         Finally, any other factors that you think bear on

19  believability you may consider.

20         As I said, this is a non-exclusive non-exhaustive

21  list. Use your God common sense in assessing the evidence in

22  this case.

23         Remember this, also, that the weight of the evidence

24  as to a fact doesn't necessarily depend on how many witnesses

25  testify about it, what that means is your task isn't just to

1    count up the number of witnesses on one side or the other and

2    go with the side that calls the most witness, your task is not

3    quantitative, it's qualitative. You look at the quality of the

4    evidence. You can be convinced by the testimony of a single

5    witness that something happened or didn't happen. Likewise,

6    one side or the other may call many witnesses and you can say I

7    don't believe it, I don't care if they call ten witnesses, I

8    know things don't happen like that, I'm not going to believe

9    that. Again, it's not a counting exercise, it is an evaluation

10    of the quality of the testimony that you will hear.

11            Let me say a few words about your conduct as jurors

12    before I release you for the lunch break.

13            First, you are to keep an open mind throughout this

14    trial. As you heard me explain and discuss with Mr. Montalio.

15    This doesn't mean, this instruction doesn't mean that you don't

16    form preliminary impressions. You are going to form

17    preliminary impressions. That's what we do as human beings.

18    We here information, we process information, we have

19    impressions about it. What this really means is exercise the

20    discipline in your mind to say I'm not going to let myself

21    decide that I'm voting this way or that way until I've heard

22    everything.

23            This case is going to involve the presentation of

24    several witnesses. You are going to hear from the lawyers once

25    you return from your lunch break. They are going to tell you

1    what they think they are going to prove and at the end they

2    will sum up the case for you, they think what they have prove.

3    You are going to get instructions of the law and an important

4    component of this, as I said, is the viewpoint of fellow

5    jurors. It's not uncommon that people change their minds about

6    impressions that they had during jury deliberations.

7              I sat as a juror once, believe it or not. I said this

8    is going to be easy. I went back, I tried a lot of cases, I

9    thought I got this down, and guess what? We got in the jury

10   room and people began talking and I will said I have never

11   thought about that. That's a good point. And it turned me

12   around on some of my preliminary impressions.

13             That can and possibly will happen to some of you. So

14   keep an open mind until the time the case is finally submitted

15   to you.

16             Second, because you must decide this case based on the

17   evidence and on the instructions you should not be exposed to

18   any other information about the case.

19             I don't think there is any press coverage of this

20   cases. It's not like you will pick up the paper tomorrow and

21   see it splashed on the front of the paper. We don't allow

22   cameras in federal courts, there won't be TV coverage, but more

23   generally what you are reading concerns sexual harassment

24   claims, put it aside until this case is over if you are

25   inadvertently exposed to I. We want you to decide the case

1    based on the evidence here.

2        Another component of this is that you should not

3    attempt to do any research about the case on your own. Again,

4    that would violate this rule that all eight of you decide the

5    case on strictly what is presented here.

6        One of the problems with juror selection, jury service

7    is we want conscientious people, we want people who are going

8    to try to get it right and apply their good common sense, but

9    those are the very people that say I want to do a good job so

10    I'm going to look something up on the Internet, I'm going to

11    Google it to make sure I got this right.

12        You can't do that in this case. You can't look to

13    outside sources. You have to rely on the lawyers to present

14    the relevant evidence.

15        You may or may not have heard about this case. We had

16    a case in California a few years ago against a guy named Scott

17    Peterson. He killed his pregnant waiver and dropped her at the

18    bottom of the ocean.

19        Did that make the news back here?

20        The presentation of evidence in that case took seven

21    months. The lawyers were presenting evidence for seven months.

22    Just as jury deliberations started, one of the jurors got on

23    the Internet and looked up some term. Fortunately, the judge

24    was able to catch that and singled her out before she told the

25    other jurors about what she had seen and kind of contaminated

1  them, but she had to be removed from the jury after seven

2  months after sitting and listening to the evidence.

3  So don't do that. If you do that I would have to

4  remove you and there is a chance we would have to start all

5  over this which would cost everybody a lot of time and money

6  and effort. As I said, I'm only here for two weeks so we got

7  to get this done this week.

8  Finally, regarding this case and your duty not to talk

9  about it, don't let other people approach you and talk about

10  the case, either. If that happens, and I don't think it will,

11  report that immediately to Mr. Lopez and he will tell me

12  because I want to know about that. No one should approach you

13  and attempt to talk to you about this case nor should you

14  engage anyone in conversation about this.

