1    Q.   And you've had ups and downs, then, throughout.

2    A.   Very much so, like any business.

3    Q.   Have there come times in which you have, I guess, changed

4    the business to go with the times?

5    A.   I think in our business we need to constantly maintain,

6    improve, and adapt, which I think we have in the past few

7    years.

8    Q.   Could you give us just some broad examples of things that

9    you've done to change the business?

10   A.   One of the big ones is, the hotel was purchased by a large

11   hotel group, and they came to us and helped invest in

12   renovating our new restaurant -- pardon -- new-look restaurant.

13   It's the same restaurant, same corporation, same everything.

14   They chose to invest a substantial amount of money in our

15   space, which was helpful because we could not ever -- could not

16   have afforded it otherwise.

17   Q.   OK.  And in terms of the hotel, so does that mean that --

18   does that cause you to expand?

19   A.   It could, two things.  It could, now that we've become a

20   restaurant of a hotel of a big group called the Marriott Group,

21   it allows us to now serve the hotel and do room service, which

22   we were not able to do before.  But on the other hand, the

23   trick was, we had to increase our rent in order for them to

24   invest the amount of money they were willing to invest to

25   improve our business.  And we felt, the business decision was

1    that it would give us, you know, longevity and maybe help us

2    increase our business.

3    Q.  We've heard testimony that plaintiffs were employed at Opia

4    in 2005 through 2007.  Is it -- would you -- who would be the

5    best person to ask regarding issues regarding money about the

6    restaurant?

7    A.  I'm very involved in it, obviously, but the best person

8    would be my accountant or my controller.  But I myself and

9    Antoine are both, you know, very involved in it.

10   Q.  Do you remember how the restaurant was doing in 2005?

11   A.  These were actually two of our best years.

12   Q.  2005 and --

13   A.  20 -- actually '06 and '07 were some of the best years.

14   Q.  I think there was mention of a bonus being paid.  There was

15   a bonus paid in 2006 to plaintiffs.  Did you pay a bonus to

16   your employees in 2007?

17   A.  Yes.  We try when we can at the end of the year to give

18   bonuses.  You tend to, in the restaurant business, to give

19   larger bonuses to what we call salary employees, which are

20   nontip employee.  And sometime if you can and if you have good

21   tip employees, you do give a little something at the time, end

22   of year, to your tip employee as well.  It's not something that

23   is done very often in the restaurant business.  Again, as I

24   said, bonuses are given to salary employees.

25   Q.  But in this circumstance, in 2006, the servers also were --

1  because it was a good year --

2  A.  Yes.  We were able to give something to some of the servers

3  and bussers and runners who have been -- who we felt were good

4  employees and some of them have been with us for a long time.

5  Q.  Did you pay a bonus in 2007?

6  A.  I think we -- I think it was the last year we did -- yes, I

7  think it was the last year we did in 2007, and then

8  unfortunately we were not able to do it in '08 and '09.

9  Q.  So you did not pay bonuses in '08 and '09.

10  A.  No.

11  Q.  Was the economy part of the reason?

12  A.  Yes, very much so.

13  Q.  You made a reference differentiating between tip employees

14  and nontip employees.  Can you explain this issue of who -- who

15  is a tip employee?

16  A.  Front of the house, anybody that deals with clients.

17  Q.  Mr. Lesort, you have to assume that no one here knows that

18  what you mean by "front of the house."

19  A.  "Front of the house" means, that is in contact with our

20  clients.  That starts with, obviously, the server, who is

21  responsible to handle the table, down to the busser, down to

22  the runner, the person who brings the food to the table, down

23  to the bartender, who makes the drinks for the cocktails or

24  waiters or waitresses.  It's a team effort that is being made.

25  It's important to understand that it's not just the server who

1    is collecting tips. It's everyone together. And sometime if a

2    busser is not polite and not friendly or not attentive, the

3    server can also pay the price and not get a good server,

4    service. So it's important that everyone together does a

5    good -- provides good service to our clients so that the server

6    can expect and hope to have the best service possible.

7    Q.   There has been testimony in this case with regards to the

8    sharing of tips. Is the sharing of tips done according to a

9    formula, or are they pooled, or something else?

10   A.   Each restaurant in New York, I assume in the U.S., has

11   different formula in sharing tip. There is what's called the

12   point system. There's a percentage system. So the service is

13   collected at the end of the night, and the person responsible

14   for it, obviously the server, and then it's shared with the

15   rest of the team that helps serve the client, and it is

16   distributed accordingly to the percentages that each restaurant

17   has. I mean, each restaurant has a different formula. It's

18   true that most of the time the server will keep a majority of

19   the tip, and which is usually a little over 50, 55 percent, and

20   then the rest is distributed between the rest of the team.

21   Q.   And this issue of managers, maître d's, can you explain,

22   what is the role of a maître d'?

23   A.   The role of the maître d' is, as I explained earlier, is

24   someone who really handles -- a good part of it is greeting the

25   client, knowing our clientele. This is really the role of the

1    *maître d'*, knowing the regulars, knowing where they like to

2    sit, what their habits are, helping eventually the server

3    serving the clients.  If there are some regulars that come in,

4    we know that they have certain habits in cocktails or wine or

5    even food that they wish to have, and the role of the *maître d'*

6    is to help handling that, making that client feel special, in

7    assistance to the server, and then is also helping

8    troubleshooting if there are any issues during service; food

9    doesn't come on time dealing with the kitchen, server might

10   make a mistake, spill the drinks.  So we -- it's client

11   relation.  It's really the role of the *maître d'*.

12          A manager, on the other hand, is someone who has

13   management decision, which can hire or fire, eventually involve

14   scheduling, maintenance of the restaurant, and all sorts of

15   things.

16   Q.  And who is responsible, in addition to yourself and

17   Mr. Blech, for the management role that you just described?

18   A.  Jimena Pereyra, as we know.

19   Q.  And Jimena does not share in the tips.

20   A.  No, she doesn't.

21   Q.  And is this issue about being called the *maître d'*, being

22   called a manager, is it just an issue of words?

23   A.  Absolutely.  Unfortunately, in our payroll system, for some

24   reason, the word "manager" describes and has -- all those

25   employees.  It's a mistake on our part and I understand that.

1    Unfortunately, the description of the job is different. We do

2    have different categories in terms of the payroll summary and

3    we do have dishwashers that are in the kitchen and kitchen

4    personnel that are in dishwasher categories. It does happen.

5    Q. And just to -- you indicated that you -- who actually does

6    the payroll?

7    A. It's -- the payroll is processed by our managers. I'm

8    sorry, forgive me. It's checked by our managers and then it's

9    actually processed by our controller.

10   Q. By, you mean checked by managers, you mean --

11   A. Time cards. We worked with time cards, old-fashioned-style

12   time cards.

13            THE COURT: Hold on. Let her finish her question and

14   let him finish his answer. Go ahead.

15   Q. I'm sorry. I mean those tip reports that you see. What

16   you mean is, at the end of the night, there is a tabulation and

17   that is what compiles and ends up on, what has been marked into

18   evidence, the tip reports.

19   A. Tips and payroll is processed by two people, Jim and our

20   chef. So we see Jim takes care of what we call front house,

21   meaning all tip entries and maître d's, and then chef takes

22   care of the back of the house. Two things are involved,

23   obviously -- tipping, which needs to be kept together and

24   reconciled on a daily basis, and then the hourly salary and

25   wages that are paid also to our wait staff and bus server and

1    runner.  And that is then provided at the end of the week on

2    Monday morning usually to our controller, who then processes

3    the other payroll through a company that we work with.

4    Q.  OK.  So that payroll sheet, did you create that payroll

5    sheet, or --

6    A.  Our controller created that, yes.

7    Q.  Your controller created it.

8    A.  It's an easy way for us on a weekly basis to keep track of

9    our payroll and control our business, which is the role of

10   Antoine and I, to see all sorts of issues that we may have on a

11   weekly basis, with overtime and so on.

12   Q.  Just a couple more questions in regards to just Opia in

13   general.  We've heard testimony in regards to what kind of

14   people, I guess, go to Opia.  There's been a lot of talk of

15   the, I guess the Wednesday-Thursday after-work drinks lounge

16   people.  Would you say that that is the primary category of

17   customers that frequent Opia?

18   A.  Opia happens to be located midtown, in a high-traffic area,

19   and very much a very business-oriented neighborhood.  So we do,

20   Monday through Friday, get quite a bit of people working in the

21   neighborhood on financial institutions, legal field and so on.

22   So it's true that Monday through Friday we get a lot of

23   businessmen and women who come not only for lunch but come for

24   drinks and come for dinner.

25   Q.  But there was testimony, I believe, at some point that

06FAYEE3ps                    Lesort - direct

1  | families don't come to Opia.  Is that correct?

2  | A.  We do get families.  Mostly, I'll tell you, we're very big

3  | on things like Mother's Day.  We do a big Easter every year

4  | where we have, even, games for kids that's all being played in

5  | the restaurant.  It's quite large.  It's over 6,000 square

6  | feet.  So it's one of the rooms that's being used for children

7  | and families.  Some, we do have families that come to the

8  | restaurant.  It's not a dominant number of people.  But

9  | obviously our primary source of business is people who work in

10 | the area.  But we do have families coming in.

11 | Q.  And would you say that it's mainly men who come to Opia?

12 | A.  No.  Actually, it's a very, very even, even probably a

13 | little bit more women than men who come to the restaurant and

14 | the bar.

15 | Q.  And the bar.

16 | A.  Yeah.

17 | Q.  Throughout the day.

18 | A.  Absolutely.

19 | Q.  And is that, I don't know, does that make a difference?

20 | A.  I don't know if it makes a difference.

21 | Q.  Different customers --

22 | A.  I think --

23 |          MR. GOLDBERG:  Objection.

24 |          THE COURT:  Hold on.

25 |          MR. GOLDBERG:  Time frame, relevance?

1      THE COURT:  Yes.  Sustained.  It's not relevant.  Next

2   question.

3   Q.  There was a reference made to payroll, to the payroll and

4   the controller.  How much does Opia spend on payroll a week?

5   A.  With services, our payroll is about 20 to 24 thousand

6   dollars a week.

7   Q.  And how much money do you need to, I guess, break even?

8   A.  A restaurant of our size, with our fixed expenses and food

9   costs, liquor costs, and bill, needs to generate 50 to 65

10   thousand dollars a week of business in order to break even.

11   Q.  In order to break even.

12   A.  Correct.

13   Q.  Did you break even into, I guess -- let's start going in --

14   were there any profits in 2005?

15   A.  2005 there were profits.

16   Q.  Do you remember how much?

17   A.  No, I don't recall now.

18   Q.  2006?

19   A.  There were profits as well.

20   Q.  2007?

21   A.  There was some profit.

22   Q.  2008?

23   A.  No.

24   Q.  2009?

25   A.  Big loss.

06FAYEE3ps                        Lesort - direct

1   Q.  Big loss.  Can you quantify the loss?

2   A.  I don't think it's anyone's business, but big loss.

3   Q.  Big loss.  OK.

4          MS. FRIDEGOTTO:  Just one moment, your Honor.

5   Q.  Mr. Lesort, did you ever sexually harass Beatriz Veerman?

6   A.  Never.

7   Q.  Did you ever racially discriminate against Ms. Veerman?

8   A.  Never.

9   Q.  Did you ever sexually harass Ms. Ba?

10  A.  No.

11  Q.  Did you ever racially discriminate against Ms. Ba?

12  A.  No.

13  Q.  Did you ever fire Ms. Veerman?

14  A.  No, I didn't.

15  Q.  Did you fire Ms. Ba?

16  A.  I did not.

17  Q.  Did you ever state that they were too dark to work certain

18  shifts at your restaurant?

19  A.  Definitely not.

20  Q.  You just testified right now that -- withdrawn.  There was

21  testimony earlier in this case that the "too dark" comment --

22          (Mr. Goldberg rose)

23  Q.  -- was because you didn't think the clientele would want

24  someone that was too dark.  Do you recall hearing that?

25          MR. GOLDBERG:  It's OK.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.   Yeah, I do remember hearing that.

2    Q.   Would you say that the clientele is the same every day?

3    A.   Very much so, yes.

4    Q.   So would it make a difference in regards to any specific

5    day?

6    A.   Not at all.

7    Q.   Not at all?  Thank you very much, Mr. Lesort.

8    A.   You're welcome.

9              THE COURT:  Mr. Goldberg, any questions?

10             MR. GOLDBERG:  Yes.  Thank you, your Honor.

11   CROSS EXAMINATION

12   BY MR. GOLDBERG:

13   Q.   Good morning, Mr. Lesort.

14             Mr. Lesort, with respect to this company Deep Blue

15   Group, that is the company that issued paychecks to Ms. Ba and

16   Ms. Veerman, correct?

17   A.   Yes.

18   Q.   So according to your company's records, Ms. Ba and

19   Ms. Veerman were employees of Deep Blue Group, correct?

20   A.   Yes.

21   Q.   And Deep Blue Group runs the Opia restaurant.  Yes?

22   A.   Yes.

23   Q.   And it runs the restaurant through the efforts of yourself

24   and Mr. Blech.

25   A.   Correct.

1    Q.   Who are partial owners of Deep Blue Group.

2    A.   Correct.

3    Q.   And you draw salaries from Opia.

4    A.   Correct.

5    Q.   And Opia is the name on the restaurant, outside the

6    restaurant.  It says "Opia."

7    A.   It's called a d/b/a.

8    Q.   It's a d/b/a, that's right.  Opia is the d/b/a of Deep Blue

9    Group.

10            What are your projected sales for 2010?

11   A.   You're asking me in gross revenues or --

12   Q.   Yes, gross revenues.

13   A.   4 million.

14   Q.   And in the years that Ms. Ba and Ms. Veerman worked at your

15   restaurant, as you said, a few minutes ago, there were profits.

16   A.   That's correct.

17   Q.   What, if you can tell me, what would Opia's typical sales

18   be, today, for example, June 15, 2010?  What would you expect

19   Opia's sales to be today?

20   A.   Today it really depends on -- unfortunately I don't have

21   the schedule of private events, but private events is a big

22   part of our revenue, and that can play a big impact on the

23   revenue.  But without private events on a day like today, then

24   Tuesday is a day that you can generate anywhere between 6 and 8

25   thousand in a day.

1    Q.   In gross sales?

2    A.   That's correct.

3    Q.   And Mr. Lesort, would you agree with me that, in terms of

4    the business district where Opia is located, is it fair to say

5    that certain nights of the week, like Wednesday and Thursday,

6    can be nights when a lot of business folks like to go out after

7    work for drinks?

8    A.   Business folks like to go out on any night of the week.

9    There's a higher volume of people who like to go out on a

10   Wednesday and Thursday, true.

11   Q.   That's why, when I spoke to you yesterday about days that

12   might be better shifts for a cocktail waitress, we were focused

13   on Wednesday and Thursday.  People, as you said, exit New York

14   City if they can on the weekend, avoid the heat, and a good

15   time to go out is Wednesday and Thursday.

16   A.   But actually the clientele does not change from Tuesday to

17   Wednesday.  The level and the quantity of clientele increases

18   on Wednesday and Thursday.

19   Q.   And you said a few minutes ago, when Ms. Fridegotto was

20   questioning you, that you're excited, I think, you're excited

21   about your business because you're connected to the Marriott

22   hotel chain now?

23   A.   We have a lot of hopes with that.

24   Q.   So you hoped for success, sales, and profits at your

25   restaurant.

1    A.    That's the whole idea of opening a business today in New
2    York.

3    Q.    So while 2008, 2009 may have been years where you had a
4    loss, you expect 2010 to be better than those years.