15  Now, we have provided note pads for you or well. They

16  will be under your chairs. You are permitted to take notes

17  during this case if you want to. As I said it is anticipated

18  this will be a relatively short case. If you are good in

19  compartment meant living information, then just sit back and

20  listen, you don't have to take notes. If you feel more

21  comfortable jotting down a note or two you are free to do that.

22  One caution I give if you do take notes, it is a

23  divided attention task. Don't be so ensconced in your notes

24  that you miss the bleeding he will elephant traipsing in the

25  room.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    I see some conscientious jurors trying to take

2    everything down. That's why we have a court reporter taking

3    down everything. So bear that in mind.

4    Speaking of our court reporter, we do not have,

5    despite all of our innovations and technology, we don't have an

6    ability to push a button and have an immediate script, we don't

7    have that. So pay careful attention to it. We don't have a

8    transcript for you. You can't say judge, we want to listen to

9    so-and-so's testimony, have it read back. We don't have a

10   transcript. Those are prepared usually long after a trial has

11   concluded, if at all. So pay careful attention. You will have

12   to rely primarily on your memory of the testimony here. As I

13   said, it's going to be a fairly short trial so that shouldn't

14   be difficult. This isn't a seven month ordeal.

15   Let me remind you one last time:

16   Don't discuss the case with any one.

17   Don't form any fixed opinions about the case or what

18   your verdict should be until it is submitted to you.

19   Keep an open mind.

20   Okay. It is 12:15. Here's what we will do. We will

21   break until 1:15. The admonition I will tell you, remember the

22   admonition and it means all those does and don't, I won't

23   repeat it fully each time.

24   Please be back in your seats at 1:15.

25   Remember if there is a line downstairs tell the court

1  security officer I'm a sitting juror, I need to get through and

2  they will put you to the front of the line.

3  Have a pleasant lunch. See you at 1:15.

4  (The jury left the courtroom)

5  All right, the jury is not present, counsel and the

6  parties are present.

7  Any issues we need to take up before we recess?

8  MS. FRIDEGOTTO: You had issues regarding the

9  exhibits.

10  MR. GOLDBERG: I will talk to you about that.

11  MS. FRIDEGOTTO: Thank you very much, your Honor.

12  THE COURT: Again, let me remind you, our preference

13  is we take up legal issues on the breaks. I hate to cut in

14  your lunch break. I will be here generally by 8:30 or after

15  the day's session in court.

16  If there is something that you in your judgment I just

17  have to talk to the judge at side bar, then I will entertain

18  it, but I discourage side bars. They are a waste of time.

19  Have a nice lunch. I will see you at 1:15.

20  (Luncheon recess)

21

22

23

24

25

06BYVERT

1     A F T E R E R N O O N   S E S S I O N

2                        1:15 o'clock p.m.

3          (In open court the; jury present)

4          THE COURT:  We are back on the record.

5          THE CLERK:  All jurors present, your Honor.

6          THE COURT:  This begins the matter of Veerman

7     investigate Deep Blue Group, et al.

8          Ladies and gentlemen, at this time let me give you a

9     little forecast of what to expect.

10         A trial begins typically with opening statements by

11    the lawyers.  Open statements, remember, is not evidence

12    because it comes from the lawyer, but each lawyer is permitted

13    to stand before you and give you sort of a road map or outline

14    of what he or she thinks the evidence is going to be so you

15    will hear from the lawyers first.

16         Once the opening statements are completed, then the

17    plaintiff begins the presentation of evidence.  Plaintiff will

18    call their witnesses first.  Mr. Fridegotto will examine the

19    witnesses on direct examination and then they will be

20    cross-examined by defense counsel, Ms. Fridegotto, and we will

21    go through all the plaintiffs' witnesses until they have

22    completed their case.

23         At that point the defense will have an opportunity to

24    present its case and tables will turn, Ms. Fridegotto will call

25    witnesses examining them on direct exam and Mr. Goldberg, as

06BYVERT

1    plaintiffs' counsel, will cross-examine them.

2            Once all the evidence is complete, I will give you

3    those final instructions that I alluded to on the law, you will

4    hear arguments of counsel and the case will be to you.

5            That's what to expect in the upcoming days.

6            For now we are at the very forefront of the trial

7    process.  You are about to hear opening statements from

8    counsel.

9            Mr. Goldberg, you may make your opening statements.

10           MR. GOLDBERG:  I would like to start by thanking all

11   of you for serving as jurors.