5    A.    We certainly hope so.

6    Q.    And you hope to have profits this year.

7    A.    We hope so.

8    Q.    At this point in time are you running at a profit?

9    A.    Not yet.

10   Q.    Not yet.  But you hope to have profits this year.

11   A.    That's correct.

12   Q.    And as you said, you're projecting 4 million in sales.

13   A.    That's correct.

14   Q.    Now, we talked -- you talked to Ms. Fridegotto a couple
15   minutes ago about payroll, payroll worksheets.  The payroll
16   is -- the payroll worksheet -- that's Exhibit 1 -- that's the
17   document that results in the W-2s, the tax forms for each
18   employee of the?

19   A.    That's correct.

20   Q.    So when I look at Plaintiff's Exhibit 1 and I see this
21   group called "management" -- and I'm not going to argue with
22   you right now about maître d's and managers, but there are no
23   tips listed for that group?

24   A.    That's correct.

25   Q.    So this payroll worksheet the results in a W-2 based on

1  data inside it.

2  A.  Yes.

3  Q.  So a manager, Sean Zier, doesn't have any tips in the

4  payroll worksheet, and his W-2 is going to be the amount listed

5  on the payroll worksheet.

6  A.  It should be.

7  Q.  It should be, but it's not.  There's no tips anywhere for

8  managers in here.

9  A.  Managers, again we talked about it earlier.  *Maître d's*

10  get tips.  Manager does not get tips.

11  Q.  OK.  Is Thadee Zachariasen, was he a *maître d'* or a

12  manager?

13  A.  Thadee was a *maître d'*.

14  Q.  And Thadee, I'll look at this document in 032, has no tips

15  next to his name for payroll worksheet May 2 of '06?

16  A.  I don't know.

17  Q.  You don't know why.  So in this document all of the people

18  who you say are *maître d's*, none of them have tips in the

19  payroll report, and none of them have a title in this document,

20  *maître d'*.  Is that correct?

21  A.  That's correct, based on the document.

22  Q.  And in terms of the sales at Opia, such as the 4 million

23  projected sales for 2010, I think you said before, the front

24  line of dealing with the customers that pay that 4 million are

25  the servers.  Right?

1  A.   The -- obviously the first person in touch and in contact
2  to the client are the servers, correct.
3  Q.   And in the case of '05, '06, and '07, when you had profits
4  at the restaurant, Ms. Ba and Ms. Veerman were partially
5  responsible for those successes, for the efforts.
6  A.   They were part of our team, that's correct.
7  Q.   And in '08 and '09 when you say you had losses, you didn't
8  have Ms. Ba or Ms. Veerman working at the restaurant.
9         MS. FRIDEGOTTO:   Objection, relevance, your Honor.
10 Q.   Right?  Am I correct?  They weren't there?
11        THE COURT:   Sustained.  All of it has been
12 established.  Asked and answered.
13        MR. GOLDBERG:   Thank you, Mr. Lesort.
14        THE COURT:   Thank you, Mr. Lesort.  You may stand
15 down.  Any other questions?
16        MS. FRIDEGOTTO:   I have questions, your Honor.
17        THE COURT:   Hold on.  Go ahead, ask your questions.
18 Ask them.
19 REDIRECT EXAMINATION
20 BY MS. FRIDEGOTTO:
21 Q.   Mr. Lesort, you said that you're projecting 4 million for
22 2010.
23 A.   Yes.
24 Q.   But you can't guarantee --
25 A.   Of course not.

1   Q.   -- you're going to make a profit.

2   A.   I wish.

3   Q.   There's unknown things that can happen?  So that 4 million,

4   is that fair to say it's an estimate?

5   A.   Absolutely.

6   Q.   And that $65,000 that you need each week to break even,

7   that is for 2010?

8   A.   That's based on our current expenses and payroll.

9   Q.   That's based on your current --

10  A.   On our current expenses and payroll yes.

11  Q.   I did a little bit of math.  65 times 52 weeks in a year,

12  that means that you were looking to spend $3,380,000 just to

13  break even.  That's how much you need to make.

14  A.   A restaurant, in the industry, depending on the ratio of

15  food and liquor, needs to -- will, when it does well, will net

16  profit anywhere between 12 to 15 percent.  That's the net

17  profit of the restaurant business.  Whether it's in New York,

18  in Los Angeles, in Washington.  You can look at any statistic,

19  national statistic.  This is a business which is a

20  penny-and-dime business, 12 to 15 percent.

21  Q.   And the profits, if there are any --

22  A.   They go directly to my investors.

23  Q.   They go directly to?

24  A.   My investors.

25  Q.   And you indicate --

1    A.    In order to pay them back.

2    Q.    Have they been repaid yet, sir?

3    A.    No, they have not.

4              THE COURT: Asked and answered.

5    Q.    Thank you very much, Mr. Lesort. I have no further

6    questions.

7              THE COURT: You may stand down.

8              (Witness excused)

9              THE COURT: Are there any other witnesses for the

10    defendant?

11              You want a minute to consult?

12              MS. FRIDEGOTTO: Just a minute to consult. And I

13    would like to see the documents.

14              THE COURT: OK. Yes, they are there.

15              MS. FRIDEGOTTO: May I step outside for them, please?

16              THE COURT: Well, I'll tell you what. We'll take a

17    ten-minute recess now.

18              Folks, we'll take ten minutes. I anticipate we're

19    winding down based on what I was told. I expect that when you

20.   come back, if we have any more witnesses, it will be brief. I

21    have these instructions ready to read. And we'll get the case

22    submitted to you. But if you want to take a little break, have

23    a cup of coffee or use the restroom, we'll be back at 12:10.

24    Remember the Court's admonition. We will be in recess for ten

25    minutes.

1        (Jury not present)

2        THE COURT: All right. The jury is not present,

3   counsel and the parties are present.

4        MR. KRAUS: We would ask for some time to review the

5   tax records and determine what, if anything we need to do.

6        THE COURT: No, I'm not going to delay this,

7   Mr. Kraus. These things were ordered and Mr. Goldberg said

8   this morning he had them. There are two counsel here. You

9   could have been looking at them during the time she was asking

10  questions.

11       MR. KRAUS: We didn't get them until --

12       THE COURT: Mr. Goldberg said he had them this

13  morning. He said he had them. He's been referring to them.

14       MR. KRAUS: He's --

15       THE COURT: Mr. Kraus, I'm not delaying this. The

16  jury is not going to be kept waiting while you look over these

17  records. He's been here since this morning. He announced they

18  were here this morning. So take a look at them. He made one

19  small correction, he even referenced them and said he made a

20  correction.

21       MR. KRAUS: I don't know what the correction is. We

22  have haven't gotten it.

23       THE COURT: He said he made one correction, I think to

24  2007 on Ms. Veerman's W-2. He said one was wrong. And

25  Ms. Fridegotto acknowledged that, shook her head when

1    Mr. Goldberg said it. So that for the hour and a half we've

2    been asking questions, Ms. Fridegotto has, you could certainly

3    have been looking at those at counsel table.

4              MR. KRAUS: If I had them, I would.

5              THE COURT: We're going round and round. If you could

6    have had them. You could have asked Mr. Goldberg, hand them

7    over four feet to me. I'm not delaying this. Ten minutes is

8    all we have.

9              (Recess)

10             MS. FRIDEGOTTO: Your Honor, I would like to ask for a

11   sidebar.

12             THE COURT: Well, we don't need it. Nobody is here.

13   Let's go back on the record in the matter of Veerman v. Deep

14   Blue. Counsel are present. Plaintiffs are present.

15   Defendants are just outside. The jury is not present.

16             Yes.

17             MS. FRIDEGOTTO: I just went through the discovery

18   that was previously provided. And I was never given W-2s for

19   2007, for Ms. Ba. And now all of a sudden, what was originally

20   shown to the jury as being an exhibit as to the amount of money

21   that she made for the year 2007 is off by $20,000. It goes up

22   to $20,000 instead of being 7. And I have all the discovery.

23             THE COURT: I'm sorry. I'm not following you. You're

24   saying she made $20,000 in '07?

25             MS. FRIDEGOTTO: She made $20,000, and instead, what

1  was shown to the jury, she was shown as having made 7. So it's

2  not a small error. It is $13,000.

3          And not only that, but I have just gone through the

4  discovery. I have every pay stub that she ever made from Opia

5  pretty much. She submitted all of them, but I was never

6  given -- I was given W-2s for the year 2008, and they match up.

7  I mean, I did the math roughly in my head. I did the math

8  roughly in my head. But one is for approximately 5 and change

9  and one is approximately 6 and change. So this 11 number, I'm

10 OK with for 2008. Ms. Veerman submitted --

11          THE COURT: I don't need to know what you're OK with.

12 What are you asking? You want to put the plaintiff on and ask

13 her whether the W-2s reflect her income for the respective

14 years? That's why we have trials. If you disagree with the

15 numbers, put her on. Offer the W -- offer the tax return,

16 redacted with her Social Security number out. And then you can

17 test these figures.

18          MR. GOLDBERG: And as I said, I apologize for the

19 13,000 oversight. The W-2s are here. And we reduced the

20 number by 13 now. I sincerely apologize.

21          THE COURT: OK. He flagged that. He flagged that at

22 the time that he produced these this morning.

23          MS. FRIDEGOTTO: By, just -- he flagged it now.

24          THE COURT: No, no. He said earlier that he was going

25 to have to adjust the number. He didn't tell me the amount.

 1    But he said one of them was wrong and a W-2 was wrong.

 2         MS. FRIDEGOTTO: All right. Well, I would like to

 3    remove 43-A from evidence.

 4         MR. GOLDBERG: We just redacted the interest and we

 5    reduced the math. And I will tell the jury in closing that we

 6    made a mistake and I apologize.

 7         THE COURT: I don't know that that's necessary. Why

 8    don't we just -- why don't we enter into -- why don't you enter

 9    into a stipulation that the amount was erroneous up to this

10    point, the error has been discovered, plaintiffs acknowledge

11    that and are not asking for that amount as to 2007.

12         MR. KRAUS: I think we would still like it removed

13    from evidence. It's improper.

14         THE COURT: OK. He's redacted it. The chart won't be

15    shown again. Don't use the chart with the wrong number. Take

16    a look at the exhibit. He has corrected the exhibit.

17         MR. GOLDBERG: I gave a copy to Ms. Fridegotto with

18    the reduced number so that she would have the exact document as

19    corrected.

20         MR. KRAUS: Our objection stands. Obviously it's up

21    to the Court to do what it sees best.

22         THE COURT: Yes. I think what I'll do is allow the

23    redactions to be made. I'll explain to the jury that there was

24    a mistake made. And I will have you explain what the mistake

25    was and tell them that the document has been corrected at this

1    point.

2          If defendants want to call the plaintiffs on the

3    matter of how much they made or put on their tax returns, they

4    are free to do that.  That's how I resolve it.

5          Anything else?

6          MS. FRIDEGOTTO:  Not at this time, your Honor.

7          THE COURT:  OK.  Call the jury.

8          THE CLERK:  Yes, your Honor.

9          THE COURT:  Are your clients still here?  They're

10   coming back in?

11         MR. KRAUS:  Yes.  I'll get them, your Honor.

12         THE CLERK:  Jury entering.

13         (Jury present)

14         THE COURT:  All right.  Once again, all members of the

15   jury are present.  Counsel and the parties are present.

16         Ladies and gentlemen, it sometimes happens in cases

17   with lots of paperwork, as this case has, that some mistakes

18   are made.  Apparently counsel had discovered a mistake on one

19   of the documents that was admitted in evidence already.  The

20   mistake is going to be corrected on the exhibit before you,

21   before it's back in the jury room with you.  Mr. Goldberg

22   acknowledges the mistake and will tell you what it is now and

23   correct that.

24         Mr. Goldberg?

25         MR. GOLDBERG:  Thank you, your Honor.  On the Ms. Ba

06FAYEE3ps

 1 │ damages chart, we made a mistake because we left out by

 2 │ accident the W-2 form, and it was discovered this morning.  And

 3 │ I adjusted Ms. Ba's damages amount downwards by about $13,000

 4 │ because of the additional W-2s that were located.  I apologize.

 5 │ I made the correction.  I have the W-2 forms for Ms. Fridegotto

 6 │ here.  And I apologize for the mistake, your Honor.

 7 │        THE COURT:  All right.  So you saw some charts.  I

 8 │ think they were used during the examination of witnesses.  The

 9 │ charts won't be in evidence.  They were demonstrative.  But

10 │ you'll have the actual exhibit that the chart was blown up

11 │ from, and that chart has been corrected to reflect what you

12 │ believe is the accurate amount of earnings for 2007 by

13 │ Ms. Veerman?

14 │        MR. GOLDBERG:  Yes, your Honor.  Thank you.

15 │        THE COURT:  OK.  So with that explanation, defendants

16 │ may proceed at this point.

17 │        MS. FRIDEGOTTO:  I would like to call Ms. Ba back up

18 │ to the stand, please, your Honor.

19 │        THE COURT:  All right.  Ms. Ba.

20 │        You are still under oath, Ms. Ba.

21 │  KHADUETOU BA,

22 │     called as a witness by the defendants,

23 │     having been duly sworn, testified as follows:

24 │ DIRECT EXAMINATION

25 │ BY MS. FRIDEGOTTO:

06FAYEE3ps                        Ba - direct

1    Q.   Good afternoon, Ms. Ba.

2    A.   Good afternoon.

3    Q.   You previously testified on Friday, last week, that you

4    sustained a loss of $47,447 in lost earnings as a result of

5    your alleged firing from Opia.   Isn't that correct?

6    A.   Correct.

7    Q.   And now, we have made a correction to your lost earnings

8    claim, and it now shows that -- and you had previously actually

9    testified that you had earned $7,300 in 2007; is that correct?

10   A.   That's what was on the chart.

11   Q.   OK.   But as of now we have just amended the chart, and so

12   now it has actually come out that you made $20,366 in 2007.   Is

13   that correct?

14   A.   Yeah.   I gave all the W-2 form to my lawyer, so...

15   Q.   So you earned $23,366 in 2007, is that correct?

16   A.   If that is what the W-2 form says, that's correct.

17   Q.   All right.   And so just to refresh, in 2006 you made

18   $27,206 at Opia?

19   A.   Yes.

20   Q.   So your lost earnings as previously testified is incorrect;

21   is that correct?

22   A.   It was a mistake on the part of my lawyers, and they

23   apologized for it, so...

24   Q.   Thank you very much.

25   A.   Thank you.

1          MS. FRIDEGOTTO: I have no further questions and --

2          THE COURT: Any questions of Ms. Ba on this?

3          MR. GOLDBERG: No. No questions, your Honor.

4          THE COURT: OK. Thank you, Ms. Ba. You may stand

5   down.

6          THE WITNESS: Thank you.

7          (Witness excused)

8          THE COURT: Next, Ms. Fridegotto.

9          MS. FRIDEGOTTO: I think, your Honor --

10          THE COURT: Defendant rests.

11          MS. FRIDEGOTTO: Yes.

12          THE COURT: OK. Any other evidence on behalf of the

13   plaintiffs at this point?

14          MR. GOLDBERG: No, your Honor. Plaintiff rests.

15          THE COURT: All right. Ladies and gentlemen, the

16   evidence is complete at this point. As I projected for you, I

17   have some instructions that I have settled with the parties

18   now. I'm going to give you these instructions. We have

19   narrowed down the verdict forms to four forms. And the forms

20   track the claims that the plaintiffs have made in this case.

21   And I will explain these verdict forms for you right before you

22   retire to deliberate.

23          But for now it's my duty to instruct you on the law.

24   You will then hear summations from counsel. Yesterday

25   afternoon I spoke with counsel about how long they intended to

1    address you in their closing arguments.  Both lawyers said no

2    more than 45 minutes, probably less.  So sit back, relax.