12           I echo what the judge said earlier, that jury service

13   is very important and we understand that it is taking out of

14   your busy lives to be here and the parties will do their best

15   to put on their case as expeditiously as we can and I do thank

16   you again.

17           May name is Kenneth Goldberg.  I'm an attorney, and

18   I'm here today with an attorney from my office, Jonathan

19   Margolis, and my two clients.

20           I wanted to reintroduce them to you as you will be

21   hearing from them testify.

22           This is Beatrice Veerman, she is one of the plaintiffs

23   in the case.

24           The other plaintiff is Khadijetou Ba.

25           This is a sexual harassment case.  It's a case about

1   two former employees of a restaurant.

2           Let me make sure that I prefaced my comments by

3   telling you, I'm not a witness, I'm giving you what the judge

4   just described as a road map of the case from our perspective,

5   the plaintiffs' perspective.  I get two chances to speak to you

6   directly, this one, my opening statement, and then at the end

7   of the case when I give a summation.

8           My clients, Ms. Veerman and Ms. Ba, worked at Opia

9   Restaurant.  It's an upscale restaurant in midtown Manhattan.

10          The restaurant was managed by two of the defendants

11  sitting at that table, Mr. Blech is on the right and Mr. Lesort

12  is to the left.  Opia is owned by an entity named Deep Blue

13  Group so they are a defendant.  The name on the outside is

14  Opia.  The paychecks are Deep Blue Group.  That's why they are

15  defendants in the case.

16          Mr. Blech and Mr. Lesort are defendants as well,

17  because my clients I intend to prove you to you that those two

18  gentleman sexually harassed them.  That's why they are here.

19  That's what they stand accused of.  As I had said before, this

20  is a sexual harassment case.

21          There are some other claims which I will outline for

22  you as well, but will certainly a large part of what you are

23  going to hear about are the allegations of sexual harassment.

24          As for Ms. Ba, who is going to testify this afternoon,

25  she is going to tell you her story, why she went to Opia, what

1    happened there, how she left her job.

2         She alleges that she was terminated from Opia because

3    she rejected and complained about the sexual advances of Mr.

4    Blech, who is sitting at that table.

5         She also says she lost her job because she was deemed

6    to be too dark by Mr. Lesort, one of the co-owners.

7         She also says that she lost her job because she did

8    not give Opia back about $600, actually, $569, when a table

9    left a restaurant without signing the credit card slip and she

10   served that party and she had given them the credit card slip

11   and they left the restaurant without signing it, and we say

12   that that breaks the law to fire her for not giving back the

13   restaurant that $569.

14        Ms. Veerman says, and she is going to testify, that

15   she was sexually harassed by Mr. Lesort, that she rejected his

16   advances, complained about it and ultimately she lost her job.

17   She lost her job less than a month after she forcefully

18   rejected one of his advances to her and made it crystal clear

19   that it was enough, enough is enough. That's the gist of what

20   she communicated.

21        The reason that the restaurant gave for these two

22   ladies leaving we suspect -- I can't tell you what they are

23   going to say until they get up on the witness stand -- we

24   expect them to say Ms. Ba wasn't fired, that she just left the

25   restaurant because she was not happy about the dispute about

 1    the customer's credit card slip.  We submit to you the evidence

 2    will show why would Ms. Ba walk out of a job to become

 3    unemployed over a credit card slip if she wasn't being asked to

 4    pay it.

 5              As for Ms. Veerman, we expect the defendants to say,

 6    well, you missed a shift and we suspended you and you just

 7    never came back.

 8              When you hear from Ms. Veerman and you see the

 9    documentation, we submit to you that the story that you are

10    going to see is that Ms. Veerman didn't know she was on the

11    schedule.  When she found out she rushed to work.  She wasn't

12    allowed to work.  She came in the next day, worked the shift

13    for somebody else.  She was then fired and told Mr. Lesort

14    doesn't want to deal with you anymore.

15              Ms. Veerman was not suspended.  If she was suspended,

16    where is the work schedule that puts her back on a shift?  We

17    are going to show you work schedules, work schedules after she

18    was let go.  Her name is nowhere to be found.  She was not on

19    the work schedule because she wasn't suspended she was fired.

20    She had no job waiting for her.  She had no reason to walk away

21    from the job.

22              In fact, my two clients went to Opia because they were

23    looking to support themselves.  Ms. Veerman, as you will hear,

24    worked at Opia because she was supporting herself as she was

25    going through nursing school.