3    You'll hear the instructions.  You'll hear summations of

4    counsel.  And then we'll do what I've been promising for

5    several hours now; we'll give this case over to you for

6    decision.

7              Members the jury, now that you have heard all of the

8    evidence, it is my duty to instruct you on the law of the case.

9    As I have told you several times, this very copy of

10   instructions will accompany you into the jury room when you

11   deliberate.

12             Because the instructions are central to the verdict

13   that you reach, along with your findings of fact, I'm required

14   to read these to you in open court.  It's a signal of the

15   importance of the principles of law.

16             You must not infer from the instructions nor from

17   anything I have said nor done during the course of the trial

18   that I have any opinion regarding the evidence or what verdict

19   you should reach.  As I explained to you last Friday, this is a

20   matter entirely for you.  The eight of you are the judges of

21   the fact.  I have no function in that regard.

22             It's your duty to find the facts from all the evidence

23   in this case and then, to those facts, apply the law as I give

24   it to you.  In deciding this case, you must follow the law,

25   whether you agree with it or not, and in deciding this case,

1    you should not be influenced, you should not base a decision on
2    such things as personal likes or dislikes, opinions,
3    prejudices, sympathy, subjective factors. Instead, you have to
4    decide the case solely on the basis of the evidence before you.
5    Remember, last Friday when you stood up and I told you this is
6    a little like church, all of you took an oath promising that
7    you would decide the case based on the evidence and the law.
8    And we expect you to hold to that oath.

9           You should decide the case as to each plaintiff and
10   each defendant separately. Unless otherwise stated, these
11   instructions apply to all parties. And in following these
12   instructions, you should follow all of them and not single out
13   some and ignore others; they are all equally important.

14          I want to go back over the claims that are at issue
15   for you to decide in this case. Now that all the evidence has
16   been received, let me give you a brief summary of the positions
17   of the parties. These are the things that you must decide.

18          Beatriz Veerman and Kadia Ba were servers at a
19   restaurant called Opia in Manhattan. Opia is owned and managed
20   by Frederick Lesort and Antoine Blech through a company called
21   Deep Blue Group. Ms. Veerman and Ms. Ba have brought claims
22   against Opia, Deep Blue Group, Mr. Lesort, and Mr. Blech
23   relating to their employment while they were at Opia.

24          The first of these claims is as follows: Ms. Veerman
25   and Ms. Ba allege that they were sexually harassed while they

1    were at work at Opia and they were required to work in a

2    sexually hostile work environment. They allege that Mr. Lesort

3    and Mr. Blech participated in the sexual harassment by verbally

4    and physically harassing them. The defendants, although having

5    no burden of proof as to any claim made by the plaintiffs, deny

6    that any sexual harassment took place, and they also deny that

7    the plaintiffs were forced to work in a hostile work

8    environment.

9           Second, Ms. Veerman and Ms. Ba allege that Opia and

10   Deep Blue and Mr. Lesort and Mr. Blech discriminated against

11   them by giving them less desirable work shifts than other

12   workers who were not of their race, color, or national origin,

13   and that they were harassed and discriminated and discharged

14   based on their race and their color and their national origin.

15   Again, the defendants, having no burden of proof as to any

16   claim made by the plaintiff, nonetheless deny these

17   allegations. They contend that they did not discriminate

18   against Ms. Veerman and Ms. Ba because of their race, their

19   color, or their national origin. They further contend, the

20   defendants do, that the plaintiffs were assigned shifts based

21   on their availability, their experience, their seniority, and

22   their capability.

23          Third, Ms. Veerman and Ms. Ba allege that Opia and

24   Deep Blue and Mr. Lesort and Mr. Blech unlawfully retaliated

25   against them and terminated their employment after they

1    complained about the discrimination against them, and Ms. Ba

2    was retaliated against and discharged after she opposed their

3    demand to pay an unpaid customer bill in violation of New York

4    State labor law.  Again, the defendants, having no burden of

5    proof as to any claim made by the plaintiffs, deny these

6    allegations.  The defendants contend that Ms. Ba walked out of

7    Opia during the middle of her shift after being spoken to about

8    a disputed credit card charge.  And the defendants contend that

9    Ms. Veerman was not fired but instead was suspended for missing

10   a shift on Sunday, May 13, 2007 and for insubordination.

11            Finally, Ms. Veerman and Ms. Ba allege that Opia and

12   Deep Blue, Mr. Lesort and Mr. Blech, unlawfully took away 5

13   percent of Ms. Veerman and Ms. Ba's tips, in violation of New

14   York State labor law.  Again, the defendants, who do not have

15   any burden of proof as to this claim, deny the allegations.

16            When a party has the burden of proof on a claim or a

17   defense or an issue, that means that the party must persuade

18   you that that claim, defense, or issue is true by a

19   preponderance of evidence.  Preponderance of evidence means

20   that the claim, issue, or defense is more probably true than

21   not true.  This is a simple tilting of the scales, convincing

22   you by 51 percent or more.

23            The plaintiffs have the burden of proof in this action

24   to prove each and every one of the elements that they claim

25   brought by a preponderance of the evidence.  You should base

1  your decision on all the evidence regardless of which party
2  presented.

3      Keep this in mind too. This is an important
4  distinction that I made at the beginning, I reiterate now.
5  It's the distinction between what is evidence and what is not
6  evidence. Evidence consists of sworn testimony from the
7  witness stand. There are a number of documents and papers and
8  some photographs that have been received in evidence. Anything
9  that's been received in evidence in tangible form is also
10 evidence. And then any facts which the lawyers have agreed or
11 stipulated. I don't think we've had any stipulation in this
12 case. We have had a correction and a concession which you can
13 consider as proof to hear at the end.

14     In contrast to these three categories of evidence,
15 these are things that are not evidence. The arguments and the
16 statements by lawyers are not evidence. Remember what I said.
17 Wherever Mr. Goldberg and Ms. Fridegotto were in '06 and '07,
18 they weren't in Opia. They didn't know what was going on
19 there. They weren't getting drinks or being served or
20 observing what's going on. So they have had to reconstruct
21 this case. And they are not witnesses to what happened. They
22 have no historical connection to the events. You heard from
23 people who did.

24     So I say that not to deprecate the lawyers or to tell
25 you they are unworthy of consideration of the things they are

1 | saying, but just to point out the important distinction. They

2 | weren't there. They're not firsthand involved in any of this.

3 | Questions and objections by the lawyers likewise are

4 | not evidence. Throughout the trial, the lawyers have made

5 | objections when they thought they are appropriate and I have

6 | ruled on them. You are not to be influenced by any of the

7 | objections or by the Court's rulings on them.

8 | A couple of times I told you to disregard testimony.

9 | Something has been said, you know, a couple of times we had

10 | people talking over each other and something was blurted out or

11 | something was nonresponsive and I struck it and instructed you

12 | at the time not to consider that. And that's not to say that

13 | you're going to forget that certain things were said. But

14 | anything that you've been instructed to disregard or that has

15 | been stricken, don't let that play a part in your decision in

16 | this case, your deliberations.

17 | Finally, I don't think this has happened because you

18 | would have notified me, but anything that you may have heard

19 | somebody say or you may have learned while court was not in

20 | session is not evidence in this case. I haven't sequestered

21 | you. I haven't forbidden you from looking at the newspaper or

22 | the TV, but the point is, we want all eight of you to be on the

23 | same page and to decide this case on the basis of the same

24 | evidence, which is what occurred here in this courtroom.

25 | Remember that evidence will be direct or

1   circumstantial.  Direct evidence is direct proof of a fact,

2   such as testimony by a witness about what that witness

3   personally saw or heard or did.

4          In contrast, circumstantial evidence is indirect

5   evidence.  It's evidence of one fact from which you can infer

6   another fact.  You remember my story about the jet flying over

7   and how that could be proved somebody could say how we looked

8   up and saw, heard the engines, somebody else could say, no, we

9   never saw the jet nor heard the engines, but we saw a vapor

10  trail that was starting to break up, that was in the sky and

11  from that you could infer that a jet had flown over.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE COURT: The point is both direct and

2    circumstantial evidence are competent ways of proving facts and

3    ultimately it is up to the eight of you to decide how much

4    weight to give any particular item of evidence, whether it is

5    direct or circumstantial.

6          Here is an important instruction. It has to do with

7    the credibility of witnesses.

8          I predicted to you from the beginning that there was

9    going to be a confrontation of versions, a confrontation of

10   evidence and you would have to sort it out. That's why we are

11   having this trial because the parties disagree on what happened

12   here. They want eight of you conscientious people to apply

13   judgment and experience and to give them a verdict as to how

14   this thing happened, what happened here.

15         In doing so, you may have to decide which testimony to

16   believe and whatnot to believe. You can believe everything a

17   witness says or part of it or none of it at all.

18         Here are some non-exclusive list of factors to take

19   into account when you evaluate the testimony of the witnesses

20   that you heard.

21         First, ask yourself what opportunity and ability did

22   that witness have to see or hear or know the things that the

23   witness was testifying about?

24         Second, what is the degree of the witness' memory or

25   the condition of the witness' memory? Is it good or is it

1  sketchy.

2          Third, what was the witness' manner while testifying?

3          Did you pick up on anything based on your instincts as

4  human beings in your judgment and experience in the way the

5  witness testified, the way something was said or the mannerism

6  of a witness while he or she was testifying.

7          Ask yourselves also did the witness have an interest

8  in the outcome of the case, or does the witness have any

9  apparent bias or prejudice that would cause me to distrust the

10  testimony?

11          Is there other evidence in the case that contradicts

12  the witness' testimony?

13          Ask yourselves also does the witness' testimony seem

14  reasonable to me in light of all of the evidence?

15          Then finally, any other factors that the eight of you

16  think bear on believability.

17          This isn't an exclusive list.  There are other factors

18  that weigh in the calculus here.

19          Remember also that the weight as to a fact doesn't

20  necessarily depend on how many witnesses testify about it.  You

21  can be persuaded by the testimony of a single witness or

22  alternatively you can reject the testimony of many witnesses if

23  it doesn't have the ring of truth in your judgment.

24          Each plaintiff in this case claims that she was

25  treated less well than other employees because of her section

 1    by the defendant Opia Restaurant and by the defendants

 2    Frederick Lesort and Antoine Blech.

 3                Specifically, each plaintiff claims that because of

 4    her sex, she was subject to a manager or supervisor sexual

 5    harasment, sexual advances, requests for sexual conduct or

 6    other verbal or physical conduct of a sexual nature, and that

 7    the defendant Opia restaurant took tangible employment actions

 8    against her for declining or refusing those advances.

 9                To succeed on this claim of sexual harassment against

10    the defendant Opia Restaurant, the plaintiffs have to persuade

11    you by a preponderance of evidence that the following occurred:

12                First, they have to persuade you that Mr. Blech or Mr.

13    Lesort or some other manager or supervisor of the Opia

14    Restaurant subjected them to unwelcomed sexual advances that

15    were sexually motivated, based on sex and, second, that their

16    rejection of those advances affected an aspect of their

17    employment.  In other words, that were it not for their

18    rejection of these sexual advances they would not have been

19    discharged from employment.

20                A sexual advance means something that is unwelcome if

21    it is uninvited and offenses or unwanted.  The advances here

22    must be proved to be unwelcome advances and for the plaintiffs

23    to prove that they have to show they were not invited, they

24    were offensive to them and they were unwanted.

25                The plaintiff need not show that the rejection of the

1    advances was the only or the predominant factor that motivated

2    the defendants.

3                   If you find that either Mr. Lesort or Mr. Blech

4    subjected either plaintiff to unwelcome sexual advances as I

5    have described, then you may find that Mr. Lesort or Mr. Blech

6    is personally liable if by a preponderance of evidence you find

7    that they participated in conduct that gave rise to the claim

8    that I just described, or if they attempted to aid and abet it,

9    which means help it or assist it, help the person or assist the

10   person engaged in that conduct in some way.

11                  You may also find for the plaintiff against the

12   defendant Opia Restaurant if you find, again, by a

13   preponderance of evidence that either Mr. Lesort or Mr. Blech

14   or some other manager or supervisors subjected them because of

15   their gender to sexual advances, requests for sexual conduct or

16   other verbal or physical sexual conduct of a sexual nature that

17   altered the conditions of their employment, that the conduct

18   was unwelcomed and that the conduct created a sexually abusive

19   or hostile work environment.

20                  The plaintiffs have to show that the conduct was

21   severe or pervasive enough to create an environment that the

22   plaintiffs themselves believed and perceived to be hostile or

23   abusive and that a reasonable person would also have perceived

24   the climate to have been hostile or abusive.

25                  If you find for the plaintiffs on their claim of

1   hostile work environment, you must determine by a preponderance

2   of the evidence whether the conduct was sufficiently severe or

3   persuasive that it altered the terms or conditions of their

4   employment. Your determination should consider the totality of

5   the circumstances, including the nature of the unwelcomed

6   sexual acts or the words, how frequent the harassing conduct

7   was, if any, the severity of the conduct, whether the conduct

8   was physically threatening or humiliating or merely offensive

9   utterances, whether it unreasonably interfered with the

10  plaintiff's work performance and whether it affected the

11  plaintiff's psychological well-being.

12          If you find either Mr. Lesort or Mr. Blech subjected

13  either plaintiff to sexually abusive or a hostile work

14  environment as I have described it, then you may find Mr.

15  Lesort or Mr. Blech personally liable if, once again by a

16  preponderance of evidence, you find that either one

17  participated in the conduct that gives rise to the claim or

18  that either one assisted, helped somebody who did engage in the

19  offensive conduct.

20          Each plaintiff also claims that on the basis of race

21  and color and national origin she was discriminated against and

22  that she was treated less well than other employees of a

23  different race, color or national origin.

24          In other words to find for the plaintiffs on this

25  claim, you must determine, once again by a preponderance of

1   evidence, two things:

2           First, you must determine that during the time that
3   plaintiffs were employed by the Opia Restaurant that an
4   employee or an agent of the employer subjected them to
5   discriminatory conduct based on their race or their color or
6   their national origin, and that that discrimination altered the
7   terms and conditions of their employment.

8           Second, you must determine, again by a preponderance
9   of evidence, that either a manager or a supervisor of the Opia
10  Restaurant engaged in the conduct or knew of the conduct and
11  that the defendant Opia Restaurant acquiesced in the conduct,
12  or failed to take appropriate action to stop it.

13          One way an employer can treat an employee less well
14  than other employees is to deny that employee desirable work
15  schedules.

16          The plaintiffs need not show that their race or their
17  color or their national origin was the only or the predominant
18  factor that motivated the defendant's discriminatory conduct.
19  If you find that either Mr. Lesort or Mr. Blech subjected
20  either plaintiff to the conduct as I've just described it, then
21  you may find Mr. Lesort or Mr. Blech personally liable if by a
22  preponderance of evidence you find that either one participated
23  in conduct giving rise to the claim or they helped someone who
24  was actually engaged in that conduct, a concept called aiding
25  and abetting.

1        Each plaintiff also accused the Opia Restaurant and

2   the defendants Mr. Lesort and Mr. Blech of unlawfully

3   retaliating against her for engaging in protected activity,

4   namely, for opposing or objecting to or complaining about the

5   unlawful discrimination or harassment based on sex and for

6   opposing or objecting or complaining about the unlawful

7·  discrimination or harassment based on color or race or national

8   origin.

9        To prove illegal retaliation the plaintiffs must

10  persuade you by a preponderance of evidence that while they

11  were employed at the Opia Restaurant they opposed or objected

12  to or complained about unlawful discrimination or harassment.

13       Second, that they were discharged or that they were

14  denied equal shifts because of their complaints.

15       Third, that the defendant knew about the plaintiff's

16  opposition, knew about their objection or their complaints and

17  that, fourth, the defendants would not have denied them equal

18  shifts, would not have discharged them but for their opposition

19  and objection to the complaints.

20       A plaintiff is not required to prove that her

21  complaint had merit in order to prove that she was retaliated

22  against.

23       In this case each plaintiffs alleges that the

24  defendant denied her equal shifts and later discharged her for

25  opposing and objecting to and complaining about unlawful

1    discrimination and harassment. Once again, the plaintiffs need

2    not show that retaliation was the only or predominantly factor

3    that motivated the defendants.

4        If you find that either Mr. Lesort or Mr. Blech

5    subjected either plaintiff to the conduct that I just

6    described, then you may find them personally liable if, once

7    again, you find by a preponderance of evidence that they

8    participated in that conduct or they aided and abetted the

9    conduct somehow.

10       If you determine that during the time the plaintiffs

11   were employed by the Opia Restaurant an employee or agent of

12   the employer who exercised managerial or supervisory

13   responsible to the restaurant subjected them to discriminatory

14   conduct based on race, color or national origin as I just

15   described, you must then determine by a preponderance of the

16   evidence whether the conduct was sufficiently severe or

17   persuasive such that it altered the terms and conditions of

18   employment and created an abusive working environment.

19       Again I tell you, your determination should be based

20   on the totality of circumstances as it has been described in

21   the evidence, including, among other things, the frequency of

22   the harassing conduct, the severity of the conduct, whether the

23   conduct was physically threatening or humiliating or merely an

24   offensive utterance or whether it unreasonably interfered with

25   the plaintiff's work performance.

1       If you find either that Mr. Lesort or Mr. Blech

2   subjected the plaintiffs to the conduct I just describe, you

3   may find them personally liable if than convinced by a

4   preponderance of evidence that they engaged in the conduct or

5   they aided and abetted it.

6       Both plaintiffs accuse the defendant company and the

7   individual defendants, Mr. Lesort and Mr. Blech, of unlawfully

8   discharging and discriminating against them on the basis of

9   race and color and national origin.

10      To find or either plaintiff on this claim, you have to

11  determine by a preponderance of evidence that the defendant

12  terminated the employment of the plaintiffs and that it was on

13  account of the plaintiff's race, color or national origin, that

14  that was the motivating factor giving rise to the defendants'

15  decision.

16      The plaintiffs don't have to show that the

17  consideration of race or color or national origin was the only

18  factor or the predominantly factor that motivated the

19  defendants' discriminatory conduct.

20      When you consider this evidence, the question is not

21  whether the defendant showed poor or erroneous judgment.  An

22  employer is entitled to make an employment decision for a good

23  reason, a bad reason or for no reason at all, so long as the

24  decision was not motivated by unlawful discrimination.

25      If you find that either Mr. Lesort or Mr. Blech

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   subjected either plaintiff to the conduct I just described, you

2   may find them personally liable if, again, by determining by a

3   preponderance of evidence that they participated in the conduct

4   or they aided and assisted it.

5           The plaintiffs are not required to produce direct

6   evidence of the defendants' unlawful motive. You, rather, may

7   infer knowledge and/or motive as a matter of reason and common

8   sense from the existence of other facts; for example,

9   explanations that were given that you find were really

10  pretextual. A pretextual reason is not the real reason that an

11  action was taken.

12          Ms. Ba has made an individual claim against the

13  defendants for unlawfully retaliating against her by

14  discharging her for engaging in protected activity, namely, for

15  opposing and objecting or complaining about the defendant's

16  demand that she pay an unpaid customer bill in violation of a

17  state labor law.

18          It would be a violation of state labor law to require

19  Ms. Ba to pay an unpaid customer bill. It would likewise be a

20  violation of state labor law for an employer to retain any

21  portion of an employees tips or gratuities.

22          To prove illegal retaliation in this case, Ms. Ba must

23  persuade you by a preponderance of evidence while she was

24  employed at the Opia Restaurant she complained about the

25  defendant's demand that she pay an unpaid customer bill and the

1    defendant knew about her opposition and objection and complaint

2    and that the defendant would not have discharged her in the

3    absence of her complaint about that subject.  The plaintiff is

4    not required to prove that her complaint had merit in order to

5    prove the retaliation claim.

6             In this case plaintiff Ba alleges that the defendants

7    unlawfully discharged her because she opposed and objected to

8    and complained about the defendants' allegedly unlawful demand

9    that she pay an unpaid customer bill in violation of state law.

10            Ms. Ba also claims that she was either fired or

11   constructively discharged from her employment at Opia.  To

12   prove that she was constructively discharged from employment,

13   Ms. Ba must show that the defendants, by taking illegal or

14   discriminatory acts, made her working conditions so difficult

15   that a reasonable person in her position would have felt

16   compelled to resign.

17            When here a company is involved in a case it may act

18   only through natural persons, that is, its agents or employees.

19   What that means is for Opia to be involved it has to operate

20   through its agents or employees, it's managers and employees

21   and the like and, in general, any agent or employee of the

22   company may bind the company by his acts and statements made

23   while acting within the scope of his authority at the company

24   or within the scope of his duties as an employee of the

25   company.

1        In this case the defendant Opia Restaurant acts

2    through managerial and supervisory employees.  This would

3    include, for example, Mr. Lesort and Mr. Blech as managers,

4    associate managers and any assistant managers of the company.

5        Therefore, if you find that Mr. Lesort or Mr. Blech as

6    managers or any other supervisor of the Opia restaurant acted

7    in a certain way, then you will also find that Opia Restaurant

8    acted in that way.

9        It is the duty of the court to instruct you also about

10   the measure of damages.  By instructing on damages I don't mean

11   to suggest for which party your verdict should be rendered, I'm

12   required to tell you how damages are measured.

13       If you find for the plaintiff on a claim against the

14   defendants, then that particular plaintiff for whom you find is

15   entitled to damages from the defendant based on the claim.  In

16   this case the damages may include back pay that the plaintiffs

17   would have earned had the defendant not acted unlawfully as

18   well as lost future earnings.

19       Uncertainties about the amount of lost compensation to

20   be awarded should be resolved in the plaintiff's favor.  If you

21   determine that a defendant has unlawfully retained plaintiff's

22   gratuities or tips that the plaintiff is entitled to, then

23   damages in the amount of the retained gratuities or tips is

24   appropriate.

25       If you find for a plaintiff on a claim against the

1  defendant, then you have to determine whether she is entitled

2  to damages in an amount that is fair to compensate for that

3  claim. You may award compensatory damages only for injuries

4  that the plaintiffs proof were caused by the defendants'

5  allegedly wrongful conduct.

6          The damages that you award must be fair compensation,

7  no more and no less. You may not award damages based on

8  sympathy or speculation or guesswork. On the other hand, the

9  law does not require that the plaintiffs prove the amount of

10 losses with mathematical precision, but only with as much

11 definiteness and accuracy as the circumstances permit.

12         You may not consider the cost to a plaintiff for

13 hiring a lawyer. Attorneys' fees are determined by the court

14 if necessary and may not be included in your damages award.

15         You may award compensatory damages also for emotional

16 pain and suffering, for inconvenience or mental anguish if you

17 find that those conditions were caused by the defendants' sex

18 based harassment or hostile work environment or for race, color

19 or national origin based harassment, hostile work environment

20 or discharge or for retaliation or for aiding and abetting any

21 of the unlawful conduct that I have described.

22         No evidence of the monetary value of these intangible

23 things, such as pain and suffering, has been or need be

24 introduced in evidence. There is no exact standard for fixing

25 the compensation to be determined for these elements of damage.

1       In addition to actual damages, you may also award

2   plaintiffs punitive damages to punish the defendant for some

3   extraordinary misconduct and to serve as an example or a

4   warning to others not to engage in such conduct.

5       If you find in favor of a plaintiff and against the

6   defendant and if you find by a preponderance of evidence that

7   the defendant's action was motivated by an evil motive or

8   intent that the defendant was callously indifference to the

9   plaintiff's rights, then in addition to any other damages to

10  which you find the plaintiff is entitled you may, but are not

11  required to, award the plaintiff with an additional amount as

12  punitive damages if you find it is appropriate to punish the

13  defendant or to deter the defendant or others from like conduct

14  in the future.

15      Whether to award the plaintiff punitive damages and

16  the amount of those damages are matters within your discretion.

17      You may assess punitive damages against any or all

18  defendants or you may refuse to impose punitive damages.  If

19  punitive damages are assessed against more than one defendant,

20  then the amounts assessed against such defendant may be the

21  same or they may be different.

22      The plaintiffs have a duty to use reasonable efforts

23  to mitigate damages by taking advantage of opportunities they

24  may have had to prevent the aggravation of their losses and to

25  reduce or eliminate those losses.  To mitigate is a legal term.

1    It means to avoid or to reduce something, in this case reduce

2    the amount of the loss or the damages.

3         The defendant has the burden of proving by a

4    preponderance of evidence that the plaintiff failed to use

5    reasonable efforts to mitigate her damages and the amount by

6    which the damages could have been mitigated.

7         All right.  I mentioned to you that I had two

8    concluding instructions that have to do only with deliberation.

9    After you heard from counsel, I'll give you those instructions.

10   I will go over the four verdict forms with you.  They are

11   basically explanatory.  Then we will send you out enjoy your

12   lunch and begin your deliberations.

13        With those things said, how do we agree we will do the

14   closings?

15        If you would start, Ms. Fridegotto.

16        You may address the jury on your final argument.

17        MS. FRIDEGOTTO:  Good afternoon, ladies and gentlemen.

18        I would like to start by thanking you for your time.

19   I know that it has been long, you had some long days and on

20   behalf of myself, on behalf of Mr. Kraus, on behalf of Mr.

21   Lesort and Mr. Blech, I just want to tell you that we really

22   appreciate it.  We know that some of the testimony has been

23   tedious, particularly with regard to the charts, but you have

24   been troopers and we really appreciate it.

25        At the beginning of this case I told you that this was

1    a case about greed, and I've changed my mind.  It's a case

2    about common sense, common sense and lack of evidence.  In

3    fact, an overwhelming lack of objective evidence.

4            I would like to remind you that plaintiffs are not

5    testifying -- have not testified in this case that they were

6    victims of one or two incidents of sexual harassment; 700

7    times, Ms. Ba said, Ms. Veerman claims she was asked out 100

8    times and she was touched repeatedly, constantly all the time

9    on the floor, in the halls, on the way to the bathroom, in the

10   kitchen, everywhere there was to be touched at Opia or standing

11   at the bar, everywhere, in a place which you heard been

12   described as 6,000 square feet, multiple rooms.  There is a

13   lounge, there is a dining area, there is a room in the back for

14   parties, there is a kitchen, it's in a hotel.  There are people

15   coming and going every single minute of every single day.

16   There are 200 people who sit at the -- can sit in the

17   restaurant on a given day and eat.  Mr. Lesort testified 200,

18   you know, maybe people would be sitting, people could be

19   standing.  There are parties, parties with, with, with groups

20   of people going in and out every single day.  And yet not one

21   person saw a single thing.  Not one person has come in here to

22   tell you I saw plaintiffs get touched.  I saw them get groped.

23   I saw them -- people going up and touching their arms, touching

24   their ear.

25           Who do they have?  They have each other.  And we both

1    know that they have skin in the game here.

2           Does it make sense to you that someone would look for

3    a job because they want to accommodate their own schedule?  Of

4    course.  Absolutely.  We do it every day.  People have

5    engagements with their families, with their friends,

6    significant others, children, charities, church, anywhere.

7    People want to accommodate their schedules.  And that is why

8    both plaintiffs testified that they came to Opia.  They came to

9    accommodate their schedules, their school schedule.  They had

10   other priorities.

11          It is perfectly acceptable to have other priorities.

12   It is perfectly acceptable to aspire to be something more than

13   a waitress.  It is okay to want for your school to be the

14   number one thing in your life, and it is okay for you to ask

15   your employer if they are willing to accommodate you.  And in

16   this case the overwhelming evidence shows that they were.  It

17   is okay for you to ask that they accommodate your schedule and

18   they give you some leeway so you can go and work your schedule

19   around what it is that you do every day.

20          It is also perfectly acceptable for your employers to

21   decide who they want to be, as Mr. Lesort testified, the first

22   people you encounter when they walk in.  You want it to be

23   someone friendly.  You want it to be someone who is more than

24   just a person who takes orders.  You want them to be

25   personable.  You want them to have experience, not a

1    requirement, it's preferable, but Jimena testified we can train

2    them.  However, we want you to be flexible, we want you to be

3    available, we want you to be there and you will grow with the

4    restaurant.  We are a team.  And when you walk in here, from

5    the minute in which you are hired -- and you heard both

6    plaintiffs testify about how they were hired, incidentally.

7              Jimena said that Ms. Ba was one of five people who she

8    interviewed in her group.  In her group of people she was the

9    only person, she was the only person of color, two Hispanic

10   ladies I believe she testified to and someone else.  Who did

11   she hired?  She hired Ms. Ba.

12             Does this strike you as a person, does common sense

13   tell you the person who hired Ms. Ba over other people who are

14   outside her race is a racist?

15             Would it strike you that Jimena, the person who makes

16   the schedules -- you heard testimony by everyone, from both

17   sides, Jimena is the person who makes the schedule.  Is the

18   person who is racist the second you walk into the door going to

19   be racist throughout your employment?

20             Is that the way that the world works?  Or is the

21   person who has absolutely no interest in what race you are --

22   she looked like she was willing to learn, she was willing to

23   learn, she didn't have experience but I hired her and she put

24   her on the schedule.

25             Yes, she didn't get the best shifts, but she hadn't

1    been there, she didn't know all these things that you have to

2    learn when you walk into a restaurant.

3          Did she know the food, the drinks, where the places

4    are, how to set the tables, the names of all the employees?  Do

5    you know that when you walk into a place?  You immediately ask,

6    are you so arrogant that you want to have the best shift

7    immediately straight off the bat, first day off?

8          It doesn't make any sense.  And it doesn't make any

9    sense here.

10         Does it make sense that if you are being touched

11   relentlessly, pervasively, constantly, repeatedly, if you are

12   being made uncomfortable, if your life is being stressful, if

13   you are being emotionally distressed, does it make sense for

14   you to go out with a person who are doing this to you to

15   parties?

16         Granted New York City is one big party.  Parties

17   happen every night of the week.  There are bars every corner,

18   restaurants everywhere.

19         Do you go out with them outside the restaurant?  Do

20   you go to their house?  Do you get into their car multiple

21   times?  Do you have your own party at the restaurant where you

22   are being sexually harassed?  Do you have your own party where

23   you are being racially discriminated?  Do you bring your own

24   loved ones, your friends, your boyfriends, your fiancee, do you

25   bring them to the place that is making your life miserable?  Do

1    you?

2           Do you hug them?  Do you hug the person that is asking

3    one of your best friends to pea in their mouth?  Do you?

4           Do you dance with them?  Do you?  Christmas of 2006,

5    two years Ms. Veerman had been there when this picture was

6    taken, two years of relentless, being asked by Mr. Lesort every

7    day, every time I was on the floor, every shift will you go

8    out, will you go out with me, will you go out with me.

9           She went out with him.  She said she did.  She went to

10   his house.

11          Mr. Lesort wanted to get to know her.  Bring a friend.

12   He told her she could bring a friend.  She went.

13          Was she scared to go up to us house?  Was she scared

14   to eat with him and his cousin?  Was she?

15          Common sense.

16          If something horrible is happening to you at work, do

17   you complain?  Of course you do.  I once heard the quote that

18   language was invented so that humans could complain.

19          We complain every day of our lives.  Now in the age of

20   technology, my goodness, the areas where we can complain are

21   almost too many.  We can e-mail, we can write, we can send, you

22   know, letters of protest, blogs, things on the Internet.

23          We have the capability and it is now fortunately for

24   everyone who feels that they have been wronged in any way,

25   shape or form, whether because of their race, whether because

1    of their sex, whether because of the color of their skin or the

2    country they are from, you have the right and it is no longer

3    any stigma associated with standing up and saying I have been

4    wronged, I've been wronged, I'm being treated improper, and

5    wrong things are happening at this place.

6           Have you been shown one e-mail? One letter? One

7    phone call? Anything, anything to substantiate that there was

8    something going on and that they were complaining about this

9    alleged racial discrimination and this alleged sexual

10   harassment? You haven't seen it. Why? Because there wasn't

11   any.

12          All these people who saw the customers in and out, the

13   managers, all the managers saw, all the waitress saw. You

14   heard them testify. People -- the restaurant business is a

15   transient industry. People don't go to a restaurant

16   necessarily and stay there for 15, 20 years. Some of them do

17   if they are lucky, but many of them go there because they want

18   to further their careers. They want to do different things.

19   They start at one restaurant, they go to another restaurant.

20   They move around. They move around.

21          Hum. Would you have looked for a job somewhere else

22   if someone was groping you, your breasts, your buttocks, your

23   arms, touching your hair, whispering in your ear every day,

24   every shift, on the floor in front of people? Would you?

25   Would you have looked for another job?

1              Common sense.

2              A lot of people would have looked for another job.

3              Do you know who probably wouldn't have looked for

4    another job?  Someone who wasn't being sexually harassed,

5    someone who wasn't being racially discriminated against,

6    someone who found in this restaurant a place where they could

7    go and they could be accommodated.  Finally no longer have to

8    work the twelve our shifts from 4:00 p.m. to 4:00 a.m. in the

9    morning, I can go around my schedule.  My schedule is very

10   busy, I have classes, full time, laboratories, different

11   courses that I have to take, I have an internship, so many

12   different other things that were more -- that impacted into

13   their schedules on a daily basis.

14             Common sense.  Common sense says you don't like where

15   you are, you look for another place.

16             There are, you heard testimony about it, thousands of

17   restaurants in New York City, thousands.  Apparently all one

18   has to do is go to Craig's list, type in server and a slew of

19   jobs appears and you can look and you can go to a call and you

20   can say this is my resume, I have worked in a restaurant

21   before, please hire me.  That's how they ended up at Opia.

22             And yet they didn't do that, did they?  They didn't

23   look for a job anywhere else.  They liked where they were.

24   They went to Christmas parties and mingled with the staff and

25   brought their loved ones to these parties.

1          Does common sense tell you that you wouldn't complain

2   to the man that one day you are going to share your life with?

3   That you would be -- that you would not feel the need to scream

4   to everyone this place has mistreated me; they are giving

5   better shifts to women who are outside of my color?

6          In a city like New York, ladies and gentlemen, in a

7   city like New York where, I mean, the colors of the rainbow in

8   this room.  People come here from all over the world.  People

9   have come here from far away, from three different continents

10  just from these two tables.  They've come here to pursue their

11  dreams, their goals.  That's why Mr. Lesort and Mr. Blech

12  opened their restaurant.

13         Mr. Lesort walked into a restaurant one day, started a

14  job as a busboy.  He said, you know what, I like this.  I want

15  this to make my live's work out of this, live's work.

16         Twenty-nine years he has been in this country, the

17  past 20-something working in this restaurant business.  He

18  testified he had plenty of other businesses.  He has hired many

19  different employees.  These employees have followed him.  They

20  have followed him.

21         Which employee, which minority employee would follow a

22  racist employer?  It just doesn't make any sense.  It really

23  just doesn't make any sense.

24         Not one stitch of evidence other than each other.

25         I mentioned the issue of complaints.

1          Do you know who complained?  Ms. Ba complained.  She

2     complained.  She complained on a blog when she saw something

3     that outraged her, when something happened to her that made her

4     furious and, therefore, she felt the need to vent, she felt the

5     need to say something, say something, do something.

6          We hear it every day when we enter the subways, if you

7     see something, say something.  New Yorkers see something, they

8     say something.

9          Oh, if you go to the Internet and you look around for

10    reviews about restaurants, they will tell you everything,

11    everything under the sun about what a place is.  It is good, it

12    is bad, the food is terrible, the drinks are awful, the wait

13    staff is rude.  Common sense.  New Yorkers complain.

14          And if they were too scared to complain, which they

15    testified that they were, that they didn't want to or that they

16    only complained, you know, just to the managers, not higher up,

17    what about all the other people in the restaurant?  What about

18    the other waitresses who no longer work for defendants, who no

19    longer work at the restaurant?  They don't care.  They have all

20    moved on with their lives.  They become actresses, yoga

21    instructors, whatever, anything under the sun.  Maybe a lot of

22    them, they might run their own restaurants now.  Maybe they are

23    employers themselves.  They know what it feels like to work in

24    a hospitality industry.

25          Where are they?  Did they come to say that they saw

1  something?  That they witnessed something?  That they, too,

2  were disgusted by this horrible pervasive hostile behavior by

3  Antoine, by Mr. Blech and Mr. Lesort?  No.

4        Why not?  Because there wasn't any, that is why.

5  Common sense.

6        I mentioned and I've touched a bit on the issue of the

7  sexual harassment and a little bit on the issue of racism, but

8  let's think about who did testify here who isn't a party.

9        Granted, yes, Jimena does work for Mr. Lesort and Mr.

10 Blech.  She works for them, had worked for them for many years,

11 twelve hour days, and yet when did she find out that Mr. Lesort

12 had a relationship with one of his waitresses?  Yesterday.

13       Who told her?  Me.  I was the one who brought it up.

14 She has worked with the man for twelve years and yet she had no

15 clue.

16       Mr. Lesort testified, he said I'm a private person, I

17 am the persona of my restaurant.  People walk in and they see

18 me, they see my, my staff, they see my employees.

19       Is that how you build careers by going around grabbing

20 people in your restaurant?  No.  You build careers out of

21 service, hospitality, being hospitable to your customers who

22 come back, to come back to your restaurant because they had a

23 good time, the food was good, the servers were very nice to me,

24 she gave me free ice cream, that's, you know, free cake, an

25 extra glass of wine on your birthday, and when you make a

1  mistake don't worry, I'll write it off, my apologies, I am

2  sorry that your soup was cold or that you found a bug in your

3  lettuce.

4          Common sense.  Common sense.

5          You also heard from Thadee.  Thadee, who to hear them

6  say it, we complained to Thadee all the time every day.  We

7  complained to Thadee about racism, and he told us Frederick

8  said that you are too dark.

9          What did Thadee say on the stand this morning when he

10  came here?  I never said that.  Frederick never said that.

11         Thadee was fired by Mr. Lesort.  He told you himself.

12  If anyone has, you know, an ax to grind, it's him, Thadee, who

13  said that he worked there for years, very long hours, from five

14  to four in the morning, and he gets fired because he's tired.

15  He is the one who has an ax to grind.  Yet what did he do?  He

16  walked in here today and he says no, I was there, I was there

17  and no one ever said anything to me about their being racial

18  discrimination at Opia; no one said anything to me about being

19  asked out; no one said anything to me about being touched and,

20  in fact, I was shocked when I found out about this lawsuit.

21         And he took time out of his day to come here to speak

22  to you the he didn't have to do it.  He doesn't work with Mr.

23  Lesort.  He doesn't work with Mr. Blech.  He doesn't work with

24  Jimena, either.  They all fired him two years ago.  And yet he

25  felt strongly enough to come in and say no, I was there, I saw

1  it, this is what was going on.

2          I mentioned the issue that there weren't any witnesses

3  to what was going on. And perhaps one could say that the

4  witnesses were scared, maybe they didn't want to come here,

5  didn't want to go and testify against a former employer about

6  the wrong.

7          But that wouldn't make any sense, would it, because

8  these people, they don't work there anymore. They are not

9  there anymore. They moved on. They have gone somewhere else.

10  They have no reason to fear what Mr. Lesort might do to them,

11  or Mr. Blech. They don't have reason to fear that Jimena is

12  going to put them on a Sunday schedule for the next twelve

13  weeks and never have them work on Wednesday again. And yet

14  they're not here.

15          There has been a lot of paper shown to you, a lot of

16  paper. A lot of the charts are pretty boring to look at, but

17  they all seem to show one thing.

18          Firstly, that their schedules got better. They did.

19  They testified to it. They got on the stand and said yes, my

20  schedules got better. And the documents support that and they

21  show that. And they show that their tips got better. A

22  hundred, $200 the first week, by the end $1,300 in tips a week

23  for two days, three days. And remember, these tips, that's

24  only 50 percent or 55 percent. That isn't even -- they had to

25  share it with the rest of their team.

1              Their shifts got better.  That's why they stayed.

2   That's why they didn't look for another job.  There was no

3   reason for them to look for another job.  They were happy at

4   Opia, they were happy.  They made friends.  They met their

5   boyfriend and fiancee, they brought their friends to this

6   place, ladies and gentlemen.  They brought their significant

7   others and they danced with people and they met the spouses of

8   their managers and everyone else and they mingled and they

9   bought each other gifts.

10             You heard testimony regarding the racial makeup of

11  Opia.  Everyone under the sun; men, women from all different

12  races, all different colors, all different origins.  They have

13  come here from afar.

14             Jimena from Uruguay.  Mr. Lesort and Mr. Blech from

15  France.  They mentioned the sue chef was from West Africa.

16  Ms. Ba is from West Africa as well.  Ms. Veerman Brazil.

17             You were willing to walk into the restaurant and work,

18  you had a job.  You were willing to work, you are willing to do

19  what was necessary in order to get at the end of the day count

20  your tips, go home, put up your feet and say tomorrow I'm going

21  to have to do this again, but you know what, that is why I

22  work.  I work to pay my bills, I work to pay for school, I work

23  to make something out of myself.  And that is what they did.

24             Ms. Veerman didn't want to be a waitress.  She's a

25  nurse, a registered nurse, possibly one of the hardest jobs in

1  the world, definitely one of the least -- the most

2  underappreciated.  They do all the work and the doctors get out

3  glory.

4          She got her dream.  She wasn't emotionally distressed

5  at Opia.  She wasn't ruined by Opia.  She wasn't damaged by

6  Opia.  She got what she wanted.  She got a job.  She got

7  schedules, she got good tips.  And everything all works

8  together and now she is where she is and she doesn't -- she

9  makes much more than she ever made at Opia.  Opia was a

10  stepping stone for her.

11          Ms. Ba has graduated.  She has a degree in finance.

12  She, too, is going somewhere.

13          (Continued on the next page)

14

15

16

17

18

19

20

21

22

23

24

25

1     MS. FRIDEGOTTO: She has -- they just graduated, in

2   fact, I believe that she testified to. She is also well on her

3   way into her career. Opia was a stepping stone. But it wasn't

4   this stepping stone that they would like you to believe that it

5   was. It wasn't this den of iniquity where people were touching

6   them and groping them and feeling them up every minute of every

7   day. No. It really was not. And how do we know this? Common

8   sense. They stayed. They stayed there for a long time. And

9   they didn't look for a job anywhere else.

10     Not only that, but when they didn't work there

11   anymore, Ms. Ba wanted to go back, back to this place. She

12   testified that she met with, who? This sexual predator, this

13   sexual predator, Mr. Blech, she met with him to ask for her job

14   back.

15     Now, tell me, ladies and gentlemen, maybe I'm just not

16   understanding, but does common sense tell you that once you are

17   free from a place that has been harassing you for years or

18   where you have been discriminated against on the basis of your

19   race and your color, do you want to go back there? When

20   there's 18,000 restaurants in New York City where you could be

21   a waitress? Does that make sense to you?

22     When I did my opening on Friday, I told you that the

23   evidence would show that they weren't fired. I told you Ms. Ba

24   had walked out on her job, walked out when she was shown an

25   error that she had made, and just walked out, in the middle of

1    service, in the middle of service.  What does that do to your

2    team?  The team that -- you hear Mr. Lesort -- survives on the

3    basis of everything that you do.  She obviously didn't care.

4    Jimena, in this memo that was prepared, yes, it was prepared

5    immediately after they received a letter from the attorneys.

6    She memorialized everything that she knew immediately on a

7    piece of paper, wrote it down.  That memo that plaintiff's

8    attorney will have you looking at the word "responsibility" and

9    trying to figure out if that is a cutesy way of saying that we

10   break the law here at Opia, that memo, made two weeks after

11   they received a letter from an attorney, says Ms. Ba walked out

12   of her shift in the middle of service.  In the middle of

13   service.  She realized that she made a mistake.  Two mistakes.

14   First mistake wasn't -- could have been an honest mistake, the

15   one with the credit card.  But you heard testimony, they never

16   asked her to pay the bill.  They didn't even owe the money at

17   the time.  They didn't owe the money at the time.  Why would

18   they have asked her to pay the bill?  It just doesn't make any

19   sense.

20           And yet she wanted to come back.  And who did they

21   want to come back through?  The man who wanted to pee in her

22   mouth.  The man who groped her 700 times on the floor at Opia,

23   the same floor that she walked out on in the middle of service,

24   with all those 200 people having their dinner, having their

25   drinks, all 50 employees of Opia walking around, the bussers,

1    the runners, the servers, the cocktail waitresses, the

2    cleaners, the people in the kitchen, the people who cooked the

3    food, the sous chefs, the manager, two managing members -- all

4    these people, to see what was going on, all the time, from

5    morning, when they opened, to evening, when they closed.

6         But she didn't get her job back. And so then here we

7    are. Her friend is still at Opia. And she had a moment of

8    arrogance too. It was Sunday schedules. "Oh, I didn't know I

9    was on the schedule." We've all heard testimony, the schedules

10   were posted on the wall for everyone to see. It was the

11   responsibility of every single waitress and server and waiter

12   and every person who had a shift to look and see what day they

13   were on the schedule for. "I didn't know." OK. Honest

14   mistake. But then do you mouth off to your manager about it?

15   Or do you say, I'm sorry, I apologize, my mistake, it won't

16   happen again. No. So instead she got suspended. Suspended

17   for what? For not showing up for her shift and for being rude

18   to someone who had a higher title than her. Perfectly

19   acceptable. It makes sense. You mouth off to someone who is

20   higher up than you and something is going to happen.

21        Now, a lot has been made about whether it's one week,

22   two weeks. It doesn't matter. Two weeks later, they had a

23   lawyer. Two weeks later she never called in to indicate that

24   she wanted to go back. In fact, Mr. Blech testified that she

25   said, you know what, I think I need a break from Opia. A week

1    later, there's the letter from the lawyer:  I think I need a

2    break.  The message which we read -- which we heard being read

3    out, "I heard that you had a problem with management.  I hope

4    you come back in a week."  That's what the message said.  Does

5    that sound like the message that someone who fired someone

6    would leave on someone's voice mail message?

7         Now I ask you to use common sense one more time.

8    Things happen to us in life.  Good things, bad things.  And

9    there are certain systems in place to protect us, to protect us

10   from when we are suffering wrongs.  There are courts, just like

11   this one.  And there are other agencies as well, agencies that

12   protect people when they lose their job.  But neither plaintiff

13   filed for unemployment.  And yet they needed money.  Well, tell

14   me, ladies and gentlemen of the jury, isn't unemployment there

15   to protect you from -- protecting you from moments in which you

16   don't have a job?  Protecting you in situations in which I'm

17   looking, I'm looking everywhere, I've looked on the Internet,

18   I've gone to this place, I've gone to that place, and they're

19   not hiring, they only want the night shift, they only want me

20   to go to work when I'm at school.  It is there to protect you.

21   When isn't it there to protect you?  When you walked out.  When

22   you have walked out of your job.  When you've quit.

23         You've heard the testimony.  I don't need to repeat

24   it.  They never suffered any adverse employment action at Opia.

25   They never suffered any sexual harassment either.  And they

1  didn't suffer any racial discrimination.

2          The evidence that we've heard in the past couple of
3  days, I believe, confirms that.  And common sense will tell you
4  that when you are deliberating the evidence that you have heard
5  this far.

6          You are the trier of fact.  You get to take everything
7  that you have heard in the past couple of days and talk about
8  it amongst yourselves, use all eight of your experiences to
9  piece it all together, and then use your joint common sense to
10  figure out, does plaintiff's version make sense?  Does it make
11  sense that they went to Opia?  Yes.  Does it make sense that
12  their shifts improved at Opia?  Yes.  Does it make sense that
13  they stayed at Opia?  Not to hear them speak about it.  But if
14  you listen to everyone else, it does make sense.  Their shifts
15  got better.  Money was good.  Schedule was being accommodated.
16  Does it make sense that they behaved the way they did?  That
17  they didn't complain, that they didn't scream to the top of
18  their lungs about all the horrible things that were happening
19  to them at every shift, by people who were supposed to be
20  protecting them, their employers?  Does it make sense?

21          Thank you very much for your time.

22          THE COURT:  All right, Ms. Fridegotto.  Thank you.

23          MR. GOLDBERG:  Thank you, your Honor.

24          THE COURT:  Mr. Goldberg, you may sum up.

25          MR. GOLDBERG:  Thank you very much.

1      I'd like to start out by agreeing with Ms. Fridegotto

2   on one point.  That is, to say thank you, thank you, Mr. Jones,

3   Mr. Docherty, Ms. Mapp, Ms. Reed, Mr. Miller, Mr. Rowe,

4   Mr. Loperena, and Mr. Cohen.  Thank you for your time.  Jury

5   service is time consuming.  Putting on a trial is time

6   consuming.  And I can tell you that this trial has moved along

7   very quickly, very smoothly.  And I appreciate the Judge on

8   that, because we really moved through witnesses and attorneys

9   fast.  So thank you to all of you because you're not doing this

10   as your living and you're giving us your time.  And I do

11   appreciate that.

12      Listening to Ms. Fridegotto's summation brought back

13   some memories for me.  I remember after I graduated from

14   college I went to work for a large company.  And I had a boss

15   that was really rough on me, very demanding, sometimes a little

16   bit abusive, made me work late at night, very rough on me.

17      This same boss would sometimes say to me, let's go for

18   lunch, let's go grab a beer after work, my car, then I'll bring

19   you back and drop you off.  And I worked for a very large

20   factory.  Big company.

21      Did I turn the boss down when the boss said, let's go

22   grab a bite to eat?  The same boss that made me work late the

23   night before, that made me redo work, teaching a young college

24   graduate what it's like to work in a large factory.  And I was

25   a supervisor.  It was rough.  But I did go to lunch.  I took

1   that car ride from the boss.  I didn't quit.  And I didn't look

2   for another job.  I had a reason.  I was right out of college.

3   I was trying to build a résumé.  I wanted to have some

4   longevity on it and hopefully go to law school.  So I made a

5   choice.  I did what I had to do.

6          At the same time, when opportunity presented itself, I

7   tried to let my boss know, you know, you don't have to -- you

8   don't really have to raise your voice to me, I understand what

9   you want me to do.  I tried to get the boss to change his

10  behavior a bit.  I tried.  I did the best I could.

11         When the time was right and my career goals were being

12  met, then I left on my own terms.  I wasn't becoming a nurse.

13  I wasn't going through Ms. Kadia's pursuit into finance.  I was

14  navigating my own career.  And so it seems odd to me that

15  somebody would say to me, if somebody said to me, you should

16  have quit, a lot of companies you could go work for, you went

17  to a good college, what's wrong with you.  When you are the

18  victim of harassment, it's not your verdict to quit that job

19  and go find some other job.  That's not what the law requires

20  or society requires.  You are entitled to say, I'm going to try

21  to tough it out and try to get that person to change their

22  behavior, even if there's no HR department, which Opia doesn't

23  have.  There's no human resources department.

24         By the way, I'm not even sure it would matter if there

25  was, because who's in charge?  The two gentlemen that are

1   accused of sexual harassment.  So even if there was an HR

2   department, the HR director would answer to Mr. Blech and

3   Mr. Lesort.  Yeah, there's a handbook.  Took a look at it.  But

4   they said they don't follow their own policies.  In fact,

5   Ms. Fridegotto put the handbook out there, to I think

6   Ms. Jimena or Mr. Blech or Mr. Lesort, said, there's your tip

7   policy, there's your policy on charging back employees.  Do you

8   follow it.  They said, no, it's just in there just for threat.

9   So they have the handbook.  They tell you they don't follow it.

10  They have no human resources department.  And the people

11  accused in this case of the wrongdoing, they're the owners.  So

12  there's nobody above them to go to.

13       Now, are people perfect?  We're not perfect.  I'm not

14  perfect.  I made a mistake on the damages chart.  And I'm not

15  happy about it.  And my client told you on the witness stand,

16  so now forever and ever it's on the record:  Ken Goldberg made

17  a mistake on a damages chart.  It happened.  We all make

18  mistakes.  But it's one thing to say, ask somebody out once and

19  then realize, you know what, they don't want to go out with me,

20  and you don't ask them again.  We wouldn't be here if that were

21  the case.  It's another thing when you ask somebody out

22  numerous times, a hundred times, and they say no and you keep

23  asking.

24       Now, Ms. Fridegotto says to you, well, Ms. Ba says she

25  was touched 700 times and you can't believe that.  On the other

1    side of the equation, you have Mr. Blech testifying, I asked

2    her out a couple of times. So Ms. Ba refers it as 700. Maybe

3    it felt like 700 and it was only 500. She's telling you, in

4    the months she worked there, the hands were on her all time.

5    And when asked a year, two years later in a deposition to

6    quantify it, she gave her best estimate, because, to her, it

7    was 700 times. It was every time she saw him on the floor.

8    And in a busy restaurant that has 200 people coming in, people

9    who don't care less about who's working there, they're just

10   there to have a good time, maybe they're there because it's

11   after work and they're having a beer with their buddies, maybe

12   they're there to watch a game on the big screen. Maybe they're

13   there because they're looking to meet somebody special. That

14   happens. They might not care at all if a waitress is being

15   harassed by an owner. That might be something that they don't

16   even pay attention to. And if they don't know the people,

17   maybe they don't care.

18        Ms. Fridegotto said to you, well, the plaintiffs

19   didn't parade in all these employees to say I saw it, I saw it.

20   You heard the judge give an instruction. And it's not how many

21   witnesses you parade into a trial. That's not who wins. It's

22   the quality of what the witnesses say. Ms. Fridegotto

23   mentioned, well, we brought this guy in name Thadee, the famous

24   Thadee. He didn't have to be here. I wrote down what she

25   said, something about, he didn't have to be here. She didn't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   mention a subpoena, trial subpoena.  That brings somebody in.

2   So to say that somebody came in here voluntarily out of nowhere

3   to tell truth because they feel motivated and then not mention

4   a trial subpoena, well, a trial subpoena says you show up or

5   they go to the judge, and if you don't show up, somebody comes

6   knocking at the door.  That's a trial subpoena.

7           And the fact that it's a transient business, yeah,

8   there are a lot of young people that go through Opia.  They

9   change addresses.  They move out of town.  They change careers.

10  So if the plaintiffs don't parade in some of these folks, don't

11  assume that's because those folks don't have something to say.

12  There could be a host of reasons: can't locate them, they have

13  moved, they have other careers.  Maybe they are on a modeling

14  shoot, because a lot of the folks at Opia, a lot of the

15  cocktail waitress, they go into modeling, they go into acting,

16  they go into singing, they go Off Broadway.  Maybe they got a

17  gig.  There's a whole bunch of reasons why people may or may

18  not show up.  They may be in the industry working somewhere

19  else.  They may be looking to get into one of these new

20  resort -- other restaurants.  They may not want to challenge

21  someone who is very powerful and make enemies just to help

22  somebody they've worked with.  Not everybody is going to show

23  up and be available and come to court, and you shouldn't read

24  into that.  It's what you hear in the court.  It's not the fact

25  that there's some person that didn't come in and testify.

1      I want to agree with Ms. Fridegotto on one other

2   point.  And then I'm going to go into a lot of disagreement,

3   and try to go as quickly as I can.

4      Ms. Fridegotto changed her position a bit.  She said,

5   I told you last week this case was about greed, it's no longer

6   about greed, it's about common sense.  I agree.  It never was

7   about greed.  You saw the damages charts.  You know these

8   ladies have moved on with their lives.  They have other careers

9   they are pursuing.  They did not hire me, take all this time

10  and spend all this period of time from '07 to 2010 out of

11  greed.  They did it because there's something called right is

12  right and wrong is wrong.  And if you feel in your heart that

13  there's something wrong and you're in a position to do

14  something about it and you're no longer threatened by the

15  people who made your life miserable and took advantage of you,

16  and you feel like there's a way to say, you know what, I'm away

17  from them, I'm going to make my statement, I'm going to make

18  sure this doesn't happen to somebody else, then it's OK.  It's

19  not a crime to file a lawsuit if you feel you've been wronged.

20  And this case wasn't about greed, as Ms. Fridegotto said.  It

21  wasn't.

22      Now, Ms. Fridegotto waved some photos at you, so I

23  want to wave them as well.  The fact that you have a picture of

24  Ms. Veerman, a foot or two foot way, in the middle of a

25  Christmas party with a roomful of people and Mr. Blech dances

1   two feet away from her, you know, that doesn't mean that

2   Ms. Veerman thinks that Mr. Blech is a Boy Scout. That's a

3   Christmas party. That's the same thing as my boss saying to me

4   20 years ago, a guy who was giving me a really hard time, you

5   know, let's grab a beer here, let's grab a beer here at a

6   Christmas party. And you go and you have that quick beer. The

7   fact that Ms. Veerman had her arm in front of Mr. Blech, that's

8   a posed photo. That's a roomful of people. And the person

9   with the camera says, hey, let's take a picture. If we asked

10  you jurors, get a little closer, we want to make a picture,

11  somebody might go like this. And it wouldn't mean that you had

12  affection for someone. That means you're going to put your arm

13  around them. And it might take all of two seconds.

14          You'll notice, who's far away from Mr. Blech? Ms. Ba.

15  Ms. Ba is keeping her distance from Mr. Blech. She's the one

16  that he had affection for.

17          Mr. Blech gave you an answer that I wrote down and

18  circled, "I'm a man." That was his answer, when we asked him

19  about his alleged affair with Ms. Ba, which she said is

20  fabricated, fabricated because he knows people saw him touching

21  her and making advances. He knows. So instead of saying, I

22  did nothing, when he knows people saw, he says, well, it went

23  even further, it went to the extreme. And my "defense" for

24  this: I'm a man.

25          Mr. Lesort's defense is, Opia is my social life.

 1   That's where Mr. Lesort gets his girlfriends.  And he's had a

 2   few.  And he wanted Ms. Veerman badly, so badly he kept asking

 3   her out.  And he had the power over her, just like Mr. Blech

 4   had the power over Ms. Ba.

 5           Mr. Lesort has had girlfriends, and that's his social

 6   life.  And he's in a perfect position to get it, right.  He

 7   owns the business.  Young guy.  Presents himself well.  And he

 8   hires all these young women, that have no money in their

 9   pocket, move into New York just trying to make their rent,

10   maybe they work in a second job.  They got no power.  But Opia

11   is a chance to make money, and look at the guy in charge.  He's

12   got it made.  Except when he made advances to Ms. Veerman.

13   Ms. Veerman had a boyfriend, was going to nursing school, and

14   wasn't interested.

15           In fact, Ms. Veerman, yeah, she brought her boyfriend,

16   this gentleman.  Looks like a nice guy, right?  He went to Opia

17   with her once for a Christmas party.  Does that mean that

18   Ms. Veerman didn't have problems at Opia with Mr. Lesort?  Is

19   her arm around Mr. Lesort in any picture?  Is there a picture

20   of Ms. Veerman with Mr. Lesort in some kind of intimate

21   position that suggests that that was OK with her?  The answer

22   is no.  You'd have it, by golly, if it existed, right?  Because

23   they've been flashing photos at you this whole time.  One was

24   sitting here for hours.  If there was a picture of Ms. Ba

25   sitting in Mr. Blech's lap at a Christmas party, don't you

1   think you would have seen it? It doesn't exist. Because

2   that's where the lines were drawn. They told you,

3   Ms. Fridegotto said to you that Jimena came in, Ms. Pereyra,

4   and that you should take her testimony because she's been at

5   this establishment for many years, she makes the schedules, she

6   does the hiring. Ms. Jimena Pereyra has been employed by

7   Mr. Lesort and Mr. Blech forever, as far as I'm concerned.

8   She's their ally. She told you that. She's been on the

9   defense team from the beginning of this case.

10          So right after my clients lost their jobs and had a

11   lawyer make contact to raise the claims, she wrote a protected

12   memo. That memo, from June of '07, is not a contemporaneous

13   memo that says, today, this happened. Jimena couldn't write

14   the memo because when Ms. Veerman got fired, Jimena was not

15   there. and when Ms. Ba was fired -- and Jimena's the one who

16   fired her -- Jimena didn't write a contemporaneous memo. She

17   waited, several months later, till my firm wrote a letter, and

18   wrote a cover-your-you-know-what memo. I'm not going to use

19   that, any more vulgar terms with you. You've heard enough

20   graphic terms. But Jimena wrote a cover-your-you-know-what

21   memo in June of '07, and that memo said Ms. Veerman was

22   suspended for two weeks and never came back. Well, I have the

23   work schedule. It's in this big pile of exhibits, that I

24   invite you to look at, the schedule that should have had

25   Ms. Veerman's name on it if she had been suspended for two

1  weeks, because Opia makes these schedules at least a week in

2  advance. That's what they said. And they gave them to me. So

3  don't you think if they had really suspended Ms. Veerman for

4  two weeks, beginning on May 14, a Monday, the schedule in there

5  from May 28 would have Ms. Veerman's name? Then they could

6  say, look, here's the schedule, we stuck it back on, consistent

7  with the two-week suspension, and she blew off work. That

8  schedule doesn't have her name on it. That's because they

9  didn't suspend her.

10          When I started to bring this out in this litigation,

11  then a new document popped up. This was an affidavit. I

12  didn't put it into evidence. But I asked Ms. Pereyra, I said,

13  two years later you change your story. Now it's only a

14  one-week suspension. Isn't that convenient, because you didn't

15  produce a work schedule for the week after Ms. Veerman was

16  fired, right? You didn't produce a schedule. So now there's a

17  mysterious document that, if Ms. Veerman had a one-week

18  suspension, they would produce it with her name on it. Doesn't

19  exist.

20          So you change your story sometimes. Not me. But they

21  change their story. And Ms. Pereyra was confronted with that

22  on the witness stand. And she did what she thought she should

23  do -- protect her employer for ten years or more, protect

24  herself because she's caught in a lie, and pretend that her big

25  memo that says "Our policy is to make the employees pay the

1    unpaid customer bills" is somehow not what the English says.

2    It somehow doesn't mean what it says. Even when Mr. Blech and

3    Mr. Lesort admit that they do ask employees to pay from time to

4    time, they admit that, they said it's to threaten them, they

5    call it a threat, we threaten them. So you tell Ms. Ba, if you

6    don't pay the bill, you got no job. Ms. Ba says, I'm not

7    giving you $569. It's not my fault and you don't have a right

8    to ask. Ms. Ba says, well, I have no job, so I'm leaving. She

9    wasn't quitting. She was fired, exactly what they said they'd

10   do. It's in the handbook, which they now tell you they don't

11   follow. They have no HR department. It's in Ms. Jimena's

12   memo, Exhibit 18. And it's in the testimony of Mr. Blech and

13   Mr. Lesort.

14         So when you use common sense, which is what

15   Ms. Fridegotto said, yeah, OK, let's use some common sense.

16         I have some other points to cover with you. They

17   talked about the issue of schedules. I gave you a name of a

18   waitress that's white, Jelena Baranov. I have nothing against

19   the lady. So let's put that out there. She's hired at the

20   same time as Ms. Ba. Ms. Ba gets bad shifts. Jelena gets

21   great shifts. Jelena makes tons more money than Ms. Ba. Not

22   only that, but Ms. Veerman, who has been there eight months

23   longer than Ms. Baranov, is getting the same bad shift as

24   Ms. Ba. So Opia is hiring these cocktail waitresses, they're

25   white, and they are getting the Wednesday and Thursday shifts.

1    And they are making a lot of money.  And that's showing you

2    discrimination in shifts.

3            And we gave you examples.  Exhibit 17, you'll see the

4    ticket reports.  We don't have schedules from 2005 because

5    somehow Opia doesn't have them anymore.  If they had them, they

6    would show you exactly what I'm telling you.  And for the first

7    half of '06, they gave us partial ones.  Why?  Where are all

8    the ones from the first half of '06?  Mysteriously we just

9    don't have them.  The plaintiffs have a hard time in these

10   cases because it's not my client, the corporate entity, who I

11   can go and rummage through their documents.  We have to depend

12   on what they give us.  We have a hard time because there are

13   witnesses that may work for a company but they may not want to

14   tell the story in court, because they work for the company.

15           Plaintiffs, they have a tricky time.  Now, when

16   Ms. Fridegotto says, we didn't bring in the witnesses to

17   corroborate the story, let's turn it around, the two guys, two

18   managers, that dealt with Ms. Veerman when she was fired, two

19   managers, one is Sean Zier.  That's the guy who, on the Sunday,

20   called Ms. Veerman and said, you're on the work shift, where

21   are you.  Where is Mr. Zier?  The defendants didn't bring him

22   in to say, she was on the schedule, she didn't show up, I

23   called her, and then -- and I didn't let her come to work that

24   day.  Where is Mr. Zier?  OK.  He's nowhere.  He's not my

25   witness.  He's nowhere.  I ask you, where is the work schedule

1    that shows May 13?  It's not even in the pile of exhibits, the

2    work schedules for '07.  That's not there.  I don't even have

3    the Sunday, May 13, in there that says Ms. Veerman is supposed

4    to work.

5            Ms. Veerman, who is a very believable person, said

6    basically, I took Mr. Zier at face value.  I got a phone call.

7    I'm enjoying Mother's Day.  He said I'm on the schedule.  I

8    don't know that.  I hadn't seen that date.  It wasn't my

9    regular shift.  I ran to work.

10           There's no schedule in there from Opia that even

11   proves Ms. Veerman was on the schedule.  But even if you take

12   that at face value that she was, she did the right thing.  And

13   Mr. Zier isn't here to tell you how insubordinate and arrogant

14   Ms. Veerman was.

15           The other guy, Mr. Kirill Kisselev -- and I'm sorry

16   with all the names.  Some of them are hard to spell.  But

17   Mr. Kisselev is the guy who, on that Monday, told Ms. Veerman,

18   you're fired, Mr. Lesort doesn't want to deal with you.  Where

19   is Mr. Kisselev to say, no, no, no, I didn't fire you,

20   Ms. Veerman, I gave you a two-week suspension, or maybe one

21   week now they changed their story.  Where is Mr. Kisselev?  So

22   if you want to make an issue of witnesses not showing up, then

23   I would say, where are their witnesses for Ms. Veerman?

24   They're not here.

25           The only issues that came up that I wanted to quickly

1    comment on was the unemployment insurance benefits.

2    Unemployment insurance benefits are, as most people know,

3    they're not a fortune in money. And they're not intended to

4    protect you from sexual harassment. It's like a stopgap. And

5    if my clients, Ms. Veerman and Ms. Ba, didn't apply because

6    they didn't know about it or because they were just busy

7    looking for work and didn't want to get a handout, I don't

8    think you fault them for that, that they were trying to get a

9    job. I think it's OK.

10          You know from the basic evidence that I want to go

11   over and try to go as quickly as I can, Ms. Veerman was

12   testifying about an hour when I got up there, and I think she

13   was up there for two hours and when Ms. Fridegotto questioned

14   her. And it went on and on. But what you heard from

15   Ms. Veerman, what was very, very sensible and common sense,

16   was, she went to Opia so she could work a schedule that made

17   sense for her and support herself through nursing school. She

18   didn't go there looking for trouble. She didn't go there to be

19   sexually harassed.

20          The evidence is undisputed, she was a good cocktail

21   waitress. You heard that from Mr. Lesort, Mr. Blech,

22   Ms. Pereyra, and even Mr. Thadee, who showed up out of the

23   blue. Everybody said Ms. Veerman was a good cocktail waitress.

24          Ms. Veerman said that Mr. Lesort asked her out, she

25   said it was at least a hundred times. Mr. Lesort, in

1   deposition testimony: One to five. Although his testimony

2   changed a bit when he was here on the witness stand. But you

3   saw me parading up and down to the witness stand to show them

4   their transcripts. So Mr. Lesort admits he asked Ms. Veerman

5   out one to five. I suggest to you, his number is way too low.

6   That's just a little convenient for him. Ms. Veerman says, I

7   was asked out numerous occasions and I turned Mr. Lesort down.

8   She explained to you how Mr. Lesort did touch her. He might

9   have been more discreet than Mr. Blech's touching of Ms. Ba,

10  but Mr. Lesort did touch Ms. Veerman. He put his hands on her.

11  And Ms. Veerman did go to his apartment once for dinner, under

12  the premise that there was going to be a party of people

13  watching the Oscars or some other show, and she went there

14  because he had not taken no for an answer and she wanted him to

15  see, if you see me in another place, another context, you

16  understand, I'm not interested in you. She tried to bring her

17  friend, who canceled at the last minute. He's her boss. He

18  owns the restaurant. And she hasn't been able to get him to

19  accept no for an answer. So she did go to the apartment and

20  had a meal. And he did touch her breast. He made a move on

21  her. And she made it clear to him, what are you doing, don't

22  put your hands on me, don't you get it by now, I'm not

23  interested in you. You know I have a boyfriend. I brought him

24  to Opia. Don't you get it? I'm not interested.

25              And Mr. Lesort, who told you that Opia is his social

1   life, he didn't give up. He just, he kept going. And he asked

2   Ms. Veerman out, in April of '07, to a restaurant opening. And

3   Ms. Veerman, as she explained, became more forceful this time

4   in rejecting him. She hadn't been able to get him to stop by

5   simply saying, I'm busy, I have school, I have this, I have

6   that. She hadn't gotten him to stop by saying, I don't want to

7   date my boss. She tried all these tactics. And in April of

8   '07, she was very, very forceful with him. They pushed the

9   envelope. She said, "You've been asking me for a year and a

10  half. Don't you know I don't want to go out with you? I have

11  a boyfriend." She was very forceful.

12        And Mr. Lesort had had enough of her. He didn't want

13  to deal with her. And that's the message that Kirill Kisselev

14  gave Ms. Veerman when she was required on May 14. "Mr. Lesort

15  doesn't want to have to deal with you anymore." That's exactly

16  the message that was passed on. And the meaning was, whether

17  Mr. Kisselev knew it or not, the meaning to Ms. Veerman was,

18  you don't want to have to deal with me because I'm coming to

19  work at your restaurant and I don't want to go out with you,

20  and you want to date the women who work at this restaurant, so

21  you'll find somebody else. You dated other women, you put your

22  hands on them in front of me. It's what you do.

23        A little bit about Ms. Ba. I had Ms. Ba on the

24  witness stand probably an hour, hour and a half. And then

25  Ms. Ba was questioned on cross, and then today she acknowledged

1    the damages, the mistake on the damages chart. Ms. Ba went to

2    Opia for her own reasons. She was going to college,

3    St. John's. And this is how she supported herself through

4    college. She didn't go to Opia looking for trouble. She's not

5    bringing this lawsuit out of greed. Mr. Blech was infatuated

6    with his Ba. He was infatuated with her, and kept touching

7·   her. He would come up from behind and put his hands on her.

8    He touched her at his wife's birthday party and told her that

9    he liked her buttocks better than his wife's, and he said in

10   French *"un deux, un deux,"* to watch her buttocks go up and

11   down.

12            Mr. Blech was infatuated with Ms. Ba. And Mr. Blech's

13   conduct was not as discreet as, perhaps, Mr. Lesort's conduct

14   was. So in this lawsuit when confronted with the questions,

15   Mr. Blech came up with a story, which is, not only did I give

16   her a ride home once, but we had oral sex. And I asked

17   Mr. Blech, "Did you have any foreplay, you know, tell her

18   You're beautiful, I want to go out with you?" He made it sound

19   like, no, there was no foreplay, there was no sexy talk,

20   there's just this car ride which all of a sudden turns into

21   oral sex. I asked him, "Did you want to go out with her

22   afterwards? You had this great experience." "Well, no, I

23   decided not. I decided, no, that's not for me. I feel bad

24   about it." But he didn't feel bad about it really until my

25   firm's demand letter came in and he couldn't hide it anymore,

1  and then he had to start making up stories to his wife.

2  Otherwise he would have kept this alleged affair a secret.

3  There was no affair. What happened was, Mr. Blech was

4  infatuated with Ms. Ba, waited outside the restaurant for her,

5  and early on in the employment said, I'm driving up to my home

6  in Westchester, I'll give you a ride. She took a ride first

7  time, no problem. He kept his hands on the steering wheel,

8  which I think Ms. Ba probably expected he would do. The second

9  time he offered her a ride, she took the ride. Maybe it was a

10  judgment error. But he put his hands on her. She didn't

11  reciprocate, at all. There's no evidence that she

12  reciprocated. There's no, like, receipts to show, I took her

13  out to dinner, we were here, we were there. There's no

14  photographs. There's a story that Mr. Blech made up so that he

15  could turn the tables in this lawsuit and make it sound like,

16  I'm going to blame the victim and say, somehow I had a thing

17  with you. And I don't think, in listening to the testimony of

18  Mr. Blech -- Mr. Blech, I asked him a lot of questions about

19  his story, his version of events. And you saw. I had to show

20  him his transcript a lot because a lot of his answers had

21  changed.

22  Ms. Ba did nothing wrong. She didn't quit Opia. She

23  was confronted with an unpaid customer bill in accordance with

24  Opia's written policies and practices. She was told, you have

25  to pay it or you have no job. She didn't pay it. She had no

1    job.

2         She was also let go not just because of that, which is

3    the Labor Law 215 claims, but she lost her job because

4    Mr. Blech similarly ran out of patience with her. She didn't

5    want to be with him, so this was a way to get rid of her, a way

6    to ged rid of Ms. Ba, bring up an issue, create an incident,

7    when there was no incident. Why would a waitress quit if the

8    boss didn't ask her to pay the bill but simply said a customer

9    is disputing that? Why would a waitress take that to mean

10   something that makes them quit and have no job and be

11   unemployed? Common sense tells me there's no reason Ms. Ba

12   would quit if she was simply told a customer is disputing a

13   bill that's two months old. Ms. Ba didn't quit. She just

14   didn't pay a bill and she was told you have no job.

15        And in the case of Ms. Veerman, Ms. Veerman didn't

16   quit. There was no suspension. It's contradicted by all the

17   documents and records. Ms. Veerman was fired because

18   Mr. Lesort did not want to deal with her anymore. That's

19   exactly what was said to Ms. Veerman.

20        So Ms. Ba, she lost her job because she turned down

21   Mr. Blech and she didn't pay an unpaid customer bill.

22        Ms. Veerman lost her job because she had turned down

23   Mr. Lesort, only one month earlier in a very forceful way. In

24   addition, as you've heard Ms. Veerman and Ms. Ba testify, they

25   take the position that they didn't get their fair share of

1    equal shifts and that when they spoke to a manager, Thadee,

2    they were told they were considered "too dark" for the good

3    shifts. And they were viewed as "too dark." And if there were

4    enough white cocktail waitresses like Jelena Baranov and

5    others, then the good shifts would go to them. But when the

6    restaurant was understaffed and when the World Cup was going

7    on, then there's more of a need and then my clients got some

8    better shifts, which was not in dispute. But my clients claim

9    that they were discriminated against based on their race and

10   their national origin. They weren't treated the same. They

11   were treated as second-class citizens. And that Mr. Lesort had

12   nicknamed Ms. Ba "the African."

13          Finally, on the issue of the tips, it's undisputed

14   that Opia takes 5 percent from the waitresses and gives it to

15   managers. Opia's defense is, they're not managers, they're

16   *maître d*'s, which is OK. But every piece of paper that we've

17   gone through does not identify any of these managers as *maître*

18   *d*'s. It doesn't identify them that way. And if they were

19   *maître d*'s, I would think it would be in the handbook or in the

20   payroll report. And the tips aren't even mentioned in the

21   payroll report.

22          So if a *maître d*'s is getting tips, it ought to be in

23   the payroll report. If the managers are stealing tips that

24   they're not allowed to have, then I would not expect it to be

25   in the report, and it's not there, because it wouldn't be on

1    the W-2.  It wouldn't be reported.  It's illegal tip money

2    being funneled off to managers, who are not entitled to it.  So

3    there's no way you're going to report it to your accountant and

4    put it in a W-2.  They're not allowed to have the money.  So

5    it's not on there because they can't have it.  That's why it's

6    not on there. that's common sense as defined by Ms. Fridegotto,

7    when she said this case is about common sense.

8                Now, about the issue of damages.  The Judge will, you

9    will be getting some verdict forms so that you can work your

10   way through the claims and the requests for damages.  The

11   damages charts were shown to you before, and they will be in

12   some documents that you will be able to look at.  But my

13   clients, they lost their job, they were fired.  They didn't

14   have jobs waiting for them.  And they made less money in the

15   jobs that they did find afterward.  And they looked for work.

16   So they have lost earnings damages.  It's in a spreadsheet.

17   There was a mistake in the math.  It's fixed.  So the math is

18   there for you to see.  It's not about greed.  But there is some

19   money that was lost, in lost earnings.  My clients did suffer

20   emotional distress damages.  A woman who goes through that kind

21   of sexual harassment and race discrimination and touching and

22   gets treated in such a degrading manner, of course there's

23   going to be emotional distress.  There's no medical bills.

24   They didn't go to doctors.  It's conceded.  That doesn't mean

25   they didn't suffer emotional distress.  And if a person thinks

1   about what happened to them and the type of comment and the
2   repeated comments and the sexual overtures, it's reasonable
3   that they would have emotional distress. And there should be
4   some compensation for it. And that's left to the jury.

5        And on the issue of punitive damages, which is in this
6   case, punitive damages are there to send a message to the
7   owners of this business, you can't do this. You can't take
8   young women, who are depending upon this place for money to pay
9   their rent, and take advantage of them. It has to stop. And
10  you have to send -- and that's how you send a message, with an
11  award of punitive damages. The amount, if you award it, is
12  left to your discretion. Of course a plaintiff's lawyer wants
13  a larger award than a smaller award. It's obvious. But it's
14  left to your discretion to figure out what amount sends the
15  right message, what amount tells these gentlemen, you shouldn't
16  have done it, don't do it again. And this is to send that
17  deterrent effect. That's why it's in there.

18       Likewise, the request for tip money is in there to
19  say, you're not supposed to take 5 percent of their tips and
20  give it to managers. And then you don't put it on the payroll
21  report because they're not allowed to have the money, they're
22  just taking it. If they were allowed, it would be on the
23  report, it would say *maître d's*, and the claim probably
24  wouldn't be in this case, because then there would be business
25  records that show, maybe they really are *maître d's*. But

1    they're not.  They're not *maître d's*.

2         So really in summary I just wanted to say, again, I

3    truly appreciate the time that you have taken for this case.

4    You've listened to a lot of witnesses.  You've seen some

5    documents.  The documents will be made available for you to

6    review.  I think from a common-sense perspective, it's

7    reasonable that Ms. Ba says to you, he touched me, and if

8    you're asking me to quantify, I say 700.  If she exaggerated

9    because it felt like 700, I don't think she should be penalized

10   for that.  She says she was touched on many occasions.  She has

11   told you where on her body she was touched.  She's explained

12   the Christmas, New Year's party, in the restaurant, in the car,

13   with Mr. Blech.  Ms. Veerman explained to you the requests for

14   dates and the touching.  And the fact that both of these

15   gentlemen admit, admit interest in my clients, admit asking

16   them out, admit but water it down to say, well, I stopped.

17   Mr. Lesort says, I stopped after the dinner in my apartment.

18   Well, you stopped because she pulled your hand off her breast.

19   So maybe you stopped asking her out?  I don't think he stopped

20   asking her out.  But he makes it sound like the dinner didn't

21   go so well.  I don't believe that.  Mr. Blech says, well, in

22   fact we had a little thing, a little affair.  I don't believe

23   that.  There was no affair.  She never reciprocated.  She had a

24   boyfriend.  She's allowed to have a boyfriend.  But she doesn't

25   have to have a boyfriend called Mr. Blech.  Mr. Veerman doesn't

1   have to make Mr. Lesort her boyfriend.  Mr. Lesort may treat

2   Opia like his social life.  That's where he finds his women.

3   But Ms. Veerman doesn't have to be one of them.  And Mr. Blech

4   may decide to follow around, but Ms. Blech -- I'm sorry --

5   Ms. Ba doesn't have to go along with it.

6          And I thank you for your time.  Look forward to the

7   end of this case, I'm sure, for everybody.  I hope you enjoy

8   your lunch break, and, again, thank you.

9          THE COURT:  All right.  Thank you, Mr. Goldberg.

10          Ladies and gentlemen, I mentioned I had two brief

11   final instructions.  I will give those now.  When you begin

12   your deliberations, you should elect one member of the jury to

13   serve as your presiding juror, or foreperson.  That person will

14   preside over the deliberations and speak for you here in court.

15   You are then to discuss the case among yourselves to reach an

16   agreement if you can do so.  You must be unanimous in your

17   verdict.  All eight of you must agree to it.  Each of you has

18   to evaluate the case for yourself, but you should do so only

19   after you have considered all of the evidence and you have

20   discussed it fully with other jurors and, importantly, you have

21   listen to the viewpoints of your fellow jurors.  Don't hesitate

22   to change your opinion if the discussion persuades you that you

23   should.  On the other hand, don't come to a decision simply

24   because other jurors think it's right.

25          It's important, it's very, very important that you

1    attempt to reach a unanimous verdict in this case.  But of

2    course only if you can do so after having made your own

3    conscientious decision.  Don't change an honestly held belief

4    about the weight or effect of the evidence simply to reach a

5    verdict.

6            If it becomes necessary during your deliberations to

7    communicate with me, then send a note out through the bailiff.

8    No member of the jury should attempt to communicate with me

9    except by a signed writing and I will answer the note, send it

10   back in, or else I will call you back out and answer it.  I'm

11   not soliciting notes, but I told you repeatedly that everything

12   you need to decide the case you'll get here.

13           Now, one caveat.  The evidence is all in.  You can't

14   say we want to hear from some more witnesses or we want to see

15   some things that are not in evidence.  You're stuck with what

16   the parties have presented at this point.  But, on the other

17   hand, if you have a legal question about one of the

18   instructions or some question about the verdict form or there's

19   something that you think that we can assist you with, then by

20   all means don't hesitate to send out a note.

21           One thing.  If you do send out a note, don't tell us

22   in the note how you stand numerically if you've taken some

23   ballots.  We're never to know that.  I think the thinking is,

24   if we know it's 7 to 1 or, you know, 4 to 4, that it might

25   affect how we answer the question.  So don't tell us until you

1  have reached a final verdict where you stand numerically.

2      There are four verdicts for you. They are fairly

3  self-explanatory. I want to give you just a moment with these.

4  The first verdict form deals with sexual harassment, has that

5  caption at the top, says, "On the claim that the plaintiffs

6  were subject to unlawful sexual harassment or were retaliated

7  against for opposing or objecting to sexual harassment, we find

8  in favor of," and then there's a caption as pertains to the

9  plaintiff Veerman. And you can check a box, either you find in

10  favor of her or you find in favor of the defendants, the

11  individual defendants and the restaurant, and then the company

12  that owns it. Only if you find in favor of the plaintiff do

13  you go on and complete the portions of the verdict having to do

14  with damages.

15      If you flip the form over -- this is the same verdict

16  form -- it has to do with sexual harassment -- then the caption

17  has to do with Ms. Ba. And again it has you check a box as to

18  who you find in favor of, whether Ms. Ba or the individual

19  defendants or the restaurant and the corporate defendant.

20  Again, only if you find in favor of the plaintiff, Ms. Ba, do

21  you go on and answer the questions about damages. And then

22  your foreperson signs it.

23      The format for the other verdicts is exactly the same.

24  There's one that deals with the claim of racial discrimination,

25  same thing. It's got the same captions. You follow the

1    verdict instructions there, depending on how you find. If you

2    find in favor of the plaintiffs, then you go on for damages.

3    If you don't, you stop and your foreperson signs the form.

4         The third verdict form has to do with the alleged

5    misappropriation of gratuities. And again it's just simple

6    questions: Do you find that gratuities or tips were

7    misappropriated or not. If you do find that tips were

8    misappropriated, then there's a place to determine damages.

9         And then finally, fourth verdict, the single-page

10   verdict, has to do only with Ms. Ba. And remember, this is the

11   claim that she was discharged for opposing or disputing having

12   to pay the customer bill when allegedly a customer didn't sign

13   and left. Again, there's a place to sign. Whether you agree

14   with Ms. Ba or agree with defendants, you check the box. In

15   the event you find for Ms. Ba on this claim, then you calculate

16   damages.

17        So there should be at the end, once you've reached a

18   decision, there should be four signatures on here from the

19   foreperson. And then the form should be dated and the

20   appropriate boxes filled out. As I said, they are fairly

21   self-explanatory. You can kind of look at them and find the

22   dots.

23        We're going to send you these instructions. We're

24   going to send you the verdict forms. We're going to send back

25   with you all paper exhibits and photos that have been admitted

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    in evidence.

2           You're probably hungry for lunch.  Let me thank you

3    again, and you get started now with your lunch and your

4    deliberations.  You may retire at this time to begin.  Have

5    your lunch and begin deliberating.

6           I'm sorry.  Swear the bailiff, please.

7           (Bailiff sworn)

8           THE COURT:  OK.  You may retire and begin your lunch

9    and deliberations.

10          (The jury retired to deliberate; time noted, 2:15

11   p.m.)

12          THE COURT:  Have you examined each other's exhibits?

13          MS. FRIDEGOTTO:  No, we have not.

14          THE COURT:  OK.  Time do that.  I want to send these

15   things in right away.

16          MS. FRIDEGOTTO:  OK.

17          THE COURT:  They're undisputed at this point?  Or are

18   we going to argue things that were admitted?

19          MR. GOLDBERG:  I have a list of all the ones that were

20   stipulated in.  If you want to double-check the list against

21   the --

22          THE COURT:  I have that list myself.

23          MR. GOLDBERG:  Should I read the numbers I have?

24          THE COURT:  Well, let me read them to you.  1 through

25   5.

1          MR. GOLDBERG:  Yes.

2          THE COURT:  Ms. Fridegotto, you may want to take this

3     note.  1 through 5, 7, 9, 10, 11, 12.

4          MR. GOLDBERG:  That's right.

5          THE COURT:  14, 15, 16, 17, 18.

6          MR. GOLDBERG:  That's right.

7          THE COURT:  20, 21.  22, 23, 24.

8          MR. GOLDBERG:  That's right.

9          THE COURT:  27, 29, 30, 31, 34, 43-A, 43-B.  Those are

10    the ones that were stipulated to.

11          Now, in --

12          MR. GOLDBERG:  I move one more document.

13          THE COURT:  Plaintiff's 3.

14          MR. GOLDBERG:  33.

15          THE COURT:  OK.  I show Plaintiff's 3 was admitted.  I

16    don't know if that was one of the other ones.

17          MR. GOLDBERG:  That's 33.

18          THE COURT:  Defendant's A was admitted.

19          Ms. Fridegotto?

20          MS. FRIDEGOTTO:  Excuse me?

21          THE COURT:  Defendant's A.

22          MS. FRIDEGOTTO:  A.

23          THE COURT:  And you've culled out the ones that were

24    tagged?

25          MS. FRIDEGOTTO:  Yes, I have, your Honor.

06EAYEE5ps

1    THE COURT:  Defendant's B was admitted, again, culling
2    out the ones that were tagged.

3    Plaintiff's 33 I show was admitted.

4    MR. GOLDBERG:  Yes, that's right, your Honor.

5    THE COURT:  Defendant's D and defendant's E-1 through
6    4 -- E-1, E-2, E-3, E-4, four photos.

7    MS. FRIDEGOTTO:  Yes.

8    MR. GOLDBERG:  That's correct.

9    THE COURT:  And then Defendant's D I have received as
10    a photo taken at Opia.

11    Those are the ones that I show admitted.  Is that what
12    you have too?

13    MR. GOLDBERG:  Yes, your Honor.

14    MS. FRIDEGOTTO:  That is correct.  Can I just glance
15    through this packet?

16    THE COURT:  Sure.  Now, I think Ms. Fridegotto, I
17    think you said C.  I didn't show C as one of the defendants's
18    exhibits that was admitted.

19    MS. FRIDEGOTTO:  It's the article that you had me
20    redact, your Honor.

21    THE COURT:  OK.  That was the -- yes, I apologize.  I
22    should have had that there.

23    OK.  I think that's it.  So, Mark, as soon as
24    Ms. Fridegotto has looked at those, if you will -- she has hers
25    organized, take plaintiff's and her exhibits, put them with

06EAYEE5ps

1  that and take it in to the jury.

2          THE CLERK:  Yes.

3          THE COURT:  Is there anything else before we recess?

4  Anything else on behalf of the plaintiff?

5          MR. GOLDBERG:  No.  I was just waiting for

6  Ms. Fridegotto to finish.

7          THE COURT:  OK.  Ms. Fridegotto, anything else on

8  behalf of the defendant?

9          MS. FRIDEGOTTO:  No.  Thank you.

10         THE COURT:  OK.  Do all parties agree that the jury

11  instructions were read as agreed upon and correctly?

12         MR. GOLDBERG:  Yes, your Honor.

13         THE COURT:  Ms. Fridegotto?

14         MS. FRIDEGOTTO:  Yes, your Honor.

15         THE COURT:  OK.  We're in recess.

16         MS. FRIDEGOTTO:  I give these to?

17         THE COURT:  To the clerk, to my law clerk.  He will

18  take them back with the verdict form and the instruction.

19         Folks, as you can see -- I say this to the counsel, if

20  you can stay within about ten minutes and make sure that the

21  clerk has your cellphone numbers?

22         MS. FRIDEGOTTO:  Yes.

23         MR. GOLDBERG:  We're going to stay, going to go

24  downstairs to the eighth floor.

25         THE COURT:  That's fine.  Make sure that Mr. Lopez has

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  your cellphone numbers so that we can reach you if there's a

2  question or a verdict.

3  MR. GOLDBERG:  We have no phone, but we'll check back

4  in half an hour.

5  MR. MARGOLIS:  The cellphones are confiscated.

6  MS. FRIDEGOTTO:  Not if you get the ID.  I told you to

7  get the ID.

8  MR. GOLDBERG:  Ours are at the security desk, but

9  we'll check back in half an hour if that's OK.

10  MS. FRIDEGOTTO:  I'll call you.

11  THE COURT:  OK.  Otherwise you'll be on the eighth

12  floor?

13  MR. GOLDBERG:  In the cafeteria.

14  THE COURT:  OK.  So ten minutes away.

15  MR. GOLDBERG:  Thank you, your Honor.

16  (Jury present; discussion held off the record)

17  THE COURT:  We're back on the record.  The jury is

18  present.  Counsel and the plaintiffs are present.  You have

19  sent me a note, ladies and gentlemen.  "Please check that all

20  the exhibits we have are in evidence.  Thanks."

21  The answer is yes.  The counsel went over all the

22  exhibits, made sure before they went back there that everything

23  you have was admitted into evidence.

24  What may be the source of confusion is this:  I don't

25  know if you remember, but on Friday, as Mr. Goldberg began his

1   case, he stood up and said, Judge, pursuant to a stipulation of

2   the parties, these exhibits are going to be admitted into

3   evidence. We have agreed that they are reliable. You don't

4   have to bring in -- a lot of times if it's a business record or

5   something, you have to bring in somebody that made the record

6   that tells you about how it was made. In this case, both

7   counsel had gone over all of the exhibits that Mr. Goldberg

8   read into the record. They agreed that those exhibits could be

9   authenticated. And so to respect your time and speed the trial

10  up, they said, we won't go through calling witnesses just to

11  say that, yes, this is a record and I recognize it as such.

12  We'll agree or stipulate that these may be admissible.

13          The source of confusion may be, some of the exhibits

14  that were admitted pursuant to that stipulation -- there was a

15  long list of them, maybe 20, 25 -- may not have been expressly

16  referenced during the trial. So you may think, well, no one

17  ever said anything about this, what are we doing with this?

18  They were admitted pursuant to agreement of the parties because

19  the parties think they have some relevance to the issues you

20  are to decide. That ultimately is up to you, to decide whether

21  they have any relevance or not. But I am speculating here a

22  little bit. I think that's the source of the confusion. Maybe

23  you've seen some documents and said, nobody ever said anything

24  about this in the course of trial. What are we doing with

25  this? Am I right about that, is that?

06EAYEE5ps

1          JUROR NO. 8:   Your Honor, Bob actually had --

2          JUROR NO. 2:   I think that's correct, your Honor, yes.

3          THE COURT:   OK.   Does that answer the question, then?

4          JUROR NO. 2:   I think it does.

5          THE COURT:   Because I gave, before I sent the exhibits

6    in, both sides had a chance to go over each other's exhibits,

7    make sure that they were admitted into evidence.   They

8    confirmed for me that everything that went back there had been

9    admitted into evidence.   So you may consider everything that's

10   back there.   It's all been received in evidence.   It's all part

11   of the evidence in this case.   Whether or not it got any

12   express play during the course of the presentation and the

13   testimony, you're free to consider it.

14          JUROR NO. 3:   OK.

15          THE COURT:   OK?

16          JUROR NO. 2:   Thank you.

17          THE COURT:   That resolves it?

18          JUROR NO. 2:   I think it does.

19          THE COURT:   OK.   You may continue your deliberations.

20          JUROR NO. 1:   Thank you.

21          (Jury deliberations resumed)

22          THE COURT:   All right.   The jury has left.   Counsel,

23   plaintiffs are here.   I think that completes it.   The fellow

24   speaking, Mr. Docherty, is that his name?

25          MR. GOLDBERG:   I believe so.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